## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF DELAWARE

SPRINT COMMUNICATIONS COMPANY, L.P.,

*Plaintiff*,

v.

CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS HOLDINGS, LLC, SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, CHARTER COMMUNICATIONS OPERATING, LLC, BRIGHT HOUSE NETWORKS, LLC,

*Defendants*.

C.A. No.: 17-1734-RGA

**JURY TRIAL DEMANDED**

## BRIEF IN SUPPORT OF SPRINT'S MOTION TO STRIKE CHARTER'S INEQUITABLE CONDUCT DEFENSE AND DISMISS ITS *WALKER PROCESS* CLAIMS, OR, IN THE ALTERNATIVE, SEVER AND STAY THE *WALKER PROCESS* CLAIMS

*Of Counsel:*

SHOOK, HARDY & BACON L.L.P.
B. Trent Webb
Ryan D. Dykal
Aaron E. Hankel
Ryan J. Schletzbaum
2555 Grand Boulevard
Kansas City, MO 64108
T: 816-474-6550
bwebb@shb.com
ahankel@shb.com
rdykal@shb.com
rschletzbaum@shb.com

Robert H. Reckers
JP Morgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002-2926
T: 713-227-8008
rreckers@shb.com

POLSINELLI PC

*/s/ Shanti M. Katona*
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
T: 302-252-0924
skatona@polsinelli.com

***Attorneys for Plaintiff Sprint***

Dated: July 24, 2018

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iv

I.    INTRODUCTION ................................................................................................... 1

II.    NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

III.    SUMMARY OF ARGUMENT ............................................................................ 1

IV.    LEGAL STANDARDS ........................................................................................ 3

    A.    Motions to Dismiss and Strike ................................................................. 3

    B.    Antitrust Standing .................................................................................... 3

    C.    The District Court Has Authority to Sever and Stay Claims ................... 4

    D.    Inequitable Conduct Requirements .......................................................... 4

    E.    *Walker Process* Requirements ................................................................. 4

V.    STATEMENT OF RELEVANT FACTS ............................................................ 5

    A.    The Asserted Claims Do Not Include ATM Switches ............................. 5

    B.    Charter's "ATM Switch" Argument Was Previously Litigated and Lost .............. 7

    C.    The Majority of the Patents-In-Suit Have Expired ................................. 9

VI.    ARGUMENT ........................................................................................................ 9

    A.    Charter's Inequitable Conduct Claims Fail ............................................. 9

        1.    Group 1 Patents: The ATM Switch Disclosure Was Not Material ........................ 9

        2.    Group 2 Patents: The ATM Switch Disclosure Was Not Material ....................... 11

        3.    Group 2: Sprint's Commercialization of JCS2000 Was Not Material ................. 12

        4.    '131 Patent: Any Alleged Modifications Were Not Material ............................... 13

2

B.      Charter Has Failed to Show Egregious Conduct ....................................................15

C.      Charter's *Walker Process* Claims Should Be Dismissed......................................15

    1.  The Statute of Limitations on Charter's *Walker Process* Claims Has Passed
        ...................................................................................................................................16

    2.  Charter Has No Antitrust Standing as the Relevant Patents Have Expired..........16

D.      In the Alternative, the *Walker Process* Claims Should Be Severed and
        Stayed....................................................................................................................18

    1.  Litigating the Inequitable Conduct Claim First Would Moot any *Walker
        Process* Claims......................................................................................................19

    2.  Including *Walker Process* Claims at Trial Would Distract the Jury and
        Prejudice Sprint.....................................................................................................19

VII.    CONCLUSION........................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
    485 F. Supp. 2d 538 (D. Del. 2007) ....................................................................... 13

*Amado v. Microsoft Corp.*,
    517 F.3d 1353 (Fed. Cir. 2008) ............................................................................... 4

*ART+COM Innovationpool GmbH v. Google Inc.*,
    155 F. Supp. 3d 489 (D. Del. 2016) .......................................................................... 4

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .............................................................................................. 18

*ATD Corp. v. Lydall, Inc.*,
    159 F.3d 534 (Fed. Cir. 1998) ............................................................................... 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ 3

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ..................................................................................... 4

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*,
    No. 03-cv-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004) ................................. 18

*Brulotte v. Thys Co.*,
    379 U.S. 29 (1964) ................................................................................................. 17

*Brunswick Corp. v. Riegel Textile Corp.*,
    752 F.2d 261 (7th Cir. 1984) ................................................................................... 5

*CFMT, Inc. v. Yieldup Int'l Corp.*,
    349 F.3d 1333 (Fed. Cir. 2003) ............................................................................. 12

*City of Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) ........................................................................ 3, 17, 18

*Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech. (USA), Inc.*,
    542 F.3d 1363 (Fed. Cir. 2008) ....................................................................... 13, 15

*Courtesy Products L.L.C. v. Hamilton Beach Brands, Inc.*,
    No. 13-cv-2012, 2015 WL 6159113 (D. Del. Oct. 20, 2015) ................................. 14

*Eurand Inc. v. Mylan Pharm. Inc.*, No.08-cv-889,
    2009 WL 3172197 (D. Del. Oct. 1, 2009) .......................................................... 4, 20

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) ................................................................... 4, 10, 12

*F2VS Techs., LLC v. Aruba Networks, Inc.*,
    No. 17-cv-0754-RGA, 2018 WL 173215 (D. Del. Apr. 10, 2018) ........................... 3

*Farag v. Health Care Serv. Corp.*,
    No. 17-cv-2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017) ................................... 5

*FMC Corp. v. Manitowoc Co., Inc.*,
  835 F.2d 1411 (Fed. Cir. 1987)............................................................ 5, 16, 19

*Fresenius Kabi USA v. Fera Pharm., LLC*,
  No. 15-cv-03654, ECF No. 422 (D.N.J. May 19, 2017)................................... 19, 20

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)....................................................................... 14

*In re Innotron Diagnostics*,
  800 F.2d 1077 (Fed. Cir. 1986).............................................................. 19, 20

*Intellectual Ventures I, LLC v. Toshiba Corp.*,
  No. 13-cv-453, ECF No. 271 (D. Del. Dec. 9, 2015) ............................................ 19

*Johnson v. City of Shelby*,
  135 S. Ct. 346 (2014) ................................................................................... 3

*Joint Stock Soc'y v. UDV N.A., Inc.*,
  266 F.3d 164 (3d Cir. 2001)......................................................................... 18

*Kimble v. Marvel Ent., LLC*,
  135 S. Ct. 2401 (2015)............................................................................... 17

*Lans v. Digital Equip. Corp.*,
  252 F.3d 1320 (Fed. Cir. 2001)..................................................................... 17

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
  No. 15-cv-723-RGA, 2016 WL 1464545 (D. Del. Apr. 13, 2016)........................... 5

*Molins PLC v. Textron, Inc.*,
  48 F.3d 1172 (Fed. Cir. 1995)....................................................................... 13

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998)..................................................................... 5

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  No. 04-cv-1689, 2006 WL 2865469 (D.N.J. Oct. 5, 2006) .................................... 12

*Orthophoenix, LLC v. Dfine, Inc.*,
  No. 13-cv-1003, 2015 WL 1938702 (D. Del. Apr. 28, 2015) ........................... 19, 20

*Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*,
  118 F. Supp. 3d 646 (D.N.J. 2015) .................................................................. 20

*Pregis Corp. v. Doll*,
  No. 09-cv-467, 2010 WL 1039856 (E.D. Va. 2010) .......................................... 13

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)..................................................................................... 16

*Quest Integrity USA LLC v. Clean Harbors Indus. Servs. Inc.*,
  No. 14-cv-01482, ECF. No. 169 (D. Del. Nov. 1, 2016)..................................... 19

*S3 Graphics Co., Ltd. v. ATI Techs. ULC*,
  No. 11-cv-1298, 2014 WL 573358 (D. Del. Feb. 11, 2014)..................................... 5

*SanDisk Corp. v. STMicroelectronics Inc.*,
No. 04-cv-4379 JF (RS), 2009 WL 1404689 (N.D. Cal. May 19, 2009) ................................ 19

*SenoRx, Inc. v. Hologic, Inc.*,
920 F. Supp. 2d 565 (D. Del. 2013) .................................................................................... 4

*Shionogi Pharma, Inc. v. Mylan, Inc.*, No. CIV.A. 10-1077, 2011 WL 3860680 (D. Del. Aug. 31,
2011) ................................................................................................................................. 3

*Smith & Nephew, Inc. v. Interlace Med., Inc.*,
955 F. Supp. 2d 69 (D. Mass. 2013) ................................................................................. 15

Sprint *Commc'ns* Co. L.P. v. Big River Tel. Co., LLC,
2009 WL 1992537 (D. Kan. July 8, 2009) .......................................................................... 7

*Sprint Commc'ns Co. L.P. v. Cox Commc'ns Inc.*,
302 F. Supp. 3d 597, 607-620 (D. Del. 2017) .................................................................... 8

*Sprint Commc'ns Co. L.P. v. Time Warner Cable Inc., et al.*,
255 F. Supp. 3d 1134, 1144 (D. Kan. 2017) ................................................................. 8, 11

*Sprint Commc'ns Co. L.P. v. Time Warner Cable Inc., et al.*,
No. 2017-2247 (Fed. Cir. Nov. 13, 2017) ........................................................................... 9

*Sprint Commc'ns* Co. L.P. v. Vonage Holdings Corp.,
500 F.Supp.2d 1290 (D. Kan. 2007) ................................................................................... 7

*Sprint Commc'ns* Co. L.P. v. Vonage Holdings Corp.,
518 F.Supp.2d 1306 (D. Kan. 2007) ................................................................................... 7

*Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns LLL, et al.*,
No. 11-2684, 2014 WL 5089402 (D. Kan. Oct. 9, 2014) ..................................................... 7

*Teva Neuroscience, Inc. v. Watson Labs., Inc.*,
No. 10-cv-5078, 2011 WL 741250 (D.N.J. Feb. 24, 2011) .................................................. 3

*Therasense, Inc. v. Becton, Dickinson and Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ............................................................................. 4, 10, 15

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
382 U.S. 172 (1965) ......................................................................................................... 16

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
274 F. Supp. 2d 937 (N.D. Ill. 2003). ................................................................................. 5

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
868 F. Supp. 2d 376 (D. Del. 2012) ................................................................................. 10

**Statutes**

15 U.S.C. § 15(b) ................................................................................................................. 5

15 U.S.C. § 2 ....................................................................................................................... 4

35 U.S.C. § 112 ................................................................................................................. 12

**Rules**

Fed. R. Civ. P. 42(b) ........................................................................................................ 4

MPEP § 608.01(d) .......................................................................................................... 15

## I.  INTRODUCTION

Plaintiff Sprint Communications Co. L.P. ("Sprint") respectfully moves to strike Defendants'[1] inequitable conduct affirmative defense and to dismiss *Walker Process* counterclaims for failing to state a claim pursuant to Federal Rules of Civil Procedure 12(f) and 12(b)(6), respectively.  In the alternative, Sprint moves to sever and stay Defendants' *Walker Process* counterclaims until after appeals regarding patent issues have been resolved.

## II.  NATURE AND STAGE OF THE PROCEEDINGS

Sprint filed its original Complaint against Charter on December 1, 2017. D.I. 1.  Sprint amended its complaint on December 15, 2017, asserting a total of fifteen patents against Charter. D.I. 14.  On June 19, 2018, Charter answered Sprint's complaint and alleged an inequitable conduct defense and *Walker Process* counterclaims against nine of the patents-in-suit. D.I. 33.[2]

## III.  SUMMARY OF ARGUMENT

Sprint's patent portfolio for voice-over-packet technologies claim important methods for bridging traditional telephone systems with modern, packet-based technologies.  The portfolio has been litigated for over a decade in multiple venues.  Time and again infringers, including Charter's affiliated company Time Warner Cable, have challenged the validity of Sprint's patents to no avail. Each time, the infringer has paid for a license to Sprint's patents or faced a sizeable jury verdict. Notwithstanding this history, Charter now advances a novel set of *Walker Process* counterclaims and related inequitable conduct defenses.  These claims and defenses, however, fail to pass basic pleading requirements, as a matter of law.  Further, Charter lacks standing to assert *Walker Process*

---

[1] "Defendants" or "Charter" collectively refers to each of the named defendants in this action.

[2] The patents subject to Charter's inequitable conduct defense and *Walker Process* counterclaims are U.S. Patent Nos. 6,463,052, 6,452,932, 6,633,561, 7,286,561, and 7,505,454 (collectively, the "Group 1 Patents"); U.S. Patent Nos. 6,473,429, 6,343,084, and 6,298,064 (collectively, the "Group 2 Patents"); and U.S. Patent No. 7,693,131.  Charter does not assert similar defenses or claims with respect to the remaining six asserted patents.

claims because 8 of the 9 challenged patents expired more than four years ago.

For the Group 1 Patents, Charter's inequitable conduct theory is that Sprint misrepresented or omitted the supposed existence of "ATM switches" at the time of invention.  Charter, however, cannot demonstrate that Sprint's statements (or omissions) regarding an "ATM switch" were material to patentablity because *no asserted claim requires an ATM switch*.  Indeed, a Kansas Court has already rejected Charter's "ATM switch" theory in the invalidity context as a matter of law, and it should likewise be rejected here.

Charter's theories for the Group 2 Patents are similarly deficient.  For those patents, Charter posits that Sprint's decision to abandon a commercialization effort gives rise to inequitable conduct. But there is no requirement to notify the PTO of commercialization activities arising years after the patents were filed.  Likewise, Charter fails to plead any plausible facts as to why asserted claims from the '131 patent would not have issued "but for" Sprint's revisions to the Summary of Invention to align claims with prior disclosures.  These modifications fully comported with the Patent Office's then-encouraged (and now-mandatory) procedures.

Beyond Charter's inability to plead "but for" materiality in its inequitable conduct allegations, Charter also lacks antitrust standing to assert *Walker Process* claims because the four-year statute of limitations has expired.  The Group 1 and Group 2 Patents expired over four years before Charter lodged these counterclaims.  Indeed, Sprint's claims for *past damages* relating to these expired patents cannot pose a barrier to entry for any company seeking to offer VoIP services, and, thus, Charter's *Walker Process* counterclaims should be dismissed.  Alternatively, the *Walker Process* counterclaims should be severed and stayed in the interest of judicial economy and consistent with this Court's typical practice for handling such antitrust claims.

## IV.     LEGAL STANDARDS

### A.     Motions to Dismiss and Strike

"A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations 'could not raise a claim of entitlement to relief.'" *F2VS Techs., LLC v. Aruba Networks, Inc.*, No. 17-cv-0754-RGA, 2018 WL 1732152, at *1 (D. Del. Apr. 10, 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)).   "A motion to strike an affirmative defense pursuant to 12(f) is governed by the same standards as a motion to dismiss pursuant to 12(b)(6)." *Teva Neuroscience, Inc. v. Watson Labs., Inc.*, No. 10-cv-5078, 2011 WL 741250, at *1 (D.N.J. Feb. 24, 2011).

"A plaintiff must plead facts sufficient to show that a claim has 'substantive plausibility.'" *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.     Antitrust Standing

"Antitrust standing is a prudential, rather than constitutional, limitation on the district court's jurisdiction." *Shionogi Pharma, Inc. v. Mylan, Inc.*, No. CIV.A. 10-1077, 2011 WL 3860680, at *4 (D. Del. Aug. 31, 2011) (citing *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998)).   The Third Circuit applies five factors for determining antitrust standing:   "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more

direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages."  *Id.* (citing *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 320 (3d Cir. 2007)).

### C.     The District Court Has Authority to Sever and Stay Claims

"A court is authorized to bifurcate any issue or counterclaim '[f]or convenience, to avoid prejudice, or to expedite and economize . . . .'"  *Eurand Inc. v. Mylan Pharm. Inc*., No. 08-cv-889, 2009 WL 3172197, at *1 (D. Del. Oct. 1, 2009) (citing Fed. R. Civ. P. 42(b)); *see Amado v. Microsoft Corp.,* 517 F.3d 1353, 1362 (Fed. Cir. 2008).  "When exercising this broad discretion, courts should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case."  *SenoRx, Inc. v. Hologic, Inc.*, 920 F. Supp. 2d 565, 567 (D. Del. 2013).

### D.     Inequitable Conduct Requirements

To succeed on a claim for inequitable conduct, the claimant must show (1) "that the patentee acted with the specific intent to deceive the PTO," and (2) but-for materiality.  *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 503 (D. Del. 2016).  Pleading inequitable conduct requires identification of the "specific who, what, when, where, and how of the material misrepresentation or omissions committed before the PTO."  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328–29 (Fed. Cir. 2009); *see Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1305 (Fed. Cir. 2011).  Regarding the materiality element, the "court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference" while applying "the preponderance of the evidence standard and giv[ing] claims their broadest reasonable construction."  *Id.* at 1291–92.

### E.     *Walker Process* Requirements

*Walker Process* claims under 15 U.S.C. § 2 require:  (1) a representation of a material fact,

(2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation. *See S3 Graphics Co., Ltd. v. ATI Techs. ULC*, No. 11-cv-1298, 2014 WL 573358, at *3 (D. Del. Feb. 11, 2014) (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069–70 (Fed. Cir. 1998)).

"[F]ailure to establish inequitable conduct precludes a determination that [the counterclaimant] had borne its greater burden of establishing the fraud required to support its *Walker Process* claim." *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1417 (Fed. Cir. 1987). "Any action to enforce any cause of action under section 15, 15a, or 15c of [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15(b). The four-year antitrust statute of limitations applies to *Walker Process* claims and starts running from the date the patent issued. *Farag v. Health Care Serv. Corp.*, No. 17–cv-2547, 2017 WL 2868999, at *8 (N.D. Ill. July 5, 2017); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 268 (7th Cir. 1984).[3]

## V.   STATEMENT OF RELEVANT FACTS

### A.   The Asserted Claims Do Not Include ATM Switches

The asserted claims from the Group 1 and Group 2 Patents are all method claims for inventive ways to set up and route phone calls between narrowband and broadband networks.

---

[3] In unique circumstances not present here, the statute of limitations may be restarted based on "the continuing violation doctrine," which provides that "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." *Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-cv-723-RGA, 2016 WL 1464545, at *4 (D. Del. Apr. 13, 2016) (finding continuing violation where patentee made new misrepresentations within four years of the antitrust claim). "[R]eaffirmation of a previous act" through serial infringement lawsuits are not continuing violations because they "do not inflict new and accumulating injury on the plaintiff." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 274 F. Supp. 2d 937, 945 (N.D. Ill. 2003).

Critically, none of the asserted claims require an "ATM switch."  While exemplary embodiments in the Group 1 Patent specification describe a telephone network with reference to "broadband" switches, the claimed methods do not require the use of ATM switches at all.  Instead, **all of the asserted claims** are directed to the process for receiving signaling messages and user communications from one type of network and transferring the communications to another type of network.  For example, claim 1 of the '3,561 patent, below, does not claim an "ATM Switch," nor a switch of any kind; rather, it is directed to the signaling used to transfer user communications:

> **1**. A method of operating a processing system to control a packet communication system for a user communication, the method comprising:
>
> receiving a signaling message for the user communication from a narrowband communication system into the processing system;
>
> processing the signaling message to select a network code that identifies a network element to provide egress from the packet communication system for the user communication;
>
> generating a control message indicating the network code;
>
> transferring the control message from the processing system to the packet communication system;
>
> receiving the user communication in the packet communication system and using the network code to route the user communication through the packet communication system to the network element; and
>
> transferring the user communication from the network element to provide egress from the packet communication system.

D.I. 14, Ex. B ('3,561 Patent), at 22:12-32 (emphasis added).  None of the asserted claims of the other Group 1 Patents require an ATM switch.  *Id*., Ex. C ('052 Patent), at 22:10-24, Ex. D ('932 Patent), at 22:11-24, Ex. I ('6,561 Patent), at 22:52-67, Ex. J ('454 Patent), at 21:48-22:6.

As for the Group 2 Patents, the claimed inventions are communications methods for interworking calls between narrowband format, such as the protocol used for the Public Switched Telephone Network, and formats used by broadband networks.  Again, none of the claimed methods require an "ATM switch" or permanent virtual connections ("PVC").  Rather, as exemplified by claim 1 of the '084 patent, the methods involve converting communications between synchronous and asynchronous formats:

> **1.** A method of operating an interworking unit to handle a plurality of calls, the method comprising:
>
> receiving messages into the interworking unit on a call-by-call basis where each one of the messages indicates one of a plurality of synchronous connections and a corresponding one of a plurality of identifiers;
>
> receiving user communications for the calls from the synchronous connections indicated in the messages into the interworking unit;
>
> in response to the messages, converting the user communications from the synchronous connections into asynchronous communications including the corresponding identifiers; and
>
> transferring the asynchronous communications from the interworking unit for subsequent routing based on the identifiers.

D.I. 14, Ex. A ('084 Patent), at 23:20-36 (emphasis added). The asserted method claims of the other Group 2 Patents similarly do not recite, let alone require, an "ATM switch" or PVC. *Id.*, Ex. E ('429 Patent), at 25:43-58, Ex. F ('064 Patent), at 23:27-41.

Asserted claim terms from both the Group 1 and Group 2 Patents have been construed multiple times in this District and the District of Kansas.[4] While certain terms in the Group 2 Patents have been construed to include terms literally limited to ATM technology, at no point has any court construed the claims in either group to require an "ATM switch" capable of receiving and processing signaling information.

## B.    Charter's "ATM Switch" Argument Was Previously Litigated and Lost

The substance of Charter's inequitable conduct allegations were previously litigated by Charter's subsidiary, Time Warner Cable ("TWC").[5] During a Kansas jury trial in February and

---

[4] *See Cox Commc'ns Inc., et al. v. Sprint Commc'ns Co., L.P.*, 2016 WL 1125729 (D. Del. Mar. 21, 2016); *Cox Commc'ns Inc., et al. v. Sprint Commc'ns Co., L.P.*, 2017 WL 2106126 (D. Del., May 15 2017); *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns LLL, et al.*, No. 11-2684, 2014 WL 5089402 (D. Kan. Oct. 9, 2014); *Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F.Supp.2d 1290 (D. Kan. 2007); *Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 518 F.Supp.2d 1306 (D. Kan. 2007); *Sprint Commc'ns Co. L.P. v. Big River Tel. Co., LLC*, 2009 WL 1992537 (D. Kan. July 8, 2009).

[5] Charter admits that it entered into a merger agreement with TWC on May 23, 2015 and that Charter's merger with TWC was completed on May 18, 2016—more than nine months ***before*** the

March 2017, TWC presented evidence that asserted claims from the Group 1 Patents[6] were invalid under the written description requirement "because the relevant specification discloses an ATM switch that did not exist at the time of the patent applications."[7] *Sprint Commc'ns Co. L.P. v. Time Warner Cable Inc., et al.*, 255 F. Supp. 3d 1134, 1144 (D. Kan. 2017) ("*Time Warner*"). The jury rejected this argument, finding that all claims were valid and willfully infringed by TWC, and awarded Sprint $139.8 million in damages. *Id*. at 1137-38.[8]

Further, on post-trial motions the Kansas Court rejected TWC's invalidity argument, finding that the existence or non-existence of an ATM switch *is immaterial* because "the patent claims here do not require the use of an ATM switch." *Id*. at 1144. Because the law requires "that the specification must show possession of the invention claimed in the patent," "the fact that no such switch existed is not dispositive." *Id*. at 1144-45. Reading an "ATM switch" into Sprint's claims, just as Charter does here, TWC argued that certain claims require a "packet communication system" and "the only disclosed embodiment of such a system in the specification uses an ATM switch." *Id*.; D.I. 33, ¶ 185. The Kansas court rejected this argument as a matter of law, finding, for purposes of written description, "the full scope of the claim need not be expressly disclosed in the specification, so long as a person skilled in the art would have understood the scope of the claim." *Id*. at 1145. TWC has appealed the verdict on damages and alternative written description grounds, but not the ATM switch invalidity decision. *Sprint Commc'ns Co. L.P. v. Time Warner*

---

Kansas jury trial. D.I. 33, ¶ 41; D.I. 14, ¶ 41. Charter also "acquired Bright House concurrently with the Time Warner transaction." D.I. 20, at 3, n. 1.

[6] The Group 1 Patents at issue in the TWC trial were the '3,561 Patent and the '052 Patent.

[7] The Kansas court also found the jury was not required to credit TWC's expert's testimony concerning the non-existence of the ATM switch. *Id.* at 16, n. 5.

[8] Cox attempted to raise the same argument using the same expert witness as TWC. The expert was precluded from testifying at the Cox trial and Sprint was granted summary judgment of no invalidity under the written description requirement. *Sprint Commc'ns Co. L.P. v. Cox Commc'ns Inc.*, 302 F. Supp. 3d 597, 607-620 (D. Del. 2017) (Bataillon, J.).

*Cable Inc., et al.*, No. 2017-2247 (Fed. Cir. Nov. 13, 2017).

### C.   The Majority of the Patents-In-Suit Have Expired

At the time of filing Sprint's Complaint, the majority of the patents-in-suit that are at issue

in the inequitable conduct defense and *Walker Process* counterclaims had already expired.   Charter

alleges nine of the fifteen patents-in-suit were procured through inequitable conduct and are the

basis for *Walker Process* antitrust violations.   Seven of the patents (the '064, '084, '932, '052,

'3,561, '429, '6,561 patents) expired on May 5, 2014, while one patent (the '454 patent) expired a

few months later on October 31, 2014.   *See* D.I. 20, at 11.   Only the '131 patent is active and it is

not related to any Group 1 or Group 2 Patent or any prior Sprint enforcement action. *Id.*

## VI.   ARGUMENT

### A.   Charter's Inequitable Conduct Claims Fail

#### 1.   Group 1 Patents: The ATM Switch Disclosure Was Not Material

Charter pleads that five of the asserted patents belonging to Group 1 are unenforceable due

to inequitable conduct because Sprint "told the PTO that ATM switches capable of receiving and

processing signaling to set up a communications path already existed as of the claimed priority

date." D.I. 33, ¶ 48.   But the portion of the specification quoted by Charter actually refers to a

"broadband switch," not an "ATM switch."   D.I. 14, Ex. B ('3,561 Patent), at 10:11-17; D.I. 33, ¶

48.   Further, the specification specifically identifies an exemplary switch (the Fore Systems ASX-

100).   *Id.*   Yet, Charter contends that Sprint's representation was false because "ATM switches did

not exist as of the claimed priority date *that could receive and process signaling as required by*

*Figure 3 of the Group 1 Patents.*"[9]   *Id.* ¶ 49 (emphasis added).   Accepting the factual inaccuracies

---

[9] Charter does not dispute that the Fore Systems ASX-100 broadband switch existed at the time
of filing.  *Id.* ¶¶ 48-49.  As the Group 1 Patents state, such "elements of a large network are familiar
to one skilled in the art" such as an ATM "broadband switch" from "Fore Systems ASX-100."

in Charter's allegations, Charter still does not identify a single asserted claim in any of the five Group 1 Patents that requires an "ATM switch."  Indeed, no asserted claims in any Group 1 Patent require an "ATM switch."  The existence or non-existence of an ATM switch is, therefore, irrelevant to the issued method claims.  Therefore, Charter cannot plead any facts of how or why the "ATM switch" statement from the specification was "but for" material to patentability as required by settled law.  *See Therasense*, 649 F.3d at 1291; *Exergen Corp.*, 575 F.3d at 1329.

The asserted claims of the Group 1 Patents each claim methods for setting up and routing telecommunications between narrowband and broadband networks.  For example, claim 1 of the '3,561 patent requires, *inter alia*, receiving a signaling message, processing the signaling message to select a network code, generating a control message, transferring the control message from the processing system to the packet communication system, receiving the user communication, and transferring the user communication to provide egress from the packet communication system. D.I. 14, Ex. B, ('3,561 Patent) at 22:12-32.  Nowhere does the claim require the use of an "ATM switch capable of receiving or processing signaling messages."

Unable to identify a particular claim or claim limitation for purposes of materiality, Charter relies on the telecommunications network in Figure 3 of the specification, <u>*not the issued method*</u> <u>*claims*</u>.  D.I. 33, ¶¶ 46-49.  But "there is no allegation that those [ATM switches] are claimed by the patents in suit," therefore, one "cannot reasonably draw the inference that the patents would not have issued but for the alleged omission."  *See XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F. Supp. 2d 376, 383 (D. Del. 2012) (granting, in part, motion to dismiss inequitable conduct defense).  Indeed, the Kansas Court found the "ATM switch" argument immaterial because "the

---

D.I. 14, Ex. B, ('3,561 Patent) at 10:7-15.)  At best, Charter's contention that the disclosed ATM switch was not capable of receiving and processing signaling is an ***omission***.

patent claims here do not require the use of an ATM switch." *Time Warner*, 255 F. Supp. at 1144.

Rather than address this legal deficiency, Charter attempts to read the "ATM switch" limitation into various other limitations, such as "packet communication system," "packet system," or "broadband network."  D.I. 33, ¶ 57.  This argument was also rejected as a matter of law by the Kansas Court and during multiple claim constructions.  *See id*.  Even if Charter were correct that Sprint omitted information about operational ATM switches, any such omission is not material to patentability of any claim in the Group 1 Patents as a matter of law.

### 2.  Group 2 Patents: The ATM Switch Disclosure Was Not Material

Charter's assertion that incorporation of the Group 1 Patents specification into the Group 2 Patents amounted to inequitable conduct is equally unfounded.  Even if Charter's assertions with respect to the Group 2 Patents are accepted as true, the disclosure that an ATM switch existed is equally immaterial for the same reasons specified with respect to Group 1 Patents—namely, no asserted claims in Group 2 require an ATM switch.  *See supra* Sections VI.A.1; V.A.

Charter's argument regarding the Group 2 Patents, however, fails on other grounds as well—the Group 2 Patents were issued even though Sprint allegedly disclosed to the PTO that ATM switches "are being developed that can process calls in response to signaling to provide virtual connections for each call."[10]  D.I. 33, ¶ 52.  Charter alleges that (1) Sprint falsely represented during the prosecution of the Group 1 Patents that ATM switches existed, (2) included such statements into the Group 2 Patents by incorporating the Group 1 Patent specification, and (3) represented that such ATM switches did *not* exist during the prosecution of the Group 2 Patents. D.I. 33, ¶¶ 159, 177-178, 180.  Despite simultaneously disclosing the broadband switch existed

---

[10] This disclosure is consistent with Sprint's reference to the Fore Systems ASC-100 ATM switch in the Group 1 Patents and neither statement is factually incorrect.  But, for purposes of this motion, Sprint does not challenge Charter's characterizations of the facts.

and ATM switches were under development, the Group 2 Patents were issued in compliance with

35 U.S.C. § 112.  The fact that the Group 2 Patents were issued—in spite of Charter's claim that

Sprint disclosed no ATM switches existed—illustrates that disclosure regarding ATM switch

existence was immaterial to patentability.  This is because no asserted claims in the Group 2

Patents require an ATM switch or PVC.  As a result, Charter "fails to identify which claims, and

which claim limitations in those claims the [ATM switch disclosures] are relevant to."  *See*

*Exergen Corp.*, 575 F.3d at 1329 (finding inequitable conduct allegations failed to satisfy pleading

requirements). Charter's inequitable conduct claims for the Group 2 Patents fail as a matter of law.

### 3.  Group 2: Sprint's Commercialization of JCS2000 Was Not Material

The commercial success of JCS2000 is irrelevant to enablement.  Charter claims that

JCS2000 was a failed attempt to commercialize the technology in the Group 2 Patents[11] and is

proof that the patents require undue experimentation and cannot meet enablement requirements of

35 U.S.C. § 112 because JCS2000 was not disclosed.  D.I. 33, ¶¶ 204, 207, 210-211.

Charter's assertions are unsupported by law—"Section 112, paragraph 1, does not require

enablement of commercial success[]."  *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, No. 04-

cv-1689, 2006 WL 2865469, at *5 (D.N.J. Oct. 5, 2006), *aff'd*, 520 F.3d 1358 (Fed. Cir. 2008).

Indeed "nothing in the patent law requires that a patentee must disclose data on how to mass-

produce the invented [process] . . . [, including] the organization and operation of factories."

*CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1339 (Fed. Cir. 2003).  In fact, efforts

undertaken to create a commercial embodiment are not determinative of undue experimentation,

let alone enablement.  *See id.* at 1339 (reversing the district court's finding that failure to disclose

---

[11] Charter's representations with respect to JCS2000 are incorrect.  As Charter is well aware
from the Kansas litigation, JCS2000 was discontinued for financial reasons unrelated to the
claimed inventions in the Group 2 Patents.  While Sprint disputes Charter's characterizations of
the JCS2000 project, for purposes of this motion, Sprint does not challenge Charter's "facts."

data regarding the commercial embodiment was "highly material" because "the inventors undertook that work to satisfy….commercial requirements, not to show enablement of the scope of the claimed inventions"). Like *CFMT*, Sprint's efforts to commercialize the invention in a nationwide "long distance telephone network" are immaterial to validity as a matter of law.

### 4. '131 Patent: Any Alleged Modifications Were Not Material

Charter's inequitable conduct claim for the '131 patent also fails. Charter contends that the "PTO would not have granted the '131 Patent" because Sprint "added substantial new matter" by amending the Summary of the Invention. D.I. 33, ¶¶ 213-224. However, Sprint's changes to the Summary of the Invention to reflect the claims were consistent with the inventions disclosed throughout the original application—a practice the Patent Office "encouraged" at the relevant time that has since become mandatory. Schletzbaum Decl., Exs. A, B. Additionally, the modifications complied with the Manual for Patent Examination and Prosecution ("MPEP") § 608.01(d), which states "[t]he brief summary of invention should be consistent with the subject matter of the claims."[12] Schletzbaum Decl., Ex. C. Critically, Sprint's compliance with the Patent Office's own "encouraged" procedures is entitled to "an especially weighty presumption of correctness in a subsequent validity challenge based on the alleged introduction of new matter." *Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008); *see also Pregis Corp. v. Doll*, No. 09-cv-467, 2010 WL 1039856, **10–12 (E.D. Va. 2010) ("[T]he USPTO's allowance . . . is entitled to an especially weighty presumption of correctness that no new matter was added.").

---

[12] The Court may take judicial notice of the MPEP as an official interpretation of statutes and regulations. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995). Following MPEP guidance cannot be the basis for inequitable conduct. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) ("it can not be inequitable conduct" to follow the MPEP); *see also Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 538, 546 (D. Del. 2007) (finding no inequitable conduct where disclosure was not required by the MPEP).

And while Sprint cited the modified Summary of Invention in responding to examiner rejections, such changes could not have been material to the issued claims because the examiner relied on other portions of the original specification as supporting the as-issued claims. *See Courtesy Products L.L.C. v. Hamilton Beach Brands, Inc.,* No. 13-cv-2012, 2015 WL 6159113, at *6 (D. Del. Oct. 20, 2015) (recommending dismissal of inequitable conduct claims because there was no indication that alleged misrepresentations resulted in issuance of the patents-in-suit). For example, in response to the examiner's § 112, ¶1 rejection that the full scope of a service node and interworking unit were not disclosed, the applicant cited "several instances in the specification," including original disclosures involving ATM technology.[13]  Schletzbaum Decl., Ex. C, Feb. 10, 2009 Response to Final Office Action, at 6-8.  In particular, the applicant cited to the ATM voice mux (AVM) in several original embodiments as support for the interworking unit that "converts between a packet format and the PSTN format." *Id.*  In other words, even without the Summary of the Invention, the original specification supported the issued claims.  Because the relevant statements in the specification were present in the earliest application, any changes to the Summary of Invention to align with the issued claims were immaterial.

But even accepting Charter's allegations that the modifications added new matter, and even if the modifications were the only support in the specification for the issued claims, Charter has failed to plead any facts that this modification was material to issuance.  At best, the '131 patent would be reclassified as a continuation in-part of the earlier applications with full written description support in the modified Summary of the Invention.  Yet, even then, Charter fails to

---

[13] Because the prosecution history for the '131 patent is public and Charter explicitly relies on it in the counterclaims at ¶¶ 215-222, the court can consider the document "without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

identify any intervening prior art or other basis on which the claims would have been rejected "but for" Sprint's modification.  Instead, Charter leaps to the conclusion that unidentified claims in the '131 patent would be invalid.  Such allegations fail to show "but for" materiality, particularly in view of the "especially weighty presumption" to the contrary.  *Commonwealth*, 542 F.3d at 1380.

### B.  Charter Has Failed to Show Egregious Conduct

Even as alleged by Charter, Sprint's alleged actions do not rise to the level of egregious conduct. Here, Charter alleges that only the following acts constitute egregious misconduct: (1) allegedly conflicting disclosure regarding operable ATM switches (D.I. 33, ¶ 195), (2) alleged non-disclosure of Sprint's efforts to commercialize the Group 2 Patents (D.I. 33, ¶ 209), and (3) alleged addition of new material to the '131 patent (D.I. 33, ¶ 223). Even if all of these acts are taken as true, Charter has failed to show that these actions rise to the level of egregious conduct.

As explained in detail above, Charter has mischaracterized Sprint's actions. At best, Sprint's allegedly conflicting disclosure of the ATM switch is a misstatement or omission—not an extraordinary circumstance of misconduct.  *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69, 73 (D. Mass. 2013) (finding the alleged "misstatements are not so extreme as to constitute affirmative egregious misconduct") (citing *Therasense*, 649 F.3d at 1292–93).  The alleged non-disclosure of JCS2000 is not relevant to enablement and can hardly be the basis for a finding of egregious misconduct.  *See supra* Section VI.3. For the '131 patent, the alleged addition of new matter is not material to patentability for at least the reasons above and is not an "explicitly false statement[], manufactured evidence, or other blatant deceit rising to the level that *Therasense* requires."  *See Smith & Nephew, Inc.*, 955 F. Supp. 2d at 73; *supra* Section VI.4.

### C.  Charter's *Walker Process* Claims Should Be Dismissed

Charter's failure to plead any plausible facts that Sprint's alleged conduct was "but for" material to patentability or egregious dooms Charter's antitrust counterclaims because there is no

inequitable conduct and Sprint is exempt from antitrust laws for seeking infringement damages.[14]

*See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965) ("to strip [a patentee] of its exemption from antitrust laws" because of its attempt to enforce its patent monopoly, the counterclaimant is first required to prove that the patentee "obtained the patent by knowingly and willfully misrepresenting facts to the [PTO]."); *see also FMC Corp.*, 835 F.2d at1417.  Charter's *Walker Process* claims are also barred by the statute of limitations and the inability to plead antitrust injury from expired patents.

### 1.   The Statute of Limitations on Charter's *Walker Process* Claims Has Passed

Charter's *Walker Process* claims are time-barred. Even when evaluating the statute of limitations for the most recently issued patent-in-suit, the '131 patent, Charter is still asserting its *Walker Process* claims at least three years after the statute of limitations ran. With respect to the first issued patent, the '064 patent, the statute of limitations expired more than a decade ago.

Absent tolling under the continuing violation doctrine, the four-year antitrust statute of limitations applies to *Walker Process* claims and starts running from the date the patent issued. *See supra* Section IV.E. Here, there are no continuing violations to toll the four-year statute of limitations period.  To the extent Sprint engaged in any anticompetitive monopolization (it did not), Charter had until April 6, 2014 to file its *Walker Process* claims and failed to do so. Accordingly, Charter is barred from bringing its *Walker Process* claims.  *See supra* Section IV.E.

### 2.   Charter Has No Antitrust Standing as the Relevant Patents Have Expired

Charter contends that it "must either pay the price that Sprint demands [for past infringement] or cease offering the VoIP services that are highly sought after by their subscribers,"

---

[14] Charter does not (and cannot) allege that the "sham litigation" exception to *Noerr-Pennington* immunity applies because Sprint's prior "winning lawsuit[s are] by definition a reasonable effort at petitioning for redress and therefore not a sham."  *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, n.5 (1993).

(D.I. 33, ¶¶ 118, 126),  and that Sprint's expired patents "pose a barrier to entry in the market for VoIP services."  *Id.* ¶ 124.  But Sprint has no ability to enjoin Charter, or preclude any other company, from offering the accused telephone service for infringing the Group 1 and 2 Patents because those patents have expired, along with Sprint's limited monopoly for those inventions.[15]  *See supra* Section V.C. Charter's novel theory that Sprint is engaging in anticompetitive behavior by seeking monetary damages for ***past*** infringement is unsupported by the law.  Liability for past infringement of expired patents cannot be the basis for antitrust injury, let alone antitrust standing.

### a.    Charter Has Not Alleged an Antitrust Injury

Charter has failed to allege an antitrust injury, thus "further inquiry is unnecessary"—and its standing to bring its *Walker Process* claims fails. *City of Pittsburgh*, 147 F.3d at 265.

It is well-settled that patentees cannot enjoin infringers or demand royalty payments for infringement occurring after a patent has expired.[16]  In this case, Sprint has no ability to create a "barrier to entry in the market" because it cannot seek ongoing royalties after the patents expired or enjoin infringers.  *Id.*  Likewise, injury due to litigation costs alone is not an antitrust injury in

---

[15] While not clear from Charter's counterclaims, to the extent Charter alleges that Sprint's enforcement of the '131 patent in this case runs afoul of *Walker Process*, Charter has failed to plead any antitrust facts specific to the '131 patent.  Rather, Charter's pleading relies exclusively on Sprint's prior enforcement efforts relating to the Group 1 and Group 2 Patents—not the '131 patent.  For example, in defining the relevant market and Sprint's alleged power within that market, Charter relies on "Sprint's position in prior actions" regarding acceptable, non-infringing alternatives to the "Group 1 and Group 2 patents."  D.I. 33, ¶¶ 95-101, 104-111.  Likewise, Charter's claims of antitrust harm rely on Sprint's allegations in "prior actions" involving the Group 1 and Group 1 Patents.  But none of the "prior actions" involved the '131 patent, which is not even in the same patent family as the Group 1 and Group 2 Patents.  Thus, the *Walker Process* allegations for the '131 patent should be dismissed because Charter has failed to allege a "direct effect" between Sprint's enforcement of the '131 patent and any purported antitrust injury.  *See City of Pittsburgh*, 147 F.3d at 268 (affirming dismissal of antitrust allegations for failure to establish causal connection).

[16] *See Brulotte v. Thys Co.*, 379 U.S. 29, 32–33 (1964) ("projection of the patent monopoly after the patent expires is not enforceable"); *Kimble v. Marvel Ent., LLC*, 135 S. Ct. 2401, 2407 (2015); *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) ("[T]he district court cannot enjoin the [defendant] from infringing an expired patent.").

this Circuit. *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, No. 03-cv-232, 2004 WL 1427136, at *6–7 (E.D. Pa. June 21, 2004). Ultimately, Sprint cannot injure any party in the market practicing the Group 1 and Group 2 Patents, including Charter.

### b.    All Factors Weigh Against Standing

Because Sprint cannot enforce its expired patents, all factors necessarily weigh against standing. Here, there can be no causal connection between the alleged antitrust violation and harm to Charter (or intent by Sprint to cause that harm) where there is no ability for Sprint to cause antitrust harm at all. Likewise, there can be no "more direct" victims where there are no infringing victims to begin with. The lack of antitrust injury also eliminates any possibility for direct injury. Charter's claims would expose Sprint to duplicative damages (or complex apportionment issues) by eliminating the need to show antitrust injury at all. Further, damages for legally unavailable acts, such as enforcing a non-existent patent monopoly, would be contrary to law, highly speculative, and would, at the least, "result in administratively complex damages proceedings.'" *Joint Stock Soc'y v. UDV N.A., Inc.*, 266 F.3d 164, 185 (3d Cir. 2001).

Moreover, Charter's antitrust allegations run counter to the purpose of the Sherman Act because Sprint cannot exclude competition. The Sherman Act was "enacted to assure customers the benefits of price competition. . . [and] the central interest in protecting the economic freedom of participants in the relevant market." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983); *see also City of Pittsburgh*, 147 F.3d at 266–67 ("[B]ecause neither the [alleged antitrust violation] brought about the lessening of competition in a 'marketplace' where there was no competition, there was no antitrust injury."). All factors weigh against prudential standing because Sprint can no longer exclude competition.

### D.    In the Alternative, the *Walker Process* Claims Should Be Severed and Stayed

In the alternative, and "consistent with the court's practice," the *Walker Process* claims

should be severed and stayed to be tried after the infringement and inequitable conduct claims.[17]

1. Litigating the Inequitable Conduct Claim First Would Moot any *Walker Process* Claims

Determining the patent claims before the *Walker Process* claims would conserve the Court's and parties' resources. Given that inequitable conduct is a prerequisite for *Walker Process* claims, it is most efficient to try the patent infringement, validity, and inequitable conduct claims first, followed by *Walker Process* claims. *See FMC Corp.*, 835 F.2d at 1417.

This holds true under a variety of scenarios. If Charter fails to establish inequitable conduct, the *Walker Process* claim is mooted.[18]   However, if Charter succeeds in proving inequitable conduct prior to trying the *Walker Process* claims, the discovery efforts and findings with respect to inequitable conduct will not be wasted—in fact, they will be the basis upon which the *Walker Process* claims may be tried.[19]   Therefore, severing and staying the *Walker Process* claims until after the resolution of patent claims serves both judicial economy and convenience.

2. Including *Walker Process* Claims at Trial Would Distract the Jury and Prejudice Sprint

Elements unique to a *Walker Process* claim, such as monopoly power in the relevant

---

[17] Ex. E, *Quest Integrity USA LLC v. Clean Harbors Indus. Servs. Inc.*, No. 14-cv-01482, ECF. No. 169, at *1-2 (D. Del. Nov. 1, 2016) (severing and staying antitrust claims); *Orthophoenix, LLC v. Dfine, Inc.*, No. 13-cv-1003, 2015 WL 1938702, at *1 (D. Del. Apr. 28, 2015) (same); Ex. F, *Intellectual Ventures I, LLC v. Toshiba Corp.*, No. 13-cv-00453, ECF. No. 271, at *1 (D. Del. Dec. 9, 2015) (Robinson, J.) (same); Ex. G, *Fresenius Kabi USA v. Fera Pharm.*, No. 15-cv-03654, ECF No. 422, at *1, 6-9 (D.N.J. May 19, 2017) (same); *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986) (affirming "the now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim.").

[18] *See SanDisk Corp. v. STMicroelectronics Inc.*, No. 04-cv-4379 JF (RS), 2009 WL 1404689, at *2 (N.D. Cal. May 19, 2009) (because "a finding that SanDisk did *not* engage in inequitable conduct may moot ST's *Walker Process* claim. . . the Court concludes that convenience and judicial economy would be best served by trying the inequitable conduct defense first."); *Fresenius*, No. 2:15-cv-03654, ECF. No. 422, at *7 (finding that if *Walker Process* claims are mooted, "discovery and litigation on complex issues peculiar to the antitrust counterclaims. . .will have been wasted.")

[19] *Id.*; *see Fresenius, LLC*, No. 15-cv-03654, ECF No. 422, at *7.

market, are likely to distract or confuse a jury that is already contemplating complex patent issues. "Allowing defendants to introduce such evidence will serve only to distract the jury from the complicated, primary, and potentially dispositive issue of patent infringement"—ultimately prejudicing Sprint. *See Eurand Inc.*, 2009 WL 3172197, at *2. As many courts have found, severing and staying the *Walker Process* claims would lessen the risk of distracting or confusing a jury, and therefore, reduce likely prejudice to the patentee.[20]

Moreover, neither party will be prejudiced by severing and staying the antitrust claims. To the extent it is not estopped, Charter will have its chance to try the inequitable conduct defense, which is a prerequisite for *Walker Process* claims, without wasting resources to litigate the nuances of *Walker Process* claims. *See Fresenius*, No. 2:15-cv-03654, ECF No. 422, at *7 ("Litigation and discovery as to [the] inequitable conduct counterclaims will look much the same with or without [the antitrust claims]."). The same applies for Sprint.

Severing and staying the *Walker Process* claims will serve to minimize the risk of confusing the jury with antitrust and patent claim issues, will avoid prejudice to Sprint, and will not prejudice either party to litigate the *Walker Process* claims after the patent claims.

## VII.   CONCLUSION

Accordingly, Sprint requests that the Court strike the inequitable conduct affirmative defenses and dismiss *Walker Process* counterclaims for failure to state a claim. In the alternative, Sprint requests the Court sever and stay the Defendants' *Walker Process* counterclaims until after appeals regarding patent infringement and validity issues have been resolved.

---

[20] *See, e.g., Orthophoenix*, No. 13-cv-1003, 2015 WL 1938702, at *1 ("[A] trial of patent infringement, patent validity, *and* antitrust issues before the same jury may lead to jury confusion."); *Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*, 118 F. Supp. 3d 646, 659 (D.N.J. 2015) (same); *In re Innotron Diagnostics*, 800 F.2d at 1085 (citing avoidance of prejudice and confusion as acceptable reasons to bifurcate antitrust claims).

Respectfully Submitted,

*Of Counsel:*

SHOOK, HARDY & BACON L.L.P.

B. Trent Webb
Ryan D. Dykal
Aaron E. Hankel
Ryan J. Schletzbaum
2555 Grand Boulevard
Kansas City, MO 64108
T: 816-474-6550
bwebb@shb.com
ahankel@shb.com
rdykal@shb.com
rschletzbaum@shb.com

Robert H. Reckers
JP Morgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002-2926
T: 713-227-8008
rreckers@shb.com

Dated: July 24, 2018

POLSINELLI PC

*/s/ Shanti M. Katona*
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
T: 302-252-0924
skatona@polsinelli.com

***Attorneys for Plaintiff Sprint***