# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4    VENTRONICS SYSTEMS, LLC      :    CA NO. 11-1114-RGA

5                                 :    December 28, 2011

6              Plaintiff,         :

7                                 :    1:05 O'clock p.m.

8        Vs.                      :

9                                 :

10   DRAEGER MEDICAL GmbH,        :

11   DRAEGER MEDICAL INC, DRAEGER :

12   MEDICAL SYSTEMS INC, MAQUET  :

13   CRITICAL CARE AB, MAQUET,    :

14   INC, HAMILTON AG, eVENT

15   MEDICAL LTD, eVENT MEDICAL

16   INC.

17

18             Defendants,

19   ...........................

20

21

22          TRANSCRIPT OF TELECONFERNCE

23      BEFORE THE HONORABLE RICHARD G. ANDREWS

24       UNITED STATES DISTRICT COURT JUDGE

25

```
 1

 2     APPEARANCES:

 3

 4     For the Plaintiff:   Morris, Nichols Arsht & Tunnell

 5                          BY:  KAREN JACOBS LOUDEN, ESQ

 6                                   -and-

 7                          McDermott Will & Emery

 8                          BY:  MICHAEL E. SHANAHAN, ESQ.

 9                          BY:  JOHN C. LOW, ESQ

10

11     Defendants:          Seitz, Ross, Aronstam & Moritz

12                          BY:  COLLINS J. SEITZ, JR, ESQ

13                                   -and-

14                          Wilmer, Cutler, Pickering, Hale & Dorr

15                          BY:  TODD C. ZUBLER, ESQ

16                          For Defendant Hamilton Medical AG

17

18                          Potter, Anderson & Corroon

19                          BY:  RICHARD L. HORWITZ, ESQ

20                                   -and-

21                          Law Offices of Wayne A. Jones

22                          BY:  WAYNE A. JONES, ESQ

23                          BY:  DUSTY S. VOGELPOHL, ESQ

24                          For the Defendant Draeger Medical GmbH

25
```

```
1                          Potter, Anderson & Corroon

2                          BY:  RICHARD L. HORWITZ, ESQ

3                                   -and-

4                          Finnegan, Henderson, Farabow, Garrett &

5       Dunner

6                          BY:  CHRISTINE J. LEHMAN, ESQ

7                          For the Defendant Maquet

8

9

10      Court Reporter:        LEONARD A. DIBBS

11                             Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1
2                    P R O C E E D I N G S
3            THE COURT:  This is Judge Andrews.
4            Can people identify who is on the line, please?
5            MS. JACOBS-LOUDEN:  Good afternoon, your Honor.  For
6    the plaintiff Ventronics, this is Karen Jacobs Louden from
7    Morris Nichols.
8            I have on the line with me Michael Shanahan and John
9    Low from McDermott, Will & Emery.
10           Mr. Shanahan will be presenting our argument today.
11           MR. SHANAHAN:  Good afternoon, your Honor.
12           THE COURT:  Good afternoon, Mr. Shanahan.
13           MR. SEITZ:  Good afternoon, your Honor.  C. J. Seitz
14   here.  And with me is Todd Zubler from Wilmer Hale and we're
15   representing Hamilton.  With the court's permission, Mr. Zubler
16   will be making the argument today.
17           THE COURT:  All right.
18           MR. HORWITZ:  Good afternoon, your Honor, it's Richard
19   Horwitz at Potter on behalf of Draeger and Maquet.
20           And with me for Draeger is Wayne Jones and Dusty
21   Vogelpohl.  And from Maquet, Christine Lehman from Finnegan
22   Henderson.
23           MS. LEHMAN:  Good afternoon, your Honor.
24           THE COURT:  Thank you all.
25           When you all speak, please identify yourself since Mr.
```

1    Dibbs is here and it's hard to tell who is speaking a lot of the

2    time.

3          First off, I want to thank Ms. Louden for writing the

4    letter on the 22nd.

5          I hadn't actually noticed that there were some

6    outstanding motions here.  I appreciate that being brought to my

7    attention.  It made sense for me to deal with the Protective

8    Order first.

9          I have read all of the papers.

10          I guess, Mr. Shanahan, and is whoever is speaking for

11    the defendants, if there is something that you want to add to

12    the papers, go ahead.

13          MR. SHANAHAN:  I do have some remarks, maybe about five

14    to ten minutes in length that I would like to share with the

15    Court and then we can proceed afterwards.

16          By way of introduction, the plaintiff here seeks entry

17    of its proposed Protective Order including a limited

18    confidential information exemption for Ventronics' employee, Dr.

19    James Biondi as well as the imposition of a two-way prosecution

20    bar.

21          This prosecution bar is really the only issue of

22    disagreement between the parties.  All other terms of the

23    proposed Protective Order -- essential terms have been agreed

24    upon.

25          Negotiations on this Protective Order have been ongoing

1      since February of this year.  So for nearly a year, as a result

2      of our failure to come to a Court here, no source code has been

3      produced in this case despite being due approximately six months

4      ago under the Eastern District of Texas Discovery Rules.

5              So that's the procedural posture as it stands.

6              By way of background, plaintiff Ventronics is a wholly

7      owned subsidiary of Cardiopulmonary Corporation.  You may hear

8      me refer to them as CPC from time to time.

9              The Ventronics' entity was created prior to this

10     litigation for corporate reasons.

11             CPC was founded by Dr. James Biondi, a Yale trained

12     anesthesiologist in the early 1990's, with the goal of producing

13     a next generation ventilator that improved the security and

14     reliability of conventional ventilators.

15             The design and development of this ventilator called

16     the Ventura resulted in the discovery of several novel features

17     that were later passed by CPC.

18             These features were subsequently incorporated into many

19     other companies ventilators products, including the accused

20     products in this case.

21             CPC currently is and always has been a small company

22     with approximately ten to twenty employees.

23             There is and never has been any in-house counsel in CPC

24     or Ventronics or any other attorney that provides such a similar

25     role.

1           Each employee of CPC has a specific contextual and

2    administrative duties which have nothing to do with patent

3    prosecution, the company's legal strategies or any significant

4    role in management.

5           Due to the very small size of the company, CPC, Dr.

6    Biondi is the only person that is knowledgeable about his past

7    portfolio.  And the only person who has ever overseen or

8    directed prosecution for the life of the company which has now

9    stretched 20 years.

10          No other CPC personnel are familiar with the portfolio

11   at all.  And no other person at CPC or Ventronics has the

12   technical business experience, acumen or training to direct

13   prosecution, nor can they be brought up to speed given the

14   complexity and time involved.

15          Similarly, Dr. Biondi is the only CPC Ventronics person

16   familiar with the current lawsuit.  He's the only one

17   knowledgeable about each phase of the case, including essential

18   aspects, including business reasons and legal strategy.

19          No other employee, past or present, have knowledge of

20   any of these topics or involved in any aspects of current

21   litigation.

22          Dr. Biondi is the sole person responsible for making

23   all litigation decisions and litigation that influence business

24   decisions.

25          Accordingly, Dr. Biondi is unique in that he is

1    irreplaceable in both the prosecuting litigation aspects of the

2    company.  He cannot be replaced by another employee.  And

3    removing him from either role would drastically and unfairly

4    handicap the plaintiff and unfairly prejudice it in the current

5    case or in any ongoing patent prosecution.

6         In short, the harm of fully excluding Dr. Biondi from

7    either responsibility outweighs any potential prejudice to

8    defendants as a result of his participation in either role.

9         Now, with all of that background information being

10   said.  When we started talking about the nature and scope of the

11   prosecution bar.

12        In light of these circumstances, the plaintiff has

13   proposed a prosecution bar that gives Dr. Biondi limited access

14   to certain confidential information so he may direct litigation

15   on behalf of the plaintiff but restrict him from certain

16   technically sensitive information that may have an adverse

17   effect on patent prosecution.

18        The proposal offered by the plaintiff allows Dr. Biondi

19   to see certain confidential information but not source code or

20   other materials that the plaintiff -- that the defendants may

21   designate as Attorney's Eyes Only or AEO materials.

22        In order to ensure the security of defendants sensitive

23   confidential information, these proposals allows defendants the

24   ability to designate their materials including sensitive

25   technical materials and trade secrets as they be said.

1    This allows Dr. Biondi to see certain confidential information

2    such as business information, to make litigation decisions but

3    not other technically sensitive information that affects

4    prosecution, thereby, protecting the defendants.

5         We note that the Federal Circuit in the Deutsche Bank

6    case which is 605 F.3d 1373 at 1381 has noted that financial and

7    other business information normally would not trigger a

8    prosecution bar.

9         And further, plaintiff in this case proposed that the

10   prosecution bar be made a two-way bar.  This is because the

11   defendants' attorneys should not be allowed to participate in

12   prosecution such as in the reexamine and European opposition

13   that have been filed by the defendants in this case and not have

14   the plaintiffs business and attorneys not participate.

15        This gives defendants an unfair advantage in both of

16   these proceedings as it allows the defendants' litigators to

17   bring to bare all the litigation work and positions developed by

18   defendants' litigators while plaintiff cannot use reciprocal

19   information or resources, thus a two-way bar is necessary to put

20   both the plaintiff and the defendant on an even footing in the

21   contentious prosecution matters that remains.

22        Now, your Honor, that's our position.  And that's the

23   background.

24        I have some remarks with respect to rebuttal on the

25   positions taken by the defendants in their brief.

1               If you would like to hear those now, I can continue?

2       If you would like to hear someone else speak right now, we can

3       do that?

4               THE COURT:  No.  Why don't you finish.

5               MR. SHANAHAN:  Thank you, your Honor.

6               The first issue that we note in defendants' reply brief

7       is that they have concerns regarding the ongoing prosecution of

8       the patents-in-suit.

9               Right now after speaking with the plaintiff's

10      prosecution counsel, the two patents that are the subject matter

11      of the suit, the '160 and '973 patent have no continuations or

12      continuations in part pending or any other application that

13      claim priority from these patents.

14              The only two prosecution proceedings that remain with

15      respect to these patents are a European opposition and a U.S.

16      filed reexamine, both which were prompted by the defendants in

17      this case.

18              So, one thing that the plaintiff would like the Court

19      to note in this regard is that it appears that the defendants on

20      the one hand would like to use these offensive prosecution

21      procedures in order to try and defeat the patent, yet on the

22      other hand would not give the plaintiff the opportunity to use

23      the sole person, Dr. James Biondi who has the ability to direct

24      these matters from participating in prosecution.

25              We think that this is inherently unfair and therefore

1   should be rejected.

2           The next point that we take exception to in the -- or

3   disagree with, I should say, in connection with the positions in

4   the defendants' brief, the nature of the prosecution bar that

5   was in the discovery order.

6           It is plaintiff's position that they never unilaterally

7   proposed a one-way prosecution bar.  Our initial prosecution bar

8   that was proposed in our protect Protective Order was two-way

9   prosecution bar.

10           And as we were negotiating the discovery order, the

11   defendants asked for a one-way prosecution bar and plaintiff's

12   graciously agreed to it as a temporary accommodation

13   understanding that in Texas, that the discovery order

14   prosecution bar would be superseded by a negotiated prosecution

15   bar, and that the prosecution bar proposed by plaintiffs in this

16   case has always been two-way prosecution bar.

17           So, the defendants main theme here has really been its

18   chief concern about prejudice.  What plaintiff has attempted to

19   do in this case is to craft a prosecution bar that would allow

20   Dr. Biondi access to certain confidential information and

21   restrict him from others that would affect prosecution.

22           From the plaintiff's side this looks like this would

23   solve any issues that they would have with prejudice with

24   respect to technical information.  And I think the only response

25   that we saw was that they were -- that the defendants are

1    unhappy with the preciseness of the definition.

2         We think that this could easily be resolved.  And this

3    is really the only in which Dr. Biondi -- he's an essential

4    person -- the only person that can perform this task, be allowed

5    to wear both hats.

6         I have some more remarks, your Honor, but I think that

7    that is our fundamental position.

8         Perhaps we can hear from the defendants now and I can

9    be given a chance after they speak?

10        THE COURT:  No.  If you've got more remarks, make them.

11        MR. SHANAHAN:  Yes, your Honor.

12        No, your Honor, I think that's it.

13        THE COURT:  All right.

14        Who is speaking for the defense?

15

16        MR. ZUBLER:  Your honor, this is Todd Zubler speaking

17    on behalf of Hamilton and on behalf of the other defendants.

18        THE COURT:  You're covering all the defendants for the

19    purposes of this motion?

20        MR. ZUBLER:  Yes.

21        THE COURT:  Okay.

22        MR. ZUBLER:  Other counsel may reserve the right to add

23    a comment on behalf of themselves.  I will be taking the lead on

24    the substantive arguments.

25        THE COURT:  Okay.  Fair enough.

1          MR. ZUBLER:  Your Honor, this case we think is really

2     about at this point, the basic principal of patent infringement

3     litigation, which is that if you receive a competitors

4     confidential information, you don't get to be involved in the

5     patent prosecution.  You don't get to be involved in drafting

6     claims that could be used to target the products and the

7     technology about which you received the confidential information

8     about.

9          It's fairly a standard principal.  It's applied across

10    patent litigation.  That's really what we're asking for here.

11         The response that Mr. Shanahan just gave is essentially

12    that they are too small, that Ventronics is too small, CPC is

13    too small to separate out the functions of litigation and patent

14    prosecution.

15         We don't think, your Honor, that this case warrants any

16    exception from the general rule in this case.

17         First of all, let me just say that a lot of the facts

18    that Mr. Shanahan just stated about the size of CPC and the

19    crucial role of Dr. Biondi and all the things he does and how no

20    one else is competent to do anything that he does.  Those are

21    frankly new facts to this case.  Dr. Biondi put in his

22    declaration here.

23         What Mr. Shanahan just told you goes well beyond

24    anything Dr. Biondi stated in his prior declaration.

25         Those are averments that we're getting from Mr.

1    Shanahan for the first time really without any documentary

2    support about who else is in the company.

3         We don't believe, your Honor, that Ventronics or CPC

4    are such small little entities that they could not handle both

5    litigation aspects and patent prosecution.

6         Let me explain a little bit more what I mean by that.

7    First of all, ADM is a one person company.  Excuse me,

8    Ventronics is a company that was created as a one person company

9    for this litigation.

10        But, you know, the fact that it has one person is

11   totally an artifact of the litigation strategy that CPC came up

12   with in order to pursue this litigation.  To say a one person

13   entity and claim you're too small to have two people is not a

14   valid argument.

15        With respect to CPC, your Honor, the parent corporation

16   of Ventronics.  Again, we really haven't seen any showing that

17   no one else can possibly handle the litigation aspects of this

18   case and/or the prosecution.  Keep those separate.

19        Let me make one point with respect to the litigation

20   aspects of this case.  Mr. Shanahan made it sound as if we're

21   trying to exclude Dr. Biondi's involvement in this litigation.

22   That is just not true.

23        The only thing that Dr. Biondi would be excluded from

24   involvement here would be in seeing confidential information.

25   He can be entirely involved in the litigation, talking about the

1   case, strategy, progress, settlement discussions.  He just would

2   not be allowed to see confidential information.  That is I think

3   is a very important here and not to get lost.

4        We're not trying to put Dr. Biondi in a box where he

5   can't hear anything about the litigation.  We're only really

6   asking that Dr. Biondi not be allowed to see confidential

7   information and then at the same time be drafting patent claims

8   that could be used against all of us.

9        I think our papers mention -- a legal bit of history

10  here and a little bit of background is appropriate, maybe some

11  sensitivity on our side here that the Court should understand.

12       CPC approached two of the defendants in this case,

13  Maquet and Draeger a number of years ago wanting to work

14  cooperatively with them and asking for information about their

15  ventilator products so that CPC could create products that would

16  be compatible with the ventilators of Maquet and Draeger.

17       Maquet and Draeger presented that information and CPC

18  went so far as to put Maquet and Draeger and Hamilton on its web

19  page as partners, as CPC partners.

20       It was then out of the blue in 2010 that CPC turns

21  around and creates Ventronics and creates this litigation entity

22  and sues all three entities.

23       I think it's important to note here that if we are

24  being sensitive here, there's a reason we're being sensitive to

25  Dr. Biondi getting access to confidential information of any

1    sort that could be used to come back against us, to be later

2    used against us.

3           I would further note, your Honor, that it's routine for

4    companies to have outside counsel handle their patent

5    prosecution matters.  That's another option here available to

6    CPC, available to Ventronics.

7           And there is really no justification here for saying

8    Dr. Biondi has to be doing everything, has to be seeing

9    everything and has to be the person who is doing the patent

10   prosecution.

11          Let me just turn now to the other major issue here

12   which is two-way bar.

13          The situation here is that the parties did stipulate to

14   a one-way prosecution bar in the discovery order in the Texas

15   case.

16          I'm frankly taken by surprise by Mr. Shanahan's

17   assertion that that was an accommodation made for the

18   defendants.  As far as we are aware and as far as I can possibly

19   know, that language came from the plaintiff.

20          It was a one-way prosecution bar, which is not unusual

21   in a case like this where the parties are not competitors.

22   There is really no justification for a two-way bar in this

23   situation where we -- where the plaintiff, where Ventronics

24   doesn't create any product.  None of the information that it's

25   going to be providing in this case is going to be information

1      that the defendants can use to create claims, to draft claims,

2      to create an offensive weapon against the other side.

3             So, the parties have agreed to a one-way bar in the

4      discovery order in the case.  And we thought that was the

5      basis -- that was going to be the basis for the litigation and

6      we have acted on that assumption, the parties, the defendants,

7      and the lawyers for the defendants have since looking at

8      confidential information and assuming that they have not thereby

9      taking themselves out of play.

10            And I assume they relied on the fact that they have

11     been able to look at this information and not now have to lose

12     -- for some people a significant role of their practice because

13     they looked at confidential information.

14            Again, with respect to the two-way bar, we think it's

15     frankly unfair to try to create a two-way bar now at this late

16     date.

17            And the one-way bar, your Honor, as we showed, it was

18     in the draft of the Protective Order for many months that went

19     back and forth between the parties.  It was only more recently

20     that Ventronics had come back and tried to make that into a

21     two-way bar.  That was a late edition from Ventronics.

22            I would say one last point, your Honor, which was --

23     not an insignificant point, but it was the last point in our

24     briefing which concerns the time frame of the prosecution bar.

25            Ventronics has sought to narrow the duration of the

1    prosecution bar at issue, instead of having to -- instead of

2    having a prosecution bar which would last as long as the

3    litigation goes on plus an extra 18 months, which is relatively

4    standard in this type of litigation, Ventronics has proposed a

5    much shorter duration so that the 18 months would start running

6    sooner.

7         It would start running as soon as someone saw

8    confidential information, and the last time they saw

9    confidential information which really increases the danger quite

10   a bit.

11        Someone who started seeing confidential information of

12   the defendants six months ago, for example, could start

13   prosecuting patents, start drafting claims potentially against

14   -- that could be used against the defendants within 12 months

15   under the plaintiff's rule.  We don't think that's fair.  We

16   don't think that's standard as shown by, for example, the

17   discovery order in this case which has the standard timing

18   duration for a prosecution bar.  And also the Deutsche Bank case

19   which we cited in the papers.

20        So, I think that summarizes the comments that I was

21   planning to make.  And I would certainly answer any questions.

22        I don't know if any of the other defendants have any

23   comments.

24        MR. JONES:  Your Honor, this is Wayne Jones.  I

25   represent Draeger.

1              THE COURT:  Go ahead, Mr. Jones.

2              MR. JONES:  I think we asked Todd to try and lead for

3     us if he could.  I did have one or two other thoughts.

4              Our parties are somewhat differently positioned.  And

5     would it be accessible for the Court if I could follow-up a

6     little with Todd's on some points?

7              THE COURT:  Go ahead.

8              MR. JONES:  The first thing I wanted to mention is -- I

9     noted that plaintiff's point out that, well, there's going to be

10    a reexamination.  Quite certainly, there is going to be a

11    reexamination declared in a month and a half.  And there is

12    already an opposition going.

13             He said well, it's so unfair that somehow we the

14    plaintiffs -- defendants would know their information and get to

15    participate in that and they couldn't know of our information

16    and participate in that.

17             The opposition -- they are mistaken general fairness

18    for what the point that is going on.  Each of those patent

19    oppositions and reexamines.  The point is what was the

20    plaintiff's invention?

21             When they filed their patent in 1995, they said they

22    did their research in 1992.  They filed their patent in 1995.

23    And that's what they got a patent for, not for what we're doing

24    today.

25             Plaintiff's stopped their research by the documents

1    they have produced to us -- they stopped any research on

2    ventilators in 1999 as far as we can tell.

3          This patent issued in 1999.  They were unable to really

4    sell any ventilators to the market.  I think they sold one or

5    two or three or four trying to get the business going.

6          My understanding of the documents is that they have not

7    sold a ventilator since 1999.

8          Now, they have been out of the business more than

9    eleven years and they want to see our current research so that

10   they can do their patent prosecution on a patent that is

11   supposedly on an invention filed in 1995.

12         There is no reason that anybody involved in the 1995

13   patent filing should be seeing our 15 year later research and

14   then try, you know, kind of spin that in on how they do their

15   patent prosecution.  That's why you have prosecution bars.

16         They are not even an active competitor, okay?  The

17   issue is in the reexamine and the opposition is not about our

18   products, it's about what their invention was in 1995.

19         Now, the other thing that's fundamental in these bars

20   that they are talking about is -- they are non-practicing

21   entity.  They have not made a ventilator for over twelve years.

22   They have not tried to sell one for over twelve years.

23         And so, we are different kind of entities.  So, no

24   matter how much technology I learn from whatever they did back

25   in 1995, '96, I can't write a patent claim that's going to cover

1    any of their products because they just don't have any products.

2         So there is no unfairness if I'm not under a bar

3    because I can't harm them.  However, them seeing my products

4    that have been developed long after they filed their patent and

5    then writing patents is very unfair because now they can spin.

6         It's common practice to spin your patent prosecution

7    work to cover the new emerging products of other competitors.

8    And they are not even a player.

9         And I have quickly just two more important points.

10   This strategy they followed.  Imagine, the hypothetical.

11   Someone wants to sue DuPont.  DuPont is a great, big well

12   established company and I'm a little competitor.  And I have 15,

13   20 guys in my company.  I create a shell company called

14   Ventronics.  I only put my chief engineer in that company and I

15   sue DuPont.  And then I argue to the Court, your Honor, nobody

16   else at Ventronics can deal with this stuff.  Since he's the

17   only person, he's the only employee, he has to be able to see

18   all of DuPont's technical information.

19        So this little competitor now has access via their

20   chief engineer to everything that DuPont is doing.  Then he goes

21   back during or after the litigation and operates in his little

22   competitive company.

23        If this technique became -- you know was allowed, you

24   know, every lawyer would be practicing malpractice if they

25   didn't set up a little shell company like Ventronics.

1           There's no way this can reasonably work.  They

2    manufactured the shell company.  They set somebody up.  That

3    person should not be allowed to do anything that should be

4    competitive with that information, particularly, prosecuting

5    patents.

6           Again, when we come down to the issue of fairness, it's

7    not unfair at all.  These aren't two equal streets.  My company

8    has signed a two-way prosecution bar in the past.  That's when

9    we're dealing with real competitors.  There is the likelihood

10   that I might misuse some information and use it unfairly against

11   the other side.

12          This is not that instance.  These people haven't been

13   in the business for twelve years.  I'm finished now.

14          Thank you.

15          THE COURT:  All right.

16          Ms. Lehman, do you have something to add?

17          MS. LEHMAN:  Nothing to add, your Honor.

18          THE COURT:  All right.

19          Mr. Shanahan, do you have something that's not been

20   said before in response to what Mr. Zubler and Mr. Jones have

21   said?

22          MR. SHANAHAN:  Yes, your Honor.  I have several things

23   to go.  Thank you very much.

24          A couple of points we would like to make.

25          The first thing that we should correct is that Mr.

1    Jones said that CPC sold only about one or two ventilators.  I

2    think they sold nearly a hundred in the 5 years that we were in

3    business.

4              THE COURT:  What 5 years were those?

5              MR. SHANAHAN:  That was 1995 until roughly 2000, your

6    Honor.

7              THE COURT:  Okay.

8              MR. SHANAHAN:  The other point that we want to bring up

9    is that really what defendants have not responded to, you know,

10   they said a number of things about they don't want the

11   confidential information in the hands of Dr. Biondi.

12             And what we've proposed, and I'll repeat this a little

13   bit because maybe the defendants misunderstood, is that they

14   have the power to designate any of their confidential

15   information, AEO documents to prevent Dr. Biondi from seeing

16   anything that might cause technical prejudice in the Patent

17   Office.

18             What we're trying to exclude from that bar is certain

19   confidential information such as financial data and other

20   business strategy information that will allow him to make

21   competent litigation decisions on behalf of the company.

22             Mr. Zubler told you earlier that I had made a lot of

23   remarks that had information about Dr. Biondi's role that he was

24   unaware of.

25             However, I'm a little surprised to hear that, because

1    all of my remarks have come from the declaration that was filed

2    in Texas on October 11th about how he alone does all the

3    prosecution, about how they are a small company, about how he's

4    been doing it the entire time.

5         So, it's unclear to me why they believe this is new

6    information.  They have known about it and have known about it

7    informally through the many conversations that we've had.

8         His role -- the uniqueness of his role is something --

9    is not something that comes as a surprise.  We've been

10   negotiating this prosecution bar for nearly a year now, and we

11   have been very forthcoming with the defendants and telling them

12   why we want certain confidential information exemption and why

13   Dr. Biondi should be allowed to wear both hats.

14        Furthermore, they talk about the drafting of claims and

15   other such actions that would be prejudicial to the defendants.

16        What they don't address is the fact that with we cannot

17   participate.  Our lawyers and all resources that have been

18   brought to bare by the defendants will be thrown into the weight

19   of these reexamine proceedings under the bar that the plaintiff

20   propose -- that defendants propose.

21        Plaintiffs would not be allowed to use the same

22   materials or effort.  And that is inherently unfair.

23        They want to use all of their litigators work that

24   they've done on this case in order to forward this offensive

25   prosecution strategy that they have initiated, yet they want to

1    tie two hands behind our back so that we cannot respond in kind.

2    We think the Court should reject that because that's also

3    inherently unfair.

4          Defendants also said something like, well, we're small,

5    and so you should be able to hire some type of outside attorney.

6    That also is not true because of the technical complexity of the

7    subject matter.

8          The unique rule that management provides in providing

9    management litigation and prosecution strategy, you can't just

10   pull some guy in off the street that doesn't have the 20 years

11   or so of technical experience and prosecution history that Dr.

12   Biondi has.

13         It's unfortunate that he's the only one who can

14   provide -- perform this role on behalf of plaintiffs, but that

15   is why the plaintiff has tried to create a confidential

16   information carve-out that protects the technical information

17   and prevents the prejudice that defendants have described from

18   happening but yet let's him see the information that he needs to

19   make litigation decisions.

20         Again, I would say the defendants have not responded to

21   that offer at all or said why that arrangement is not suitable

22   for them.

23         I think that's it from me at this point, your Honor.

24         THE COURT:  All right.  Hold on for just one minute.

25         The Biondi affidavit, is that an exhibit to DI 146?

1          MR. SHANAHAN:  Yes.

2          THE COURT:  Which one?

3          MR. SHANAHAN:  It's Exhibit 3, your Honor.

4          I'm referring to statement 9 through at least 13.

5          THE COURT:  It doesn't say too much about what the

6     other 17 CPC employees do, right?

7          MR. SHANAHAN:  It does not, your Honor.  But Section 11

8     says, I alone continue to participate without with outside legal

9     counsel, making it clear at least in plaintiff's perspective

10    that none of the other employees are involved in prosecution.

11         MR. ZUBLER:  When I was characterizing what was in and

12    what wasn't in the Biondi declaration what I was really

13    referring to -- first of all, the fact that this declaration

14    really didn't tell us how many employees CPC currently has.  It

15    said there were 18 employees in 1995.  20 years later.  We were

16    unsure of how many employees they had.  We don't have proof of

17    that.

18         Separately, Mr. Shanahan made a number of statements

19    saying not just that Dr. Biondi along has been doing x, y or z,

20    but he said that no one else can do it.  It's impossible for

21    someone else to get up to speed and to learn these issues.

22       There is no documentary evidence or proof of that.  That's

23    what I was referring to when I said Mr. Shanahan is going beyond

24    the Biondi declaration.

25         THE COURT:  All right.  Here's what I think.

1          There's really two applications for patent prosecution
2    bar here.  The defendants want one for Dr. Biondi.  The
3    plaintiffs want a reciprocal one.
4          Pursuant to In Re:  Deutsche Bank 605 F.3d 1373 Federal
5    Circuit.  The burden of proof is on the part that wants the
6    prosecution bar.
7          My understanding which came from the documents I read,
8    and other than the number of years here really nothing that has
9    been said really changed that.
10          Ventronics is not a manufacturer.  And I thought the
11    papers said for six years, but I will accept that it's 11 years,
12    and shows no inclination to be so in the future.  And it is not
13    a competitor of the defendants in relation to ventilator control
14    systems.
15          Ventronics does own at least two patents and is
16    involved in patent proceedings both at the U.S. Patent and
17    Trademark Office and in Europe.
18          Dr. Biondi, who I got from the papers, was a scientist
19    and now I've been told is a Yale trained anesthesiologist, is
20    the main person in all of its activities.  Because I think I saw
21    that he was Chairman of the Board of Directors and Chief
22    Executive Officer of CPC as well as probably the only person at
23    Ventronics.  So he's the main person in all of their activities.
24    He's the essence of what In Re:  Deutsche Bank referred to as
25    the competitive decision maker.

1          The defendants, I guess at least are fairly large

2     companies and they are competitors of each other.  Everyone,

3     that meaning lawyers, agrees that there should be a patent

4     prosecution bar against Dr. Biondi.  The question is the scope

5     of it.

6          The defendants want to include quote, confidential

7     unquote information.  And the plaintiffs wants it only to

8     include quote, highly confidential outside counsel only unquote,

9     and quote, highly confidential source code unquote.

10         Plaintiff has no issue with the patent prosecution bar

11    including the two highly confidential designations.

12         The highly confidential outside counsel only

13    designation as outlined in paragraph 9 of the proposed

14    Protective Order includes all trade secrets and non-public

15    technical information.

16         I think it also includes business or marketing plans.

17    In includes a lot of stuff.  And so under both sides

18    understandings and requests, Dr. Biondi doesn't get any of that,

19    instead what he would get is quote, confidential research

20    development, commercial or financial information unquote.

21         The disclosure which the defendant quote, reasonably

22    believes could cause harm to its business operations or provide

23    improper business or commercial advantages to others unquote.

24         It doesn't really seem to me that there is that much of

25    a risk in providing confidential information to Dr. Biondi of

1    the nature that's included within that definition given that he

2    works for two companies that don't actually engage in this sort

3    of commerce.

4         And that seems to me to be pretty much what the Federal

5    Circuit had in mind when it said In Re:  Deutsche Bank.  And I'm

6    quoting page 1381.

7         Quote, In evaluating whether to grant a patent

8    prosecution bar in the first instance, the Court must be

9    satisfied that the kind of information that will trigger the bar

10   is relevant to the preparation and prosecution of patent

11   applications before the PTO.

12        For example, financial data and other sensitive

13   business information even if deemed confidential would not

14   normally be relevant to a patent application and thus would not

15   normally be expected to trigger a patent prosecution bar

16   unquote.

17        I think the understanding that I get from that is also

18   perfectly consistent with the interim Protective Order entered

19   by the Eastern District of Texas at docket item 93, paragraph 14

20   B and C, which puts the patent prosecution bar on quote,

21   confidential technical information unquote.

22        So I think the patent prosecution bar as proposed by

23   the defendants -- let me just address one other thing first.

24        It seems to me that 18 months from the end of this

25   litigation for the duration of the patent prosecution bar is

1   reasonable.  And let me just address the reciprocal request for

2   a patent bar, which I don't think the plaintiffs have met any

3   kind of burden of proof.

4           I don't really understand why they want one.  I don't

5   think after In Re:  Deutsche Bank that what's good for the goose

6   is good for the gander, is an argument that carries any weight

7   because it fails to take into account any differences between

8   the goose and the gander.

9           It also strikes me as unfair to make it retroactive or

10  anymore onerous on the defendants choice of counsel than it was

11  when the Eastern District of Texas entered the interim

12  Protective Order.

13          Though, I didn't hear it today, in the papers the

14  plaintiff argued that it was for the benefit of the defendants.

15  But since the defendants don't seem to want it, I can't give

16  that argument much weight.

17          So, therefore, if the Protective Order is submitted we

18  with the defendants' version of the patent prosecution bar minus

19  the inclusion of the word confidential in paragraph 35, line 4,

20  I will sign that.

21          So will someone submit a Protective Order to that

22  effect?

23              MR. ZUBLER:  Yes, your Honor, we can do that.

24              THE COURT:  Mr. Zubler said yes, they can do that.

25              All right.  Shall we go on to the docket item 123?

1           I do realize that perhaps the way this was set up since

2   I hadn't real noticed that docket item 123 and docket item 139

3   were out there.  If there is no notice, therefore, you're not

4   prepared to discuss them, just say so.  If you are prepared to

5   discuss them, we might be able to get them ruled on.

6           MR. SHANAHAN:  Are you referring to the two Motions to

7   Compel?

8           THE COURT:  Yes.

9           MR. SHANAHAN:  I think, defense counsel can respond as

10  well, we understood that we were just going to discuss the

11  Protective Order issue today.  And that we were going to

12  schedule for another day, although, I suppose that if plaintiff

13  had to argue those motions today, we'd probably could with five

14  or ten minutes preparation.

15          THE COURT:  Defense?

16          MR. ZUBLER:  Your Honor, this is Mr. Zubler speaking

17  for Hamilton.

18          We again were under the understanding after speaking

19  with Ms. Selmeyer that today we would just be dealing with the

20  Protective Order issue.

21          I do think because we have multiple motions there, it

22  might take sometime.  I don't think we're really ready to argue

23  that today.  We would need to put more than ten minutes to do

24  it.

25          THE COURT:  Well, that's fair.

1           I would note that the one that I've called docket item

2     123, that seems to be just between Ventronics and Hamilton.

3     That has to do with your five ventilators from Europe.  And I

4     believe that docket item 139 is basically between Ventronics and

5     Maquet and has to do with what we'll call the anesthesia

6     devices.  I will hold off on those.

7           We also have a different motion which I think is maybe

8     perhaps moot now, which is the discovery timetable dispute which

9     may not what it is called.  It's docket item 157?  And it had

10    something to do with the Protective Order.  I think that was

11    really the only thing that was -- that anybody seemed to want to

12    argue.

13          MR. SHANAHAN:  We had two issues there.

14          The first issue is we would like to schedule -- we

15    would like to point out to the Court that the current Scheduling

16    Order that we had in the Eastern District of Texas had the close

17    of fact discovery set for April of 2012 and trial set for

18    December of 2012.

19          What we'd like to do is set a date sometime in January

20    to argue these two motions and set the Scheduling Order in the

21    hopes that we can preserve as much possible from the original

22    schedule given that this case has now been pending for 14 plus

23    months.

24          THE COURT:  In that regard, the close of fact discovery

25    in April 2012, what was the specific date, do you recall, or

1    does anyone know?

2            MR. SHANAHAN:  I believe it's April 27, your Honor.

3            MR. ZUBLER:  Your honor, if I could just interject

4    briefly on the issue of the schedule?

5            THE COURT:  Yes.

6            MR. ZUBLER:  There is an existing schedule from the

7    Eastern District of Texas.  The parties have agreed since the

8    transfer that, for example, a lot of those deadlines relate to

9    the claim construction briefing and so forth and have, you know,

10   sort of gone by the wayside.

11           The parties have agreed to defer those.

12           My understanding is that this case will need a new

13   schedule and need a new trial date.  Even the fact discovery

14   date may need some pushing back just in light of the fact that

15   there has been an interim hiatus here in the litigation.  We

16   don't view there to be a great pending urgency necessarily here

17   that Mr. Shanahan maybe trying to push.

18           THE COURT:  I'm sorry.

19           Does any other defense counsel want to say something.

20           MR. JONES:  Again, I would hesitate to see --

21   certainly, I didn't expect discovery to be closing in April.

22           There are a lot of Markman issues that have -- the

23   dates have already gone by unresponded to as we waited to land

24   in Delaware.

25           I felt a lot of things that were imposed -- I thought

1    Texas was clearly an improper venue.  The rules there were

2    improper to be applied in this case.  That's why we wanted to be

3    in Delaware.  And I hoped that we would get a Delaware look at

4    this case.  I think -- nothing has happened.

5         We, for example, yesterday, I just got an increase of

6    900 percent of plaintiff's production.  Meaning I had 18,000

7    documents.  We had been asking and asking for more.

8         I think he told us in August that he had them but he

9    never gave them to me until yesterday.  I had 18,000 documents

10   in my bin.  And yesterday -- by today I now have a 186,000.

11        I don't think this case ready on the facts.  I think a

12   lot of things have not been developed.

13        So I vote that we sit down and take a look at the real

14   schedule and what's happening.  I think another very, very

15   important point is the fact that there is a reexamination filed.

16   It's absolutely -- we're not suppose to be certain, but it's

17   certain that every claim in this patent will be ordered under

18   reexamination and will initially be declared probably invalid.

19      We don't know how long that reexamination takes.

20        So all the Markman or other kinds of issues that we

21   maybe doing or other discovery that we take maybe wasted effort

22   until with see what claims really come out of that

23   reexamination.

24        We can't really develop the case for now, patent claims

25   that are floating and clearly are going to be changed in

1    reexamination.  So I think that -- I look forward to a

2    scheduling hearing.  I think we have one scheduled sometime

3    February 15th to the 18th.

4         The Patent Office has under their rules a final day for

5    issuing their order on the reexamination, I think of February

6    15th.  I would hope that date would get date.  February 17th,

7    18th, something like that so we have the order in hand.  The

8    Court can clearly act with knowledge of what the PTO is going to

9    do.  And then in light of that very important fact, decide how

10   you want to move forward on scheduling the case.

11        THE COURT:  Just on the question of what the PTO is

12   going to do, isn't what they're going to do on February 15th

13   some non-final thing?

14        MR. JONES:  What they are going to do is they are going

15   to declare yes or no binary.  Yes, we going to do a

16   reexamination because we have found quote, a substantial issue

17   of invalidity unquote, pertaining to the claims of the patents

18   that are under reexamine.

19        THE COURT:  This is Mr. Jones, right?

20        MR. JONES:  It is, sir.

21        THE COURT:  If they say yes, then they do the

22   reexamine.  If they say no, does it mean it's over?

23        MR. JONES:  It means they are not going to have a

24   reexamine and we're ready to go with the claims we have.  If

25   they say yes, then they have a significantly detailed procedure

1    they follow like with their key examiners who are detailed for

2    this kind of duty.  And they try and look at the prior art.

3          This is thing set up by the Patent Office to try and

4    provide an alternative method for resolution of prior art

5    disputes about patents that otherwise would be in litigation.

6          So here we have a litigation.  We have significant

7    prior art.  Quite frankly, one of the devices plaintiffs says

8    infringes their patent.

9          THE COURT:  Let's not get into the merits of this here.

10         If they do do a reexamine, couldn't that go on forever?

11         MR. JONES:  No.  They have expedited rules.  They try

12   to handle the litigation issues -- litigation related patents

13   faster.  It will take a year and a half or something.

14         That's why actually -- it's my party, as defendant

15   Draeger, we would be moving as soon as that court, PTO rules, to

16   ask the Court to stay the case which is commonly done.  It's not

17   done in every instance.  It's commonly done to wait so that

18   we're not all running around and trying to define and take

19   discovery on claims that may not never exist as we wait until

20   the Patent Office has some claims, they reissue something if

21   they ever do.  They may never issue a patent on this stuff.

22         MR. SHANAHAN:  Really, we're getting very, very far

23   afield here.

24         There is a lot of wishful thinking by the defense

25   counsel about what the outcome of the reexamine is going to be.

1          I think the issue before the Court with respect to the

2    Scheduling Order and these pending motions.  It would have been

3    plaintiff's preference to argue those motions and do a

4    Scheduling Order today because we think that this case has been

5    pending for 14 months.  And by the time any reexamine happens it

6    will a year and a half ago.

7          We would strongly prefer to set a date in January now

8    to set the Scheduling Order and to hear these two motions

9    because discovery and then a production that the plaintiff is

10   going to have to produce depending on how these discovery

11   motions are heard, really needs to get going sooner rather than

12   later.

13         And we think address the reexamine issue when and if it

14   happens sometime later in February.

15         THE COURT:  Okay.

16         Let's pick a date to hear these other two motions.

17      Defendants, do you all want to participate in the motions

18   even if it is not your argument?

19         MR. JONES:  I think it's useful because some of the

20   issues maybe uniformly applied across.  I think it has to do

21   with products not yet introduced into the market.  Those may

22   affect us, for example, on Draeger.  Maybe they want to assert

23   the same kind of discovery against me.

24         I would be interested in at least listening and seeing

25   what the Court thinks on some of these things.

1           THE COURT:  Okay.

2           MS. LOUDEN:  It may well make sense to discuss a

3    Scheduling Order at the same time which would affect all defense

4    counsel.

5           THE COURT:  Yeah, it might indeed.

6           The only thing is I kind of like to get these two

7    motions decided.  I don't have the sense there is going to be a

8    lot of agreement between the parties as to what the schedule

9    should be.  So, maybe that's unavoidable.

10          The February date that was discussed with Ms. Selmeyer,

11   what was that for?

12          MR. HORWITZ:  That was for what we're talking about

13   now.

14          THE COURT:  Okay.  Then I guess it was being discussed

15   to do it perhaps coincidentally right after this reexamine yes

16   or no was due?

17          MR. HORWITZ:  That just happened to be around the same

18   time as the series of dates, the 15th, 17th, whatever the exact

19   dates that Ms. Selmeyer gave us when we spoke to her a couple of

20   weeks ago.

21          THE COURT:  Okay.  All right.

22          You were looking at the week of what?

23          MR. SHANAHAN:  The plaintiff was available the week of

24   January 16th.

25          THE COURT:  February.  I thought you were talking about

1     in February.

2          MR. SHANAHAN:  Those were the dates that we discussed

3     with your clerk.  We were looking to advance those dates to

4     sometime in January, your Honor.

5          MR. HORWITZ:  When we spoke with chambers, those dates

6     were given to us.  We were prepared to talk about those dates

7     and try to lock them in now.  And then I forget whether it was

8     late Thursday or Friday right before Christmas, plaintiff sent

9     in a letter trying to advance the date.

10          And I think the defendants believe that we should be

11     operating under what your chambers gave us and we were prepared

12     to discuss those dates.

13          It just so happens that there maybe some more

14     information about the reexamine at the same time.  And we

15     believe it would be appropriate to keep that time frame that was

16     provided by your Honor's chambers.

17          THE COURT:  All right.  Let me ask a question.

18          If we schedule this for the middle of February, is

19     somebody -- perhaps Mr. Jones said that he had gotten a 180,000

20     documents within the last day or two.  I assume that discovery

21     will keep on going even if we don't have this conference until

22     February?

23          MR. JONES:  I expect it will.

24          MS. LOUDEN: The concern, of course, is the two motions

25     that we have before you involve products that haven't -- that

1    aren't yet in the suit.

2         Our concern is by putting this off until February at

3    the end of the deadline now is April, if we're just addressing

4    those two months from now, that is much longer that the case is

5    stalled and we're not able to move forward on those products,

6    that may well be accused of infringement and added to the case.

7         MR. SHANAHAN:  I think, your Honor, another point worth

8    considering is the briefing on these motions has been done for a

9    long time.  The time that would take up to speed to argue them

10   should not be, really, super-intensive because of the amount of

11   time that has elapsed since they have been submitted in their

12   finality.

13        MS. LOUDEN:  Your Honor, we had preferred with,

14   frankly, having all these issues heard that was actually offered

15   by Ms. Selmeyer.  Defendants understandably didn't want to have

16   everything heard today given that it was the holidays.

17        The initial discussion was about having everything

18   addressed today.

19        THE COURT:  Hold on just one minute.

20        All right.  Here's what I think we should do.  I think

21   we should pick a date in February.  I'm going to suggest

22   February 17th to do the scheduling.  And I'm going to suggest

23   9:00 a.m. on February 17th.

24        MR. JONES:  Your Honor, I'm happy to do that a little

25   bit.  I'm on the west coast.

1           THE COURT:  I'm sorry.  I didn't realize that you were

2      in California.

3           MR. JONES:  I'll be there if you want me to.

4           THE COURT:  No, no, no, no.  I thought nobody was west

5      of Texas here and it wasn't too early.

6           How about 11:00 a.m?

7           MR. JONES:  Thank you, your Honor.  All right.

8           THE COURT:  We'll do the Rule 16 on February 17th at

9      11:00 a.m.

10          I'd like the at least the local counsel to come to

11     chambers for that, out-of-state counsel can call in.  Okay.

12          MR. JONES:  Thank you.

13          THE COURT:  Now in terms of these to motions, I'd like

14     to just have a telephone argument on them sometime realistically

15     maybe next week.  I'm wondering if we could do them on Thursday

16     the 5th at 11:00 a.m?

17          MR. SHANAHAN:  Is that January 5th?

18          THE COURT:  Yes.

19          MR. SHANAHAN:  That's fine with plaintiff.

20          MS. LEHMAN:  That's fine with Maquet.

21          MR. ZUBLER:  I believe that should be okay.  There is

22     one outstanding item perhaps on our end for scheduling.  If we

23     can give -- I apologize.  If we can give a tentative approval

24     for that date?

25          THE COURT:  I think Mr. Seitz can certainly argue it if

1    you're not available.

2          All right.  Mr. Jones is that okay with you?

3          MR. JONES:  Certainly, your Honor.  I'm just a rider on

4    this one.

5          Okay, January 5th at 11:00 a.m.

6          There's one -- this is probable a really stupid

7    question but I have been advised that I should just ask the

8    stupid questions and you can draw from it what you will.

9          On the motion between Ventronics and Maquet, there

10   seems to be a lot of argument about whether or not an anesthesia

11   device, anesthesia delivery device that has a ventilator as part

12   of it, whether that can be an infringing device.

13         And it would make things easier for me if somebody

14   could say, you know, send me a case or something before January

15   5th that just says, in effect, if you have -- something that

16   infringes -- that essentially you have a patented ventilator

17   device, or ventilator system, and if you have a ventilator

18   control system and method, if you have an anesthesia device that

19   uses something that stood alone would infringe the ventilator

20   control system and method, does it also infringe when it's part

21   of anesthesia delivery device.  That maybe obvious.  The answer

22   maybe obvious.

23         I'm kind of new at this.  I would appreciate getting a

24   case that says what the answer is.

25         MR. SHANAHAN:  For the plaintiff, what I would say is

1    if you're looking for a case that stands for the proposition

2    that a component of a larger unit it infringes, would it be

3    proper to say that the larger unit infringes?  I think we can

4    find case law on that.

5            THE COURT:  That's what I'm looking for.

6            MR. SHANAHAN:  Plaintiff will provide you with a case.

7    It will take a couple of days to do that.

8            THE COURT:  And defendants, I would appreciate a case

9    from you all, too.

10           MS. LEHMAN:  Yes, your Honor.

11           This particular allegation there kind of goes directly

12   to the claim construction issues that will be arising in this

13   case.

14           THE COURT:  Have we covered everything that we can do

15   today?

16           MR. SHANAHAN:  I think we're good for plaintiffs, your

17   Honor.

18           MR. JONES:  Fine with me.

19           MR. ZUBLER:  Fine with us, your Honor.

20           MS. LEHMAN:  Thank you for Maquet.

21           THE COURT:  Thank you everybody.

22           And I look forward to talking to you again on January

23   5th.

24           (At this time, the teleconference concluded)

25

# EXHIBIT 2

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3   TQ DELTA LLC,              :
                               :
4              Plaintiff,      : No. 13-1835-RGA
                               : No. 13-1836-RGA
5        v.                    : No. 13-2013-RGA
                               :
6   2wire Inc.,                :
                               :
7              Defendants.     :


8
                     Thursday, October 30, 2014
9                    4:00 p.m.

10

                     Conference
11                   Chambers of Judge Richard G. Andrews

12                   844 King Street
                     Wilmington, Delaware
13

14     BEFORE:    THE HONORABLE Richard G. Andrews,
                   United States District Court Judge
15

16   APPEARANCES:

17
                   FARNAN LLP
18                 BY:  MICHAEL FARNAN, ESQ.

19                             -and-

20                 MCANDREWS, HELD & MALLOY, LTD.
                   BY:  PETER McANDREWS, ESQ.
21
                        On behalf of Plaintiff
22

23

24
```

```
 1      APPEARANCES CONTINUED:

 2

 3              MORRIS JAMES LLP
                BY:  KENNETH DORSNEY, ESQ.

 4                          -and-

 5              ALSTON & BIRD, LLP
                BY:  ELIZABETH RADER, ESQ.
 6
                    On behalf of ZyXel Communications,
 7                  Inc.

 8

 9              MORGAN, LEWIS & BOCKIUS, LLP
                BY:  COLM CONNOLLY, ESQ.
10
                    On behalf of Pace Americas, Inc.
11                  and 2wire, Inc.

12

13              SEITZ, VAN OGTROP & GREEN, P.A.
                BY:  JARED GREEN, ESQ.
14
                    On behalf of Zhone Technologies
15

16

17

18

19

20

21

22

23

24
```

```
 1                  THE COURT:  Good afternoon, and

 2      please be seated.  This is the conference in TQ

 3      Delta LLC vs. 2wire, Inc.  Civil Action Nos.

 4      13-835 and also 13-836 and 13-2013.  It will be

 5      useful to have on the record who's representing

 6      who here.  Mr. Farnan?

 7                  MR. FARNAN:  Michael Farnan for

 8      the Plaintiff, and with me is Peter McAndrews

 9      from McAndrews, Held & Malloy.

10                  THE COURT:  All right.  Good

11      afternoon.

12                  MR. McANDREWS:  Good afternoon,

13      Your Honor.

14                  MR. CONNOLLY:  Colm Connolly, Your

15      Honor, for Pace and 2wire.  Good afternoon.

16                  MR. GREEN:  Good afternoon, Your

17      Honor.  Jared Green on behalf of Zhone

18      Technologies.

19                  MR. DORSNEY:  Good afternoon, Your

20      Honor.  Ken Dorsney on behalf of ZyXel.  And

21      with me is my co-counsel Elizabeth Rader from

22      Alston & Bird.

23                  THE COURT:  I believe I've met you

24      before, Ms. --
```

1          MS. RADER:  Rader.

2          THE COURT:  Ms. Rader, yes.  I was

3    going to say Ms. Byrd because it's the last name

4    I heard.  I want to thank you all for coming.  I

5    do have a question.  I originally got this

6    protective order that seemed to have a place to

7    make a choice and I don't recall there being any

8    actual requests that people wanted to argue the

9    choice which would involve writing those kinds

10   of letters that I got after I made the choice.

11         Did I misunderstand something or

12   what was going on there?

13         MR. FARNAN:  Your Honor, it was

14   probably my fault.  We were working with Your

15   Honor's new procedures so your new procedures

16   were essentially put argument in a joint letter

17   or just submit opinion proposals, so when we

18   submitted the opinion proposal, it didn't

19   include the argument.

20         THE COURT:  Okay.  All right.  No

21   problem there.  But a lot of times I will get

22   something and it will -- if there's going to be

23   some argument, I would like to know because then

24   I will wait to get the argument as opposed to

1    looking at it, trying to make a decision, making

2    a decision and then getting the argument

3    afterwards.

4              So I have a letter signed by Brian

5    Farnan on October 9, 2014 and I think the other

6    two letters are essentially the same as

7    Mr. Connolly's letter of October 15th and I

8    brought with me the page of the protective order

9    where it said prosecution bar.  That's Paragraph

10   13.  No individual retained by -- and then there

11   was the dispute where TQ Delta's position was

12   either party and 2wire's position was Plaintiff,

13   and I chose Plaintiff, including in-house or

14   outside counsel and/or outside consultants whose

15   access to any producing party's highly

16   confidential attorneys eyes only or highly

17   confidential source code material may without

18   consent of the producing party engage in any

19   prosecution activity involving claims relating

20   to DSL technology during the pendency of this

21   action for a period ending two years after, and

22   then there's the termination dates.

23             So I get the impression that TQ

24   Delta says this is unfair -- you may have a more

```
 1      legal term for that -- because TQ Delta does
 2      something beyond prosecuting the patents that it
 3      has bought or inherited from other people?
 4                  MR. McANDREWS:  That's correct,
 5      Your Honor.
 6                  THE COURT:  All right.  So what is
 7      it that you do that you want to tell me about?
 8                  MR. McANDREWS:  Your Honor, TQ
 9      Delta actually is an extension of the prior
10      patent owner Aware.  Aware was a company that
11      effectively -- their product that they produced
12      was actually not necessarily a tangible product.
13      The business of Aware was to generate referenced
14      designs.  So in some sense of the word, Aware's
15      business was intellectual property.
16                  Although I guess you could say
17      it's taking what is sufficient for a patent and
18      a patent application enabling disclosure and
19      taking it down to something a little more
20      specific in the terms of source code.  So to the
21      extent Aware had brick-and-mortar in products,
22      it was something that was somewhat more tangible
23      than intellectual property.  Nevertheless, it
24      was never a product in the sense that the
```

1    Defendants are using the term.

2              In any event, that effectively

3    brick-and-mortar was sold to a company called

4    Lantic(ph).  Lantic took that aspect, the

5    reference design aspect of the business, but

6    left Aware with the patents, the intellectual

7    property.  They also left Aware with the two

8    main brains behind the intellectual property, an

9    individual named Michael Zanos and an individual

10   named Marcos Zanos.

11             Michael and Marcos Zanos traveled

12   with the patent portfolio with TQ Delta.  They

13   are not employees of TQ Delta so I'm not

14   intending to misrepresent them as employees.

15   However, they are consultants and

16   representatives of TQ Delta in their ongoing

17   inventive work.  And what I mean by that is they

18   continue to develop DSL technology which is the

19   technology in the case.

20             They continue to contribute those

21   technologies to the ITU which is the

22   international standards body that governs DSL

23   technology, so that's the ITU.  And they

24   participate on a monthly or maybe even

```
1     bi-monthly basis in contributing their ideas.
2     And those ideas are brand new technologies in
3     some cases which will lead to development of a
4     next generation DSL standard, but they are also
5     improvements to the existing DSL standards.
6               If Your Honor wants some
7     evidence -- this is Mr. McAndrews on the facts
8     here, but if you would like some evidence to
9     back up that they are ongoing contributors to
10    the standards process, I can provide their
11    submissions made that are signed and these are
12    on behalf of TQ Delta.
13              THE COURT:  I guess what I would
14    appreciate understanding is why their ongoing
15    efforts would be subject to discovery?
16              MR. McANDREWS:  Why would it be
17    subject for discovery?
18              THE COURT:  Right.
19              MR. McANDREWS:  Potentially for
20    several reasons.  One is that their current
21    development work may lead to improvements to the
22    very technologies in the case.  And so a
23    discovery request is broad enough to encompass
24    development work that led to the inventions of
```

```
 1      the patent-in-suit and would be broad enough to

 2      encompass some of the work they're doing now.

 3                      THE COURT:  How long were these

 4      patents-in-suit sought?

 5                      MR. McANDREWS:  Filed in the first

 6      instance, some of them very recently, as

 7      recently as 2009.  In fact, there have been new

 8      patent filings now that Marcos and Michael Zanos

 9      are with TQ Delta.  So there have been brand new

10      patent filings made in the name of TQ Delta, and

11      those are not in the case, Your Honor.  But let

12      me give you an example --

13                      THE COURT:  Okay.  So what I've

14      heard you say is they might ask for something

15      related to the development of technology

16      relating to these patents.  But what I'm

17      wondering is why is what they're doing today

18      relevant?

19                      MR. McANDREWS:  Well, let me take

20      on general relevance, not necessarily in the

21      sense is it discoverable.  It's only

22      discoverable if they ask for it.  And it sounded

23      to me like their position was if they don't ask

24      for it, then it's not relevant.  We may want to
```

```
1     affirmatively rely on the fact that TQ Delta is

2     an ongoing inventive entity and not

3     pejoratively referred to as an MPE.

4              THE COURT:  Well, we're not going

5     to have pejorative references when the rubber

6     hits the road so you don't need to prove that

7     you're not something that they're not going to

8     be allowed to call you in the first place.

9              MR. McANDREWS:  Your Honor, I

10    understand that, but there are shades of grey of

11    what they're allowed to call us.  There's a

12    recent decision of Judge Lucy Koh out in

13    California where they said you can't call them

14    an MPE, you can't call them a troll.  However,

15    you can tell the jury that they do not continue

16    to contribute anything, that they are merely a

17    patent-holding company.  So while you're not

18    allowed to call them names, you're allowed to

19    list the facts.

20             And if they're allowed to list the

21    facts of we don't continue to contribute to

22    anything, we merely bought a patent portfolio

23    and we make our money off of suing people, we

24    should have the ability and we may want to
```

1     introduce the jury to the company, the ability

2     to tell them about their ongoing inventive work.

3              THE COURT:  Well, this kind of

4     dispute was raised a few weeks ago in a

5     different case.  And what I said was essentially

6     you can talk at a high level about what you do

7     but the details don't matter because we're not

8     going to have a trial where Mr. Zanos gets up

9     and says, yeah, I continue to invent things and

10    he gets cross-examined with here is your source

11    code, it's not very inventive.

12             I guess what I'm wondering is it

13    seems like we're arguing over this prosecution

14    bar to at least right now your leading argument

15    seems to me incredibly tangential in the first

16    place, which is the reason why I was asking you

17    why is it relevant.  Because typically one of

18    the reasons why you have a one-way bar is

19    because they're the accused infringers and

20    you're looking for when you cut off what they're

21    doing so we can get a case to trial so you're

22    looking for what they're doing right now.

23             At least it seems to me generally

24    as a matter of the core questions of the

1     infringement and invalidity, what you're doing

2     right now makes no difference.

3              MR. McANDREWS:  Let me set aside

4     what we're doing now just for the moment and

5     talk about the documents that will show a

6     conception and reduction to practice or work on

7     the things that were leading to the products at

8     the time where it was an ongoing entity.  There

9     will be information there that remains

10    confidential.  In fact, currently some of that

11    information will be owned by Lantic, a third

12    party.

13             That information that remains

14    confidential is intellectual property that might

15    ultimately wind up in a commercial product of

16    someone, maybe not ours, maybe ours in the

17    future, but there's no reason why their

18    attorneys and their expert witnesses that have

19    access to that type of information, there's no

20    reason to distinguish my access to their

21    information, from their access to my information

22    because they can use it for the same reason.

23             All of the reasons that they're

24    concerned about that I would run out and write a

```
 1        claim -- and by the way, we're not asking to not
 2        have a prosecution bar apply to us.  We're
 3        asking for their prosecution be defined in a way
 4        such that I can participate in an IPR for them
 5        as long as I'm not allowed to draft claims.  We
 6        have no problem with that.
 7                  The problem we have is that it's a
 8        unilateral thing that impacts the ability of TQ
 9        Delta to manage this case economically versus
10        what they have to deal with.  Let me use a
11        specific example.  2wire has proposed -- and the
12        reason this dispute arose is originally the
13        parties appeared to be in agreement on a two-way
14        prosecution bar.  The only reason we got to the
15        point of them insisting on a unilateral
16        prosecution bar is 2wire proposed an expert
17        witness.  Her name is --
18                  THE COURT:  Ms. Jacobson.
19                  MR. McANDREWS:  -- Kris Jacobson,
20        that's correct.  She has a Ph.D. in DSL.  She
21        used to participate at the same tables and in
22        the same rooms as Marcos and Michael Zanos at
23        the ITU on behalf of 2wire, so she's a
24        participant in the industry and she could turn
```

1    around and go back to that.  But currently her

2    job is a patent attorney.  And I would imagine

3    with her expertise in DSL that's what she does

4    in large part in her private practice.  She

5    prosecutes DSL applications.

6           So the reason we're here is

7    Defendants desperately want to use this expert.

8    We said, well, are you sure that she's going to

9    be compliant?  We see that her current job is a

10    patent attorney.  Are you sure she's willing to

11    comply with the prosecution bar, and that's when

12    we got the letter back saying, you are an MPE.

13    We don't agree to that.

14           So I guess I will use fairness,

15    Your Honor.  There is nothing to distinguish the

16    information that they will be receiving from us

17    and we will be receiving from them in the sense

18    of why a prosecution bar ought to apply.  If

19    they get access to our information, they can

20    write claims that will read on people that use

21    our intellectual property.  They will write

22    claims that may read on things that we

23    contribute to the ITU.  If we are going to be

24    contributing information to the ITU and it

1    becomes part of the standard, then it will

2    necessarily be used by third parties.

3            The other thing that they can do

4    is if we have a new technology, now I'm back in

5    the new technology area, because the United

6    States is now a first-to-file country or regime

7    rather than first-to-invent, they can actually

8    destroy our inventive rights by filing first.

9            THE COURT:  This is all assuming

10   that they violate the confidentiality order,

11   right?

12           MR. McANDREWS:  I agree, Your

13   Honor, that's true.  But the same presumption is

14   made against me, and that's the reason it's a

15   prosecution bar to insulate that and make sure

16   to put some security in place to make sure that

17   it does not inadvertently happen.

18           THE COURT:  Mr. Connolly, are you

19   speaking on behalf of the --

20           MR. CONNOLLY:  I'm going to speak

21   on behalf of my client, Your Honor.  And first

22   of all, I need to apologize.  In preparing for

23   this, I didn't realize that we had not enclosed

24   as exhibits the three documents referenced in

```
 1      our letter.  The most important one is --
 2                   THE COURT:  I'm sorry.  You --
 3                   MR. CONNOLLY:  We cited your
 4      decision, your oral decision in Ventronics --
 5                   THE COURT:  I remember that.
 6                   MR. CONNOLLY:  I assume you would
 7      remember that.
 8                   THE COURT:  No, actually that's a
 9      bad assumption to make, but that was in the
10      first month I was a judge so I do remember some
11      of those things.
12                   MR. CONNOLLY:  That's a good one
13      to remember, Your Honor.  Let me concentrate on
14      Ventronics.  Because what you said there was
15      that what's -- after Deutsche Bank, what's good
16      for the goose is no longer good for the gander.
17      The whole point of a prosecution bar is to
18      ensure that a party doesn't suffer a competitive
19      disadvantage created by an inadvertent
20      disclosure.  We're not competitors.  There are
21      no products that they are producing.
22                   I'm having a hard time frankly
23      understanding exactly what the nature of the
24      information is that they are concerned about
```

1        disclosing to us.  But the bottom line is they

2        don't have products where we would take that

3        information that they give us and rewrite or

4        prosecute patents that we would then go and

5        assert against them.  So the whole concern that

6        was addressed by Deutsche Bank, and that is the

7        motivation and reason behind a prosecution bar

8        just isn't at play here.

9                   As far as the possibility that we

10       could destroy their inventor rights by rushing

11       to file, you've got to swear under oath an

12       inventor declaration.  We're not going to commit

13       fraud at The Patent Office.  There are

14       mechanisms in place to address that type of

15       egregious conduct.  We're talking trade secret

16       theft, all sorts of things.  That's not what the

17       prosecution bars were meant to address.

18                   They're meant to address what The

19       Federal Circuit called inadvertent compromises.

20       The idea that the folks that are prosecuting the

21       patents inadvertently are using that information

22       they were given such that your typical

23       confidentiality order in place in a case isn't

24       sufficient.  We have to extend it to the

1     prosecution realm and have these prosecution

2     bars.

3               The burden under Deutsche Bank is

4     on the party who seeks the prosecution bar.  I

5     have not heard anything that would justify that

6     kind of bar.  What I have heard and I think the

7     most telling phrase that Mr. McAndrews used is

8     the fact that he's concerned that there's not a

9     fairness because it would impact his ability to

10    manage the case.  And what's really going on

11    here, Your Honor, is TQ Delta does not want us

12    to take advantage of the services that

13    Ms. Jacobson is offering and has offered in the

14    past as an important consultant to Pace and

15    2wire, but that tactical litigation desire is

16    not sufficient to ask the Court to impose a

17    prosecution bar.

18               Somebody like Ms. Jacobson is just

19    not willing to endure a two-year prohibition

20    on --

21               THE COURT:  What is it that she

22    does?  I gather she was an associate of

23    Covington & Burling.  Apparently, she has a

24    Ph.D. in some relevant field and is an expert in

```
 1        DSL.  Is she now essentially a full-time
 2        consultant?
 3                    MR. CONNOLLY:  My understanding is
 4        she's a consultant/lawyer.  I don't know if I
 5        can speak to anything more specific to that.
 6        She did --
 7                    THE COURT:  What I'm wondering is,
 8        is part of what she does patent prosecution?
 9                    MR. CONNOLLY:  Yes.  I couldn't
10        represent to the Court to the extent to which it
11        is.  So there's no question that she's involved
12        in patent prosecution.  But I think the issue is
13        if she is provided information in this case
14        could she use that information to the
15        competitive disadvantage of TQ Delta.  That's
16        what the core of Deutsche Bank is all about.
17                    THE COURT:  Mr. McAndrews, what
18        you were saying is that part of the documents
19        that might be produced had to do with
20        essentially inventor information that predates
21        the filing of the patents.  You mentioned
22        conception and reduction to practice and that
23        this would be information that I guess was not
24        reflected in the patents?
```

```
1               MR. McANDREWS:  Correct.  But I'm
2      not suggesting that it's information relevant to
3      the patents-in-suit necessarily.  It could be an
4      additional invention that might ultimately lead
5      to a new patent application to be filed.  The
6      problem we would face on the concept of burden
7      is their primary response was, well, that
8      information isn't relevant.  And so if we don't
9      get it, there's no reason for a prosecution bar.
10     That places an immense burden on us to attempt
11     to filter documentation.
12               If I've got a lab notebook and
13     it's got on 30 of the pages information relevant
14     to the case but interspersed in there and I've
15     got information that they say is not relevant,
16     I've got an immense burden to separate that.
17     And I will hear of course, you can't redact
18     pages.  How do we know it's not relevant to the
19     case.
20               THE COURT:  Maybe that's what I
21     think Mr. Connolly was talking about.  One place
22     where you're different is they don't have any
23     choice but to provide their highly confidential
24     attorneys eyes only information because it has
```

```
 1        to be produced for the case.  What you're

 2        saying, and I'm perhaps exaggerating here a bit,

 3        but it seems what both you and Mr. Connolly said

 4        was that essentially you are talking about

 5        information that doesn't have to be produced for

 6        the case, but it would be a lot more convenient

 7        and maybe even transparent to just produce it

 8        and let them figure out which is relevant and

 9        not relevant to the case.  Is that a fair

10        characterization?

11                     MR. McANDREWS:  Yes.

12                     THE COURT:  All right.  Do you

13        have anything else you want to say?

14                     MR. McANDREWS:  I know I haven't

15        been clear on this point so they want to make

16        the distinction between products.  On the one

17        hand, they don't want me to inadvertent -- well,

18        not me because I'm not going to be writing

19        claims but someone that would inadvertently

20        write claims that read out a product and I've

21        learned about -- let's say it was going to be

22        me.  And --

23                     THE COURT:  Right, that's

24        inadvertent.  You see something.  It's in the
```

1    back of your mind and then you're busy writing

2    some claims and it comes from the back of your

3    mind to the front of your mind and you forgot

4    how it got into the back of your mind.

5                    MR. McANDREWS:  Correct.  And I

6    agree that's one of the issues that courts look

7    at when they're considering a prosecution bar.

8    The same consideration applies to TQ Delta.

9    Granted it's not brick and mortar, metal box

10   with chips in it.  But when you're contributing

11   ideas to a standard, the standard will not

12   accept your ideas.  If there was intellectual

13   property out there, patents out there, that are

14   not FRAND obligated, so if it's going to become

15   part of the standard, they want you to check the

16   right boxes that say we agreed to license on

17   fair nondiscriminatory terms.

18                    If that information should

19   inadvertently find its way into Ms. X -- we

20   don't have to worry about Ms. Jacobson

21   necessarily, but Mr. And Mrs. X Patent Attorney,

22   if it should make its way into their patent

23   application and the patent application gets

24   filed on behalf of yet a third party that

```
 1          doesn't have an obligation to license on FRAND

 2          terms, that can cause real harm to the ITU

 3          process, to the standardization process.

 4                     So while there is not the

 5          identical concern of writing a claim on a

 6          product, there is a competitive harm that

 7          occurs.  Maybe it's not a competitive harm to

 8          us.  I mentioned earlier that maybe it's the

 9          Lantic information that gets disclosed, but it's

10          the same consideration.

11                     If they have attorneys or

12          witnesses with access to the confidential

13          information in this case, there is a chance that

14          that information could be inadvertently be used

15          in a patent application to the harm of TQ Delta

16          but also to the industry in general.  The ITU is

17          set up so that those contributing to

18          intellectual property are obligated to license.

19                     THE COURT:  All right.  Anything

20          else from you, Mr. Connolly?

21                     MR. CONNOLLY:  I guess I'm a

22          little befuddled by that.  If a contribution was

23          made to the ITU and we took that information and

24          went to the PTO with it, I don't think that
```

```
1    that's a realistic risk that anybody would take
2    and I think there's mechanisms to deal with it
3    and I think, obviously, if that information has
4    already been disclosed, you don't have a patent
5    to begin with.  So I don't really understand the
6    example.
7              I think at the end of the day
8    where we are we have not heard anything
9    sufficient to establish the burden that there's
10   a risk that some inadvertent disclosure is going
11   to create a competitive disadvantage.  And then
12   on top of it even if we did establish that, you
13   would have to balance it against the harm that's
14   posed to us which is significant because we're
15   not going to have the consultant that we've
16   chosen, and that's what gave rise to this
17   concern.
18              THE COURT:  I will take a recess
19   for a minute.  I will be right back.
20              (Brief recess.)
21              THE COURT:  So I think the burden
22   is on the Plaintiff here and I think the
23   Plaintiff hasn't met the burden.  And I say that
24   partly because I really do think it's in
```

```
1        Plaintiff's control whether any of the

2        information they provide could cause a person

3        who has it, who's involved in patent prosecution

4        activities to inadvertently disclose it, I think

5        it's under their control.

6                    And I'm not persuaded that there's

7        any reason to be disclosing the sorts of things

8        that would trigger the need for a bar of the

9        Defendants' attorneys and in particular their

10       consultant, so I'm going to not order it.  All

11       right.  Sorry for the delay here.  Okay?

12                   MR. FARNAN:  Thank you, Your

13       Honor.

14                   MR. McANDREWS:  Thank you, Your

15       Honor.

16                   MR. CONNOLLY:  Thank you, Your

17       Honor.

18                   (The proceedings ended at

19       4:40 p.m.)

20

21

22

23

24
```

```
 1                    C E R T I F I C A T I O N

 2
                      I, Taneha Carroll, Professional
 3
     Court Reporter, certify that the foregoing is a
 4
     true and accurate transcript of the foregoing
 5
     proceeding.
 6
 7                    I further certify that I am neither

 8   attorney nor counsel for, nor related to nor

 9   employed by any of the parties to the action in

10   which this proceeding was taken; further, that I am

11   not a relative or employee of any attorney or

12   counsel employed in this case, nor am I financially

13   interested in this action.

14

15

16           /s/Taneha Carroll
             Taneha Carroll
17
             Professional Reporter and Notary Public
18

19

20

21

22

23

24
```