## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> CHARTER COMMUNICATIONS, INC., *et al.*, <br> *Defendants*. | C.A. No. 17-1734-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> MEDIACOM COMMUNICATIONS CORP., <br> *Defendants*. | C.A. No. 17-1736-RGA <br><br> **PUBLIC VERSION** <br><br> C.A. No. 18-361-RGA |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> WIDEOPENWEST, INC. *et al.*, <br> *Defendants*. | **PUBLIC VERSION** <br><br> C.A. No. 18-362-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> ATLANTIC BROADBAND FINANCE, LLC *et al.*, <br> *Defendants*. | C.A. No. 18-363-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> GRANDE COMMUNICATIONS NETWORKS, <br> LLC *et al.*, <br> *Defendants*. | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY UNDER *DAUBERT*

OF COUNSEL:

David S. Benyacar
Daniel L. Reisner
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
david.benyacar@arnoldporter.com
daniel.reisner@arnoldporter.com

Gregory Arovas
Jeanne M. Heffernan
Ryan Kane
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
garovas@kirkland.com
jheffernan@kirkland.com
ryan.kane@kirkland.com

Luke L. Dauchot
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400
ldauchot@kirkland.com

Bao Nguyen
Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400
bnguyen@kirkland.com

Kelly E. Farnan (#4395)
Valerie A. Caras (#6608)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
caras@rlf.com

*Attorneys for Defendants Charter
Communications, Inc., Charter
Communications Holdings, LLC,
Spectrum Management Holding
Company, LLC, Charter Communications
Operating LLC and Bright House
Networks, LLC*

OF COUNSEL:

Robinson Vu
Natalie Alfaro Gonzales
Lindsay Volpenhein Cutié
Amy E. Bergeron
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Timothy S. Durst
BAKER BOTTS L.L.P.
2001 Ross Avenue
Suite 900
Dallas, Texas 75201-2980
(214) 953-6500

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants Mediacom
Communications Corporation,
WideOpenWest Finance, LLC,
WideOpenWest Networks, Inc.,
WideOpenWest, Inc., WideOpenWest
Georgia, LLC, Knology of Alabama, Inc.,
Knology of Florida, LLC, Knology of
Georgia, Inc., Knology of South Carolina,
Inc., Knology of Tennessee, Inc., Knology
of Kansas, Inc., Anne Arundel Broadband,
LLC, Atlantic Broadband (CT) LLC,
Atlantic Broadband (Delmar) LLC,
Atlantic Broadband (Miami) LLC,
Atlantic Broadband (NH-ME) LLC,
Atlantic Broadband LLC (Penn), Atlantic
Broadband (SC) LLC, Atlantic Broadband
Finance, LLC, Grande Communications
Networks, LLC, RCN Telecom Services,
LLC, Radiate Holdings, LP, and
WaveDivision Holdings, LLC
Telecom Services, LLC, Radiate Holdings,
LP, and WaveDivision Holdings, LLC*

Dated: June 12, 2020

**TABLE OF CONTENTS**

I.      Introduction ........................................................................................................ 1

II.     Case Background ............................................................................................... 1

III.    Summary Judgment Standard ........................................................................... 2

IV.     Defendants Do Not Infringe the ATM Patents .................................................. 2

        A.      Factual Background ................................................................................ 4

                1.      Sprint Alleges It Invented the Solution to Connecting the PSTN to
                        Packet Networks ......................................................................... 4

                2.      Claim Construction ..................................................................... 4

                3.      Sprint's Doctrine of Equivalents Infringement Allegations ....... 5

        B.      Legal Standard ....................................................................................... 7

        C.      Argument ............................................................................................... 7

                1.      Sprint's Equivalence Theories Nullify The Court's *Markman*
                        Ruling .......................................................................................... 7

                2.      Sprint Impermissibly Recaptures Disclaimed Non-ATM Claim
                        Scope .......................................................................................... 10

V.      The SPS Claim Is Invalid For Lack Of Written Description ........................... 11

VI.     Dr. Mangum's Failure To Analyze Available Non-Infringing Alternatives
        Precludes Sprint From Recovering Lost Profits ............................................. 12

        A.      Factual Background .............................................................................. 14

        B.      Legal Standard ..................................................................................... 16

        C.      Argument ............................................................................................. 17

                1.      Sprint Cannot Show That Circuit Switching Would Have Been An
                        Unacceptable Non-Infringing Alternative. ............................... 18

                2.      Sprint Cannot Show Defendants Were Prohibited From Partnering
                        With a Licensed VoIP Retailer Such As Vonage. .................... 19

3.      Sprint Cannot Show That Defendants Would Have Entered The Telephony Business If The Alternative Was Buying Sprint's Interconnection Service. ................................................................ 20

VII.   **Sprint Cannot Recover Pre-Suit Damages For The Marking Patents Because Sprint Failed To Mark Its Products** .............................................................. **21**

A.     Legal Standard ............................................................................ 22

B.     Argument .................................................................................... 22

1.      Sprint Alleges That It And Its Licensees Practice The Marking Patents. ............................................................................. 22

2.      Sprint Asserted Apparatus Claims, Triggering The Marking Statute. .............................................................................. 22

3.      Sprint Failed To Provide Actual Or Constructive Notice Under § 287(a). .............................................................................. 23

VIII.  *Daubert* **Standard** ............................................................................ **24**

IX.    **Dr. Mangum's Analyses Are Unreliable And Unsupported** ......................... **25**

A.     Factual Background .................................................................... 25

B.     Argument .................................................................................... 26

1.      Dr. Mangum's Hypothetical Negotiation Construct is Impermissibly Predicated on Verdicts and Other Non-Comparable Litigation Materials. ............................................................. 26

2.      Dr. Mangum's Analyses Are Based on Unreliable Methodology. ........... 32

X.     **Dr. Wicker's Improper And Unsupported Opinions Fail** *Daubert* .......................... **41**

A.     Argument .................................................................................... 41

1.      Dr. Wicker's "Blocking Patent" Opinion Has No Methodological Basis. ................................................................................. 41

2.      Dr. Wicker's "Direction or Control" Opinions Should Be Excluded. ............................................................................. 42

3.      Dr. Wicker's Economic Feasibility Opinions Should Be Excluded. ........ 44

XI.    **Conclusion** ...................................................................................... **45**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
  324 F. Supp. 3d 470 (D. Del. 2018)................................................................26, 28

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*,
  6 F.3d 1523 (Fed. Cir. 1993)........................................................................22

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
  24 F.3d 178 (Fed. Cir. 1994)........................................................................22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................2

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017).................................................................22, 24

*Ariad Pharm., Inc. v. Mass. Inst. of Tech.*,
  560 F.3d 1366 (Fed. Cir. 2009),
  *aff'd in rel. part*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc)...................................11

*AstraZeneca AB v. ApoteX. Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015)......................................................................40

*Calhoun v. Yamaha Motor Corp.*,
  U.S.A., 350 F.3d 316 (3d Cir. 2003)................................................................43

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
  541 F.3d 1115 (Fed. Cir. 2008)....................................................................9, 11

*CelotEx. Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................2

*Coleman Motor Co. v. Chrysler Corp.*,
  525 F.2d 1338 (3d Cir. 1975).........................................................................27

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
  559 F.3d 1308 (Fed. Cir. 2009)......................................................................22

*Daubert v. Merrell Dow Pharms. Inc.*,
  509 U.S. 579 (1993).......................................................................................25

*Dow Chemical Canada Inc. v. HRD Corp.*,
 656 F.Supp.2d 427 (D. Del. 2009) .......................................................................44

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
 914 F.3d 1347 (Fed. Cir. 2019) ...........................................................................7

*Elcock v. Kmart Corp.*,
 233 F.3d 734 (3d. Cir. 2000) ...............................................................................24

*ePlus, Inc. v. Lawson Software*,
 764 F. Supp. 2d 807 (E.D. Va. 2011),
 *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) ..............................................................29, 32

*Finjan, Inc. v. Secure Computing Corp.*,
 626 F.3d 1197 (Fed. Cir. 2010) .......................................................................23, 30

*Gentry Gallery, Inc. v. Berkline Corp.*,
 134 F.3d 1473 (Fed. Cir. 1998) ...........................................................................11

*Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*,
 No. 2:16-CV-00055-JRG-RSP, 2017 WL 5165606 (E.D. Tex. Oct. 15, 2017) ......................22

*Inline Connection Corp. v. AOL Time Warner Inc.*,
 465 F. Supp. 2d 312 (D. Del. 2006) .......................................................................24

*King Instruments Corp. v. Perego*,
 65 F.3d 941 (Fed. Cir. 1995) ...............................................................................16

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) .........................................................................................32

*LaserDynamics, Inc. v. Quanta Comput. USA, Inc.*,
 694 F.3d 51 (Fed. Cir. 2012) ................................................................28, 30, 37, 40

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
 481 F.3d 1371 (Fed. Cir. 2007) ...........................................................................11

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
 324 F.3d 1308 (Fed. Cir. 2003) ...........................................................................9

*Looksmart Grp., Inc. v. Microsoft Corp.*,
 No. 17-CV-04709-JST, 2019 WL 4009263 (N.D. Cal. Aug. 5, 2019) ..............................33, 34

*Lucent Techs., Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) .......................................................................36, 40

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
 851 F.3d 1275 (Fed. Cir. 2017) ...........................................................................35

*Mfg. Res., Int'l, Inc. v. Civiq Smartscapes, LLC*,
  Civ. No. 17-269-RGA, 2019 WL 4198194 (D. Del. Sept. 4, 2019) ................................41, 42

*Moba, B.V. v. Diamond Automation, Inc.*,
  325 F.3d 1306 (Fed. Cir. 2003)..................................................................................23

*Odetics, Inc. v. Storage Tech. Corp.*,
  185 F.3d 1259 (Fed. Cir. 1999)..................................................................................30

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006)..................................................................................23

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
  575 F.2d 1152 (6th Cir. 1978) ...................................................................................17

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017)..............................................................................17, 18

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
  849 F.3d 1360 (Fed. Cir. 2017)..................................................................................37

*Riles v. Shell Expl. & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002)..................................................................................32

*Rivera v. ITC*,
  857 F.3d 1315 (Fed. Cir. 2017)..................................................................................11

*Sage Prods., Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997)....................................................................................7

*Shamberg, Johnson & Bergman, Chtd. v. Oliver*,
  289 Kan. 891 (Kan. 2009)..........................................................................................20

*Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*,
  No. CV 16-284-LPS-CJB, 2018 WL 7893901 (D. Del. Dec. 17, 2018) ................................22

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
  926 F.2d 1161 (Fed. Cir. 1991)..................................................................................17

*Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*,
  225 F. Supp. 3d 1233 (D. Kan. 2016)......................................................................34, 39

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*,
  No. 12–1013–RGA, 2015 WL 456154 (D. Del. Jan. 30, 2015) ......................................29, 30

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*,
  No. C.A. No. 12-1013-RGA, D.I. 245 (D. Del. Jan. 30, 2015) .............................................29

*Sprint Commc'ns Co. L.P., v. Vonage Holdings Corp.*,
    No. 05-2433-JWL, D.I. 287 (D. Kan. Aug. 17, 2007) ............................................................29

*Sprint Commc'ns Co. L.P. v. Time Warner Cable*,
    760 F. App'x 977 (Fed. Cir. 2019) ................................................................ *passim*

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
    C.A. No. 17-1390-LPS-CJB, D.I. 445 (D. Del. Jan. 13, 2020) ..............................36

*TC Tech. LLC v. Sprint Corp.*,
    No. 16-cv-153-RGA, 2019 WL 2515779 (D. Del. June 18, 2019)..........................38

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)....................................................................................5

*Trell v. Marlee Elecs. Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990)..................................................................................31

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998)....................................................................................9

*Ultratec, Inc. v. Sorenson Commc'ns, Inc.*,
    45 F. Supp. 3d 881 (W.D. Wis. 2014) .......................................................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011).............................................................................33, 35

*Unwired Planet, LLC v. Apple Inc.*,
    No. 13-CV-04134-VC, 2017 WL 1175379 (N.D. Cal. Feb. 14, 2017) ...................22

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)..................................................................................33

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)..........................................................................................7, 10, 11

*Wechsler v. Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007)..................................................................................17

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
    913 F.3d 1067 (Fed. Cir. 2019)..................................................................................35

*In re Wilder*,
    736 F.2d 1516 (Fed. Cir. 1984)..................................................................................12

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013)......................................................................24, 25

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019).........................................................................29

**Statutes**

35 U.S.C. § 271(a) .........................................................................................................23

35 U.S.C § 287.........................................................................................................21, 22

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................2

Fed. R. Civ. P. 56(c)(1)....................................................................................................2

Fed. R. Evid. 702 ...................................................................................................*passim*

## I.     INTRODUCTION

Sprint seeks over ███████████████████████ for alleged infringement of decades-old, and now obsolete, technology. Sprint can only make these expansive claims by making technical and economic assertions that stretch beyond the bounds of the law. Sprint's attempt to expand its old ATM-based patents to cover new technology never disclosed in its patents negates the Court's *Markman* order and violates the written description law. Sprint's damages expert makes unsupported assumptions in an attempt to generate the highest possible damages award, and Sprint's technical expert offers economic and legal opinions to buttress those unsupported analyses. For example, without investigating alternatives that Sprint's other experts admit were available, Sprint's technical expert opines that there were no non-infringing alternatives to Sprint's patents. These opinions fail *Daubert* and, in the case of lost profits, entitle Defendants to summary judgment. Finally, no material dispute exists that Sprint and its licensees failed to mark the products it alleges embody the Asserted Patents, and thus Sprint is barred from seeking pre-suit damages for nearly all the Asserted Patents. This Court should grant Defendants' motions and preclude Sprint from asking the jury to award it damages to which it is not entitled under the law.

## II.    CASE BACKGROUND

Sprint currently asserts Defendants' Voice-over-IP ("VoIP") systems infringe eleven[1] patents (collectively "the Asserted Patents"), which can be grouped into the following categories:

**"Call Control Patents":** 6,452,932 ("'932 Patent"); 6,463,052 ("'052 Patent"); 6,633,561 ("'3,561 Patent"); 7,286,561 ("'6,561 Patent"); and 7,505,454 ("'454 Patent").

---

[1] Sprint initially asserted fifteen patents, but has since dropped four and recently indicated it will drop the '728 and '224 Patent as a result of the *Cequel* claim construction order. D.I. 445. Despite requests, Sprint has not withdrawn its claims based on those patents.  The Asserted Patents are attached as Exhibits 1-9 (still asserted patents), and 57-58 (the promised to be dropped patents).

**"Broadband Patents":** 6,343,084 ("'084 Patent"); 6,472,429 ("'429 Patent"); 6,298,064 ("'064 Patent"); and 7,327,728 ("'728 Patent").

**"Enhanced Services Patents"**: 6,330,224 ("'224 Patent"); and 6,697,340 ("'340 Patent").

The Call Control and Broadband Patents are also referred to as the "**Christie Patents.**" The Broadband Patents and the '224 Patent are also referred to as the "**ATM Patents**."

Relevant to these motions, Sprint relies on the opinions of Dr. Stephen Wicker, its technical expert, and Dr. Russell Mangum, its damages expert, to seek ▮▮▮▮▮▮ from Defendants.

## III.   SUMMARY JUDGMENT STANDARD

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *CelotEx. Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by "citing to particular parts of materials in the record…or showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." Fed. R. Civ. P. 56(c)(1). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.   DEFENDANTS DO NOT INFRINGE THE ATM PATENTS

Defendants move for summary judgment that the accused systems do not infringe any asserted claim of Broadband Patents or the '224 Patent (collectively, the "ATM Patents"). The Court ruled that the "interworking unit" limitation in those patents is limited to ATM and does not capture IP; in so doing the Court expressly rejected Sprint's argument that the specifications of these patents do not narrow the scope of the claimed interworking units to a particular type of packet network. Now, Sprint relies on the doctrine of equivalents to argue that the claimed ATM

2

interworking unit does capture any type of packet network, including IP. Sprint cannot erase the Court-imposed ATM limitation on the interworking unit via the doctrine of equivalents.

Sprint claims to have developed the solution to interconnecting packet (asynchronous) and non-packet (synchronous) telephone networks. The solution that the ATM Patents attempt to describe relies critically on an interworking unit to perform the necessary conversion. The parties did not dispute that "interworking unit" has a plain meaning, as Sprint argued, of a "device that translates communications between asynchronous and synchronous formats" and that this term was ordinarily "limited by the particular type of packet-based protocol." D.I. 162 at 7. The Court rejected Sprint's argument that the invention uses an interworking unit understood according to its plain meaning, ruling that the specification clearly and unmistakably "disclaim[s] any meaning of 'interworking unit' beyond ATM technology." D.I. 296 at 8.

It is undisputed that Defendants do ***not*** use ATM interworking multiplexers and do ***not*** use ATM technology. To maintain its claim, Sprint tries to undo the Court's claim construction via the doctrine of equivalents by arguing an "ATM interworking multiplexer" covers any ***packet-based*** interworking unit. But that is precisely what the Court rejected during claim construction. Sprint's equivalence theory thus unwinds the claim-construction process as if it never happened, impermissibly rendering the Court's ATM construction inconsequential and ineffective.

Sprint repeatedly described "the invention" as limited to ATM and thereby distinguished its invention from all types of packet interworking. Now that it has, it cannot use the doctrine of equivalents to erase that distinction. Defendants therefore are entitled to summary judgment of non-infringement of the ATM Patents.

A.      **Factual Background**

1.      **Sprint Alleges It Invented the Solution to Connecting the PSTN to Packet Networks**

Sprint pled that, prior to its invention, there were two separate telecommunications worlds. One was the Public Switched Telephone Network ("PSTN") which carried voice in a synchronous format. D.I. 14 at ¶ 13. The other was "packet communications" which, "unlike the synchronous communications of the PSTN, could occur 'asynchronously.'" *Id*. at ¶ 14. Packets, as Sprint's expert Dr. Wicker explains, include a "'payload' of information to be communicated"—such as voice—along with a "header" that has "identifying bits used to route the packet through the packet network." Ex. 14 (Wicker Infring. Rpt.) ¶¶ 36-37. He further explained that packets are "asynchronous communications." *Id.*, ¶ 38.

Sprint alleges that "the two systems"—synchronous and asynchronous (packet)—"were not compatible." D.I. 14 at ¶ 14. "Interfacing" them "in a geographically expansive telecommunica-tions environment was not a reality, at least not before" Sprint's inventor Joe Christie arrived at his solution. *Id*. He "devised a way to leverage the efficiencies of packet-based networks to make telephone calls to and from the PSTN." *Id*. at ¶ 15. Sprint calls this technology "Voice-over-Packet ('VoP')" which is protected by over 120 VoP patents. *Id*. ¶¶ 16, 18.

2.      **Claim Construction**

"The 'interworking unit'," the Court noted, "is a crucial component of the claimed inventions." D.I. 296 at 6. Sprint argued that "interworking unit" is "not limited by the particular type of packet-based protocol," D.I. 162 at 7, urging that it be construed according to its plain meaning as a "device that translates communication between asynchronous and synchronous

formats." *Id.* at 19.[2] Such a device, Sprint argued, translated between "narrowband and packet formats," and that the "only question becomes whether additional intrinsic evidence demonstrates 'clear and unmistakable disclaimer' or disavowal of protocols aside from ATM." *Id.* at 20. The Court noted that reading the claims without taking the specification into account, the term interworking unit refers to a device that allows "calls to transfer across phone lines and packet-based networks." D.I. 296 at 6. But, as the law requires, the claims should not be read in a vacuum. The Court found that the Broadband specification "repeatedly and consistently refers to the device that translates communications (*i.e.*, the interworking unit) as an 'ATM interworking multiplexer.'" *Id.* at 5. The Court held that these "repeated references [to ATM] … create a 'clear and unmistakable' implication that the patentee intended the term 'interworking unit' to mean an 'ATM interworking multiplexer.'" *Id.* (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("[t]o constitute disclaimer, there must be a clear and unmistakable disclaimer")). Finally, the Court held that "The '224 [Patent] … also disclaim[s] any meaning of 'interworking unit' beyond ATM technology." *Id.* at 8. Thus, the Court construed "interworking unit" to be an "ATM interworking multiplexer."

### 3.   Sprint's Doctrine of Equivalents Infringement Allegations

Defendants provide voice services to subscribers over cable (hybrid fiber-coaxial) infrastructure and an IP backbone network, relying on Voice-over-IP (VoIP) technology. Because IP is not ATM, Sprint concedes that Defendants do not infringe the ATM Patents literally. Instead, Sprint's expert Dr. Wicker argues that Defendants' IP gateways are ***equivalent*** to the claimed ATM interworking multiplexers. The core of Dr. Wicker's doctrine of equivalents analysis is that

---

[2] The Court, and therefore this motion, treats the '728 claim's use of the term "communication unit" to be the same as "interworking unit." D.I. 296 at 8–9.

the accused interworking units, like the claimed interworking units, are packet-based and "convert[] *packet-based* communications into TDM format." *E.g.*, Ex. 13 (Wicker Rpt. '064 Chart) at 20. Dr. Wicker characterizes the inventions and claims as directed to packet-based technology generally. *E.g.*, Ex. 14, ¶ 177 ("The *claimed methods* relate to the *interworking* between *packet-based/non-packet-based* and asynchronous/synchronous telephony network systems."). His function/way/result analysis is based on generic similarities like "a header component and a payload component" common to any type of packet technology. Ex. 14 (Wicker Rpt.) ¶¶ 177–79; Ex. 13 (Wicker Rpt., '064 Chart) at 16–17, 22–23, 26 (relying on surrounding non-ATM claim language with no ATM-specific analysis).[3] Similarly, Dr. Wicker's interchangeability opinion is that "the actual packet protocol is interchangeable" in the context of the Sprint patents. Ex. 14, ¶ 182. He admitted that his function/way/result and interchangeability analyses are directed to "fundamental aspect[s] of packet networks" that would be "true of any packet network." Ex. 15 at 167:10–13, 169:18–170:6; *see generally id.* at 161:17–188:18. Dr. Wicker further admitted that in his view, the Broadband Patents "cover *every way* to do a *packet based* telephony service." Ex. 15 at 1272:2–7, 1271:8–1273:14, 242:2–10. In other words, according to Dr. Wicker, IP is equivalent to ATM by virtue of sharing the same genus: packet data.

---

[3] *See also, e.g.*, Ex. 14 (Wicker Rpt.) ¶¶ 178–79 (focusing on generic packet-based technology such as "a header component and a payload component" and an interworking unit "capable of converting bearer traffic between *packet-based*/nonpacket-based" formats); Ex. 13 (Wicker Rpt. '064 Chart) at 20 (equivalents opinion based on "[a] Charter interworking unit … convert[ing] *packet-based* communications into TDM format" and discussion of "*interworking* asynchronous *packet-based* voice communications into synchronous *non-packet* based user communications"); Ex. 16 (Wicker Reply Rpt.) ¶ 176 ("the actual packet protocol is interchangeable"), ¶ 413 n.60 (relying on "known interchangeability between various packet-switching technologies, including ATM and IP"), ¶ 413 (use of non-ATM packet technology not a distinction because "skilled artisans view packet technologies as interchangeable").

### B.      Legal Standard

The doctrine of equivalents is not "simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019). Rather, it "prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997). Applied too broadly, the doctrine "conflicts with the definitional and public-notice functions of the statutory claiming requirement." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). "[I]f a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issue for the jury to resolve." *Id.* at 39 n.8.

### C.      Argument

### 1.      Sprint's Equivalence Theories Nullify The Court's *Markman* Ruling.

During claim construction, Sprint argued that "interworking unit" covered any type of packet technology. D.I. 162 at 7, 19–20. The Court—on the basis of clear and unmistakable disavowals in the patent specification—limited "interworking unit" to ATM, finding that insofar as the interworking unit is concerned, ATM differs from other types of packet technologies. D.I. 296 at 4 ("The dispute is whether the term [interworking unit] is limited to Asynchronous Transfer Mode (ATM)—a specific type of packet-based technology. I, like the other district courts that have considered this question, conclude it is.").

Dissatisfied with that construction, Sprint now argues—this time under the doctrine of equivalents—that its claims still embrace any type of packet technology. Because Defendants' interworking units use IP, not ATM, Sprint's expert Dr. Wicker attempts to use the doctrine of equivalents to expand the scope of the claims to recapture all types of packet technologies. Dr.

Wicker's function/way/result analysis relies on generic packet-based functionality and his interchangeability analysis is that "the actual packet protocol is interchangeable" in the context of the Sprint patents. Ex. 14 (Wicker Rpt.) ¶¶ 177–79, 182; Ex. 13 (Wicker Rpt., '064 Chart) at 16–17, 22–23, 26. Dr. Wicker admitted that his analysis is directed—not to any unique similarities shared between ATM and IP—but to "fundamental aspect[s] of packet networks" that would be "true of any packet network." Ex. 15 at 167:10–13, 169:18–170:6; *see generally id.* at 161:17–188:18.

There can be no dispute that Dr. Wicker's doctrine-of-equivalents opinions capture packet-based interworking generally. Dr. Wicker conceded the point at deposition, repeatedly admitting that in his view there is no type of packet-based telephony service that wouldn't practice the Broadband Patents: Ex. 15 at 1271:8–13 (confirming his opinion that "there's no way defendants could have provided a packet based telephony service to connect to the PSTN without practicing the Broadband patents"); *id.* at 1271:14–19 (cannot identify any packet-based telephony service that would not practice the Broadband Patents).

Under Dr. Wicker's theories, the Court's ATM construction has no effect: with or without the ATM limitation, the Broadband Patents cover ***all*** packet-based telephony services. Despite the fact that the Broadband Patents are limited to ATM and the Call Control Patents are not, Dr. Wicker admitted that under his equivalents theories, both "have the same scope." *Id.* at 1272:2–7. Dr. Wicker could not identify any packet-based interworking multiplexer that would not be equivalent to the claimed ATM interworking multiplexer:

> **Q.** But in a situation where the interworking unit is interworking between the packet based technology and the PSTN, can you identify for me any packet based interworking multiplexor that would not be equivalent to the ATM multiplexor of the broadband patents?
> **A.** No, I can't.

*Id.* at 1273:8–14.

By asserting that any interworking unit, regardless of the type of packet it translates to or from, is equivalent to an ATM interworking unit, Sprint eviscerates the "ATM" limitation from the Court's construction. ATM is not just one aspect of the Court's construction: that construction exists to limit the claims to "a specific type of packet-based technology," namely ATM. D.I. 296 at 4. By eliminating any distinction between ATM and packet-based interworking generally, they eliminate the meaning of the Court's construction itself. If ATM interworking is equivalent to all interworking, then the Court's ATM construction has no meaning.

The Federal Circuit has repeatedly rejected approaches like Sprint's. In *Tronzo v. Biomet, Inc.*, the patentee argued that claims requiring a cup with a "generally conical outer surface" were infringed under the doctrine of equivalence "by a hemispherical cup." 156 F.3d 1154, 1160 (Fed. Cir. 1998). The patentee's doctrine of equivalents theories were not directed to unique similarities between cones and hemispheres, but rather expanded the scope of the claims to capture any shape of cup. *Id.* The Federal Circuit rejected this equivalence theory because it impermissibly vitiated the conical shape limitation. *Id.* ("According to the expert testimony, any shape would be equivalent to the conical limitation … [s]uch a result is impermissible … because it would write the 'generally conical outer surface' limitation out of the claims."). Likewise here, Dr. Wicker's equivalence theory that ATM interworking units are equivalent to any packet-based interworking unit impermissibly writes the ATM limitation out of the claims. *See also, e.g.*, *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1129 (Fed. Cir. 2008) (affirming summary judgment of non-infringement where claim specified *E. coli* bacterial source and equivalence theory would vitiate that limitation by capturing "any bacterial source"); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003) (affirming summary judgment of

non-infringement where "limitations required by the proper construction" would be "entirely vitiate[d]" by doctrine of equivalents theory).

### 2.    Sprint Impermissibly Recaptures Disclaimed Non-ATM Claim Scope.

Not only do Dr. Wicker's theories eviscerate the Court's ATM construction, they also erase its foundation: the specification's clear and unmistakable disclaimer of non-ATM interworking units. Whereas the specification states that "[t]he invention is a system for providing virtual connections through an ATM interworking multiplexer" (Ex. 6 ('084 Patent) at Abstract), Dr. Wicker's theories broaden the claims to packet-based interworking generally. Doing otherwise would frustrate the public's reasonable reliance on what Sprint set forth as the scope of its invention. And that is precisely why Sprint cannot recapture via equivalence what it disclaimed.

By disregarding its clear disavowals of non-ATM technology, Sprint violates the public notice function of patents. *Warner-Jenkinson*, 520 U.S. at 29. Here, the notice provided limiting the interworking to ATM is "clear and unmistakable," as the Court has held. D.I. 296 at 3–9. The inventors plainly knew about other packet networks such as IP; the Broadband specification expressly discloses TCP/IP in the signaling context. *E.g.*, Ex. 6 ('084 Patent) at 11:21–25, 12:57–58, 13:15–19. The named Broadband inventors even considered using IP for voice, but chose not to pursue it because voice over IP "was much harder" than ATM, "wasn't ready for us to use as a replacement for circuit switching," and would be "too much risk." Ex. 10 (Gardner Dep.) at 95:19–96:6, 102:25–103:4. Sprint cannot use the doctrine of equivalents as an end-run around the public's reasonable reliance on this clear and unmistakable disclosure. *Warner-Jenkinson*, 520 U.S. at 29.

Sprint's doctrine of equivalents theories render the Court's ATM requirement meaningless and ignore the patents' description of the invention purely in terms of ATM. They impermissibly negate the Court's claim construction, improperly recapture disclaimed subject matter, and defy

the public notice function of patents. Defendants are entitled to summary judgment of non-infringement on the ATM Patents.

## V.      THE SPS CLAIM IS INVALID FOR LACK OF WRITTEN DESCRIPTION

Claim 17 of the '340 Patent ("the SPS Claim") requires use of a service platform system, or "SPS." During *Markman*, Defendants proposed that "service platform system" be limited to "a system containing a signaling processor, a service platform, and an ATM interworking multiplexer"; however the Court adopted Sprint's "plain and ordinary meaning" construction. D.I. 296 at 12. In agreeing with Sprint that the "plain and ordinary meaning" was sufficient, the Court noted the specification "is ATM-centric," (*id.*), and later, in a related proceeding, ruled that the specification "requires that the invention converts to or from an ATM format." *Cequel* Order, C.A. No. 18-01752-RGA-SRF, D.I. 146 at 9. Having drafted the SPS Claim without explicitly requiring ATM conversion and having obtained a broad construction exceeding the scope of its disclosure, Sprint now faces the consequences of defending an invalid claim.

It is an "unremarkable proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope." *Carnegie Mellon Univ.*, 541 F.3d at 1127; *see Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) ("[C]laims may be no broader than the supporting disclosure."); *Rivera v. ITC*, 857 F.3d 1315, 1320 (Fed. Cir. 2017); *Ariad Pharm., Inc. v. Mass. Inst. of Tech.*, 560 F.3d 1366, 1376–77 (Fed. Cir. 2009) ("[Plaintiff] maintained the breadth of these claims through claim construction and into trial. . . . [Plaintiff] chose to assert claims that are broad far beyond the scope of the disclosure provided in the specification."), *aff'd in rel. part*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) (invalidating claims for lack of enablement based on broad claim construction while noting "[t]he motto, 'beware of what one asks for,' might be applicable here.").

There is no material dispute that the specification only describes an SPS that includes an interworking unit. *See* Ex. 9 ('340 Patent), Figs. 1, 3, 7 and 8; 3:29-30, 34-36, 45-50; 6:41-50, 10:51-56, 11:19, 17:12, 17:34, 18:7-8, 18:19. Sprint's expert Dr. Wicker agreed. Ex. 15 at 684:23-685:2. Sprint argues that the interworking unit need not be ATM, even though the specification unequivocally states the opposite, just as in *Cequel*.[4]

As there is no genuine dispute Sprint's claims are "broader than the supporting disclosure" because they do not require that the SPS include an ATM interworking unit—or even an interworking unit of any kind—while the specification never describes the use of an SPS without an ATM interworking unit. *See In re Wilder*, 736 F.2d 1516, 1517-18 (Fed. Cir. 1984) (claiming a "genus of indicating mechanisms" that do not require synchronous scanning not supported by only disclosing a synchronous scanning-indicating mechanism). The SPS claim is thus invalid.

## VI. DR. MANGUM'S FAILURE TO ANALYZE AVAILABLE NON-INFRINGING ALTERNATIVES PRECLUDES SPRINT FROM RECOVERING LOST PROFITS

As Sprint frequently observes, it has spent the past 15-plus years asserting the Asserted Patents against VoIP providers. But prior to this round of litigation against Defendants, Sprint has never once sought lost profits damages. Ex. 22 (Mangum Charter Rpt.) ¶ 64. In fact, Sprint's damages experts in prior cases all bluntly admitted that Sprint is *not* entitled to lost profits. Ex. 38 (Sims Vonage Rpt.), § 6; Ex. 39 (Rao TWC Rpt.), ¶¶ 72-73; Ex. 40 (Rao Comcast Rpt.), ¶¶ 65-66; Ex. 41 (Rao Cable One Rpt.), ¶¶ 61-62; Ex. 42 (Rao Cox Rpt.), ¶¶ 67-68.

---

[4] SPS 104 contains interworking unit 114 which "may be an ATM interworking multiplexer that interworks between the ATM format and other formats . . . or it may be an ATM interworking unit that interworks between different types of ATM systems." Ex. 9 ('340 Patent), Fig, 1; 7:63-8:1. SPS 104A contains interworking mux 340 which "interworks between ATM cells and other call formats." *Id.*, Fig. 3, 11:45-46. SPS 704 and 712 contain "ATM interworking mux" 710 and 718, and SPS 802, 804 and 806 each contain an "ATM IW MUX." *Id.*, Fig. 7, 18:7-8, Fig. 8; 18:19.

It is unsurprising, then, that Sprint cannot show entitlement to lost profits here. Sprint has to prove, *inter alia*, that "but for" Defendants' alleged infringement, it would have earned additional profits from its wholesale VoIP service from the very same Defendants and that there were no acceptable non-infringing alternatives.[5] Dr. Mangum concedes that at least one non-infringing alternative was available, and from a technical perspective, this alternative would have been just as good as using Sprint's wholesale VoIP service. Instead, Dr. Mangum argues that this non-infringing alternative was economically "unacceptable" because, although the alternative was admittedly profitable, it would not have been as profitable as VoIP. Even though a non-infringing alternative can only be "unacceptable" for purposes of lost profits if it is unacceptable as compared to the patented service (i.e., Sprint's wholesale VoIP service), Dr. Mangum admits that he did not analyze how expensive it would have been for Defendants to use Sprint's wholesale VoIP service, and thus Sprint cannot satisfy its burden to show that "but for" the alleged infringement Defendants would have purchased Sprint's wholesale VoIP service.

Defendants had other acceptable non-infringing alternatives as well. For example, rather than offer VoIP service themselves they could have entered into paid referral arrangements with existing Sprint licensees who would pay Defendants fees when they obtained new customers from Defendants' referrals. Dr. Mangum has no response to this. Instead, he opines that ██████████ ████████████████████████████████████████████████████████████████████ ████████████████. Even if true, it is irrelevant, as providing service to Defendants' own

---

[5] Dr. Mangum's "lost profits" theory does not conform to the traditional lost profits notion of a patentee having lost sales to end-users due to Defendants' allegedly infringing sales to those end-users. Instead, his theory assumes the "customer" (the Defendants) should have been paying Sprint for the accused services rather than paying another provider or providing services themselves.

customers is an entirely different thing than the proposed alternative of referring customers to Sprint licensees. Again, Sprint cannot satisfy its burden to show this alternative was unavailable.

Finally, Defendants could simply have stayed out of the telephony business. Dr. Mangum responds that they would not do this for economic reasons, but he provides no support for that conclusion. In fact, he did not even determine whether offering VoIP telephony with Sprint would have been profitable for Defendants. His *ipse dixit* cannot satisfy Sprint's burden. For all these reasons, Defendants are entitled to summary judgment that Sprint is not entitled to lost profits.

### A.    Factual Background

Given that ██████████████████████████████████████ ███████████████████████████, ( ████████████████████████████████ Dr. Mangum unsurprisingly does not calculate any alleged lost profits based on sales to retail VoIP customers. Instead, he opines that, had Defendants not infringed Sprint's patents by connecting their VoIP networks to the PSTN, they would have hired Sprint to handle such interconnections. Ex. 22 (Mangum Charter Rpt.), ¶¶ 88-89. Dr. Mangum calculates Sprint's alleged lost profits based on the average per subscriber, per month ("PSPM") fee Sprint's wholesale VoIP customers paid. *Id.*, ¶¶ 80, 82 & Mangum Exs. 1-2. That average fee over the damages period is about ██████████. *Id.* at Mangum Ex. 1.

Under his reasonable royalty "analytical approach" alternative to lost profits, Dr. Mangum says that Defendants could have offered telephony service by employing circuit-switched networks rather than VoIP networks, and that this would have been both technologically acceptable and profitable. *Id.*, ¶¶ 70, 88, 192 & Table 3; Ex. 21 at 70:18–71:16, 77:21–78:5, 601:10–15, 602:16–603:1. By virtue of using circuit-switching as the comparison point in his analytical approach, Dr. Mangum concedes that it would not infringe Sprint's patents (this must be true: if Defendants' own networks were circuit-switched, connecting to the PSTN would not involve connecting a

packet network to a circuit-switched network). Dr. Mangum contends, however, that the circuit switch alternative would have been "significantly more expensive than VoIP" (although, admittedly still profitable). Ex. 22, ¶¶ 70, 192. But even if more expensive, circuit switching might well have been less expensive than offering VoIP service using Sprint's interconnect service; indeed, Dr. Mangum calculates Defendants' costs with Sprint would have been an average of ██ ████ during the damages period in addition to Defendants' other VoIP costs.

Dr. Mangum admits he did not analyze Defendants' overall costs or profits had they offered VoIP service using Sprint's interconnect service. Ex. 21 at 100:23-101:5; 163:25-164:14; 166:18-22; 170:18-171:1; Ex. 22 (Mangum Charter Rpt.) at Mangum Ex. 1. He did not analyze the economic feasibility of offering circuit-switched telephony instead of VoIP telephony using Sprint's interconnection service. Ex. 21 at 98:25-101:6. Instead, he merely opined—based on third-party data—that the non-infringing circuit-switched alternative would have been ████ ████ less profitable than Defendants' allegedly infringing VoIP services (without Sprint's services). Ex. 22 (Mangum Charter Rpt.) at ¶¶ 198–200, Tables 3, 5, and 7.

In addition to the circuit switch non-infringing alternative, Charter's damages expert explained that Defendants had the option of referring customers to one of the existing licensees of Sprint's patents in exchange for a fee. In other words, Defendants would not themselves offer retail VoIP, but would instead take referral or "marketing" fees from a VoIP telephony provider that was licensed under the Sprint patents. Ex. 23 (Mulhern Rpt.) at ¶¶ 139-141.[6] One of those licensees,

---

[6] Mr. Bakewell, Medicom's, ABB's, Grande's, and WOW's damages expert, did not explicitly opine about a marketing fee arrangement, but observed that Vonage was a third party providing VoIP services that could qualify as a potential non-infringing alternative. *See* Ex. 32 (Mediacom Rpt.) ¶ 167; Ex. 33 (ABB Rpt.) ¶ 169; Ex. 34 (Grande Rpt.) ¶ 166; Ex. 35 (WOW Rpt.) ¶ 168. Mr. Bakewell further noted that ████████████████████████████ ████ Ex. 32 (Mediacom Rpt.) ¶ 171.

Vonage, ████████████████████████████████████████████

████████████████████████████. *Id*.; ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

        Dr. Mangum contends that ██████████████████████████

████████████████████████████████████████████████

███████████Ex. 24 (Mangum Reply Rpt.) at ¶ 49. However, Charter's expert did not suggest a

wholesale arrangement whereby Charter would provide service to its own customers with

Vonage's help. Instead, Charter's expert suggested an arrangement whereby Vonage would

provide retail service to its own █████████████████████████.

Vonage would simply pay fees to Charter for customers referred to it by Charter.

### B.    Legal Standard

        To establish lost profits, Sprint must "show that it would have received the additional

profits 'but for' the infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir.

1995). "Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits." *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007). Here, Sprint seeks to show "but for" causation exclusively through the four-factor *Panduit* test, which requires showing "(1) a demand for the patented product, (2) the absence of an acceptable, non-infringing substitute for the patented product, (3) the patent owner's manufacturing and marketing capability to exploit the demand for the patented product, and (4) the amount of profit the patent owner would have expected to make if the patent owner had made the infringer's sales." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1165 (Fed. Cir. 1991) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156 (6th Cir. 1978)). It is Sprint's burden to establish each factor. *Id*. at 1165.

"To prove the absence of acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (citation omitted). The relevant inquiry is whether the non-infringing alternatives (here, circuit-switching, a partnership with a licensed provider, or leaving the market) would have been acceptable as compared to the ***patentee's*** product (here, VoIP with Sprint's interconnect service); *not* an infringing product (here, Defendants' allegedly infringing VoIP service). *Id*. at 1381.

## C.    Argument

Defendants have identified at least three acceptable non-infringing alternatives to hiring Sprint to do interconnection between VoIP and PSTN networks, including (1) deploying circuit-switched networks instead of VoIP networks; (2) referring customers to an existing Sprint licensee, such as Vonage, in exchange for fees; and (3) never entering the telephony business at all. Because Sprint has not "made a showing sufficient to establish" that these alternatives would have been unacceptable or infringing, Defendants are entitled to summary judgment of no lost profits.

17

### 1.    Sprint Cannot Show That Circuit Switching Would Have Been An Unacceptable Non-Infringing Alternative.

Sprint's expert Dr. Mangum admits that "[t]raditional circuit-switched telephony is a non-infringing alternative [ ] from a technical perspective" (Ex. 22 (Mangum Charter Rpt.), ¶ 70) and that it could deliver to consumers results and features similar to VoIP. *See id.* at ¶ 88 (conceding that "traditional circuit-switched telephony may have delivered a similar result to consumers"), *id.,*¶ 198 (noting that circuit-switched and VoIP services have "comparable feature sets"). There is no dispute that circuit-switched telephony was an available non-infringing alternative.[7]

Instead, Dr. Mangum argues that—although the circuit-switched alternative would have been profitable[8]—it was not an *acceptable* non-infringing alternative because it "is significantly more expensive than VoIP," based entirely on his analytical approach analysis, where he compares the costs of offering infringing VoIP telephony to the admittedly non-infringing circuit-switched alternative. *See id.* at ¶¶ 70, 198-200 & Table 7. But that is not the legally relevant comparison for lost profits; rather, Dr. Mangum is required to show that the non-infringing alternative was unacceptable as compared to the patentee's product, not the infringing product. *Presidio,* 875 F.3d at 1380-81. The legally relevant comparison is the cost of circuit-switched telephony versus the cost of Defendants' VoIP telephony when incurring the the additional costs of Sprint's interconnecting service, and Dr. Mangum's own calculations show that Sprint's services would

---

[7] Although Dr. Wicker says "he is *not aware* of evidence" that cable companies would be able to set up a circuit switch network, that certain unidentified aspects of the network "may well still" have infringed and that circuit switched networks had "inefficiencies," such speculation is insufficient to carry Sprint's burden of showing that circuit switch was not an acceptable non-infringing alternative. *See* Ex. 14, ¶¶ 211-212. Indeed, Charter was using circuit switched networks in 2002. Ex. 22 (Mangum Charter Rpt.) ¶ 49.

[8] Dr. Mangum calculates that the "normal" profits that cable companies could expect (even after deducting capital expenses) for offering circuit-switched telephony would be ███████, with a profit margin of ████. Ex. 22 (Mangum Charter Rpt.) ¶ 192.

have averaged ███████ on top of Defendants' other costs of offering VoIP.[9] Dr. Mangum

admitted that he never did this analysis. Ex. 21 at 100:23-101:5; 163:25-164:14; 166:18-22;

170:18-171:1. Indeed, as he admits, he never attempted to determine Defendants' costs or profits

from offering VoIP services using Sprint's interconnecting service. *Id.*[10] Because Sprint has not

made any showing (much less "a showing sufficient to establish") that circuit switching was an

unacceptable non-infringing alternative to Sprint's wholesale VoIP service, Defendants are

entitled to summary judgment that Sprint cannot recover lost profits.

### 2. Sprint Cannot Show Defendants Were Prohibited From Partnering With a Licensed VoIP Retailer Such As Vonage.

Defendants had the non-infringing alternative of exiting the retail VoIP business

completely and instead entering into a marketing partnership with a licensed VoIP retailer such as

Vonage, ████████████████████████████████████████████████.

Defendants would encourage their customers to become Vonage customers, and Vonage would

pay Defendants marketing fees in connection with these referrals. Ex. 23 (Mulhern Rpt.), ¶¶ 139-

141. Dr. Mangum does not contend that such an arrangement would be logistically, technically, or

fiscally infeasible, or that it would be an unacceptable alternative to Defendants or their

---

[9] If anything, Dr. Mangum's report demonstrates that circuit switching is actually much *cheaper* than offering VoIP with Sprint's service. Dr. Mangum alleges that Defendants' allegedly infringing VoIP service saved it ███████ over the non-infringing circuit switching alternative. However, according to Dr. Mangum, Defendants would have had to pay Sprint an additional ███ in the but-for world in order to avoid infringement. Thus, if anything, the non-infringing alternative is actually ███████ *cheaper* than using Sprint's service.

[10] Dr. Mangum also ignores evidence that many cable companies, including Charter, RCN, Grande, and Wave—Defendants in the present action—have provided (and some continue to provide) circuit-switched telephony services. *See* Ex. 21, (Mangum 6/5/20 Dep.) at 593:12-23; Ex. 22 (Mangum Rpt.), ¶ 49.

customers.[11] *See* Ex. 24 (Mangum Charter Reply Rpt.), ¶ 49. Instead, he argues that ███████████

███████████████████████████████████████████████. *Id.* But that is not

the non-infringing alternative described by Charter's expert; there is a difference between exiting

the retail VoIP business in favor a marketing partnership with another VoIP retailer and purchasing

wholesale VoIP services to offer retail VoIP services directly. Sprint's licenses to retailers such as

Vonage ████████████████████████████████████████████████████

████████████████████. *See, e.g.,* █████████████████████ Sprint has

not made "a showing sufficient to establish" that such a partnership is prohibited or would be less

profitable than connecting with Sprint. For this reason, Defendants are entitled to summary

judgment that Sprint cannot recover lost profits.[12]

### 3. Sprint Cannot Show That Defendants Would Have Entered The Telephony Business If The Alternative Was Buying Sprint's Interconnection Service.

Of course, as Defendants' damages experts explained, the defendant cable companies

always had the option of simply not providing telephony service. Ex. 23 (Mulhern Reb. Rpt.), ¶

116; Ex. 30 (Pedigo Rpt.), ¶ 58. In that event, because ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ ████████████████████ at

291:14–292:4; Ex. 23 (Mulhern Rpt.), ¶ 116. Sprint's "profits" would have been exactly $0. *Id.*

---

[11] Dr. Mangum also argues, without support, that Defendants would not want to partner with competitors in the retail VoIP market. Ex. 24 (Mangum Charter Reply Rpt.) ¶ 49. Under this alternative, there would be no competition as Defendants would no longer be in that business.
[12] Although ████████████████████████████████████ any remaining issues of contract interpretation are for the Court to resolve. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900 (Kan. 2009) (interpretation of a written contract is a matter of law); Ex. 44 (Vonage Agreement) at Article 12.7 (agreement construed under laws of Kansas).

Dr. Mangum does not dispute this. Instead, he contends that Defendants would have provided telephony service because of purported "economic benefits" they receive in connection with their ability to promote other products and services to their telephony customers. Ex. 22 (Mangum Rpt.), ¶ 219. However, Dr. Mangum admits that he did not and cannot quantify these speculative "economic benefits." *Id*. For that reason alone Sprint cannot carry its burden of showing that Defendants would have provided telephony service. Moreover, Dr. Mangum made no attempt to determine Defendants' costs or profits of offering VoIP telephony using Sprint's interconnection service, or even whether this service would have been profitable at all. Ex. 21 at 100:23-101:5; 163:25-164:14; 166:18-22; 170:18-171:1. For all Dr. Mangum knows Defendants would actually lose money by using Sprint's service. And he provides no explanation for why Defendants would offer a money-losing service.[13] As Sprint has not made "a showing sufficient to establish" that Defendants would have provided telephony service if they had to pay Sprint, Defendants are entitled to summary judgment of no lost profits.

## VII.   SPRINT CANNOT RECOVER PRE-SUIT DAMAGES FOR THE MARKING PATENTS BECAUSE SPRINT FAILED TO MARK ITS PRODUCTS

Sprint initially asserted apparatus and method claims against Defendants for the Asserted Patents containing apparatus claims (the "Marking Patents").[14] Sprint also claims to have practiced the Marking Patents without marking or providing pre-suit notice. Defendants request summary judgment of no pre-suit damages for the Marking Patents pursuant to 35 U.S.C § 287.

---

[13] Even if Sprint had shown Defendants could earn some profit after paying Sprint ███████ for its interconnect service, Sprint still has not shown that Defendants would have agreed to this price in a "but for" world where Sprint had no way to earn this revenue without Defendants' full cooperation. Defendants are not aware of any court awarding lost profits to a patentee who could only make a profit in the "but for" world with the full cooperation of the accused infringer.

[14] *I.e.*, the '224, '340, '728, '429; '084, '064, '932, '6,561, and '454 Patents.

## A.      Legal Standard

Under 35 U.S.C. § 287, "[a] party that does not mark a patented article is not entitled to damages for infringement prior to actual notice." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009). "Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). "The patentee bears the burden of pleading and proving" compliance with the marking requirement. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017). "A patentee's licensees must also comply with § 287." *Id.*; *see also Amsted Indus.*, 24 F.3d at 185.

## B.      Argument

### 1.      Sprint Alleges That It And Its Licensees Practice The Marking Patents.

Sprint contends that its wholesale VoIP service practiced the Marking Patents. Ex. 46 at 11–12; Ex. 14 (Wicker Rpt.), ¶¶194–95; Ex. 48 at 403:20–404:2; Ex. 43 at 282:6–16, 291:4–13. Sprint licensed these patents to companies selling VoIP, and contends its licensees "have offered services that use" the Marking Patents. Ex. 46 at 12; Ex. 49 at 395; Ex. 50 at 362; Ex. 51 at 837.

### 2.      Sprint Asserted Apparatus Claims, Triggering The Marking Statute.

If a patentee "initially assert[s] an apparatus claim" then "the marking statute is applicable to that patent." *Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, No. CV 16-284-LPS-CJB, 2018 WL 7893901, at *4 (D. Del. Dec. 17, 2018); *see also Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993). "To further conclude that application of the statute turns on a patent holder's decision to drop apparatus claims at some point during litigation defies logic." *Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-CV-00055-JRG-RSP, 2017 WL 5165606, at *2-3 (E.D. Tex. Oct. 15, 2017); *see also Unwired Planet, LLC v. Apple Inc.*, No. 13-CV-04134-VC, 2017 WL 1175379, at *4 (N.D. Cal. Feb. 14, 2017). Here, Sprint's initial

22

assertion of apparatus claims triggered the marking statute for the Marking Patents.

Sprint asserted at least one apparatus claim in each Marking Patent by alleging that Defendants infringed via "making" "products." *See, e.g.*, D.I. 14, at ¶ 77 (alleging that "Charter directly infringed the '084 Patent by ***making***, using, selling, ***and*** offering for sale broadband and/or packet-based telephony ***products*** or services" that (allegedly) infringe "***at least*** claim 1" (emphasis added)).[15] This constitutes assertion of apparatus claims because the "manufacture of equipment to perform a claimed method is not direct infringement within the meaning of 35 U.S.C. § 271(a)." *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003).

Sprint also accused products that were "capable of receiving" or "capable of placing" certain types of calls—an allegation that applies to apparatus claims. *Finjan*, 626 F.3d at 1204; *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (method claims are not infringed "by the sale of an apparatus that is capable of infringing use.").[16] Sprint could have limited its allegations to method claims or omitted allegations directed to "making," but it did neither. Sprint's actions triggered the marking statute's requirements, and Sprint's later narrowing of its claims to method only does not change that result.

### 3. Sprint Failed To Provide Actual Or Constructive Notice Under § 287(a).

For at least Mediacom, Wave, Wide Open West, and Charter, Sprint █████████████

████████████████████████████████████████████████████████

█, yet failed to provide notice of alleged infringement. Mr. Ball, Sprint's former in-house IP

---

[15] The same is true of the other Defendant groups. D.I. 25, *Atlantic Broadband*, No. 1:18-cv-00362-RGA, ¶ 70; D.I. 16, *WideOpenWest et al.*, No. 1:18-cv-00361-RGA, ¶ 68; D.I. 23, *Grande et al.*, No. 1:18-cv-00363-RGA, ¶ 95; D.I. 9, *Mediacom*, 1:17-cv-01736-RGA, ¶ 65.
[16] *E.g.*, D.I. 14, *Charter*, No. 1:17-cv-01734-RGA, ¶ 77; D.I. 25, *Atlantic Broadband*, No. 1:18-cv-00362-RGA, ¶ 70; D.I. 16, *WideOpenWest et al.*, No. 1:18-cv-00361-RGA, ¶ 68; D.I. 23, *Grande et al.*, No. 1:18-cv-00363-RGA, ¶ 95; D.I. 9, *Mediacom*, 17-cv-01736-RGA, ¶ 70.

counsel and corporate designee regarding communications with Charter about its alleged infringement (Ex. 48 at 23:3–24:17), confirmed that "█████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 132:13–17; 164:23–165:2. Mr. Ball confirmed the same with respect to the remaining Defendants. *See id.* at 395:25–398:22, 428:23–429:15, 430:15–20, 431:2–7, 433:18–434:5, 445:15–446:8. Thus, Sprint cannot bear its burden of proving actual notice under § 287(a) to Defendants prior to filing suit. *Arctic Cat*, 876 F.3d at 1366. Sprint also admits ██████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████ Thus, there is no genuine dispute that the customer-premise equipment involved in VoIP services (and included in Sprint's infringement expert report), such as the Embedded Media Terminal Adapter ("eMTA") or the VoIP phone itself, could have been marked with patent numbers but were not.[17] *See, e.g.*, Ex. 56 at 644 (showing eMTA and VoIP phone in "customer home"); *see also* Ex. 47 at 2.

Because Sprint failed to provide pre-suit notice as required by the marking statute, Defendants are entitled to summary judgment of no pre-suit damages for the Marking Patents.

## VIII.   *DAUBERT* STANDARD

Fed. R. Evid. 702 governs the admissibility of expert testimony. The burden of admissibility lies with the offering party. *Withrow v. Spears*, 967 F. Supp. 2d 982, 991 (D. Del.

---

[17] Courts addressing similar situations have found that customer-premise equipment constitutes a tangible item that can be marked. *See Inline Connection Corp. v. AOL Time Warner Inc.*, 465 F. Supp. 2d 312, 320–21 (D. Del. 2006) (finding that wall jack used for internet access could have been marked); *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, 45 F. Supp. 3d 881, 929–30 (W.D. Wis. 2014) (finding that patentee's phones needed to be marked).

2013). The requirements set forth in Rule 702 "embody 'three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit.'" *Id.* (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d. Cir. 2000)). "Reliability" "mandates that the relevant expert testimony 'must be supported by appropriate validation—*i.e.,* good grounds, based on what is known,'" "should be 'ground[ed] in the methods and procedures of science,'" and must "be 'more than subjective belief or unsupported speculation.'" *Id.* at 991–92 (quoting *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)). "Fit" mandates that "the testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue' and have 'a valid scientific connection to the pertinent inquiry.'" *Id.* (quoting *Daubert*, 509 U.S. at 591–92).

## IX.    DR. MANGUM'S ANALYSES ARE UNRELIABLE AND UNSUPPORTED

Pursuant to Fed. R. Evid. 702, Defendants respectfully move to exclude Dr. Mangum's: (1) *Georgia-Pacific* royalty opinion because the verdicts and settlement agreements upon which he relies are not comparable to the hypothetical negotiation; (2) lost profits opinion because it improperly relies on unsupported conclusions; (3) "analytical approach" royalty opinion because it improperly assigns to Sprint 100% of the alleged cost savings from using the patented technology; (4) royalty opinion for the two Enhanced Services Patents because his methodology has no connection to the alleged value of those patents; and (5) all damages opinions for failure to apportion to reflect the contribution of the patented technology.

### A.    Factual Background

Dr. Mangum calculates Sprint's alleged damages under three theories: lost profits, an "analytical approach" royalty, and a *Georgia-Pacific* royalty. Ex. 21 at 16:4–16.[18] The *Georgia-Pacific* royalty is predicated on eleven settlement agreements and two jury verdicts from Sprint's

---

[18]Because Dr. Mangum's methodologies are common to all Defendants, this motion cites to Dr. Mangum's *Sprint v. Charter* report and cites to other reports only where necessary.

prior litigations ("the Litigation Materials"). Ex. 22 (Mangum Charter Rpt.) ¶¶ 94–147. According to Dr. Mangum, "the most relevant" Litigation Materials are (1) the 2007 *Vonage* verdict, (2) the 2017 *Time Warner Cable* ("TWC") verdict, (3) the 2006 VoiceGlo settlement, and (4) the 2019 MetroCast settlement (from after this litigation began). Ex. 21 at 463:22–464:11; Ex. 22 (Mangum Charter Rpt.) ¶¶ 205–208. They are the foundation for his conclusion that the hypothetical negotiation would yield a ▮▮▮▮▮ royalty for all Asserted Patents through the expiration of the Christie Patents on May 5, 2014. For the Enhanced Services Patents, which expired November 22, 2016, Dr. Mangum calculates a reasonable royalty rate of ▮▮▮▮▮ for the time period following the Christie Patents' expiration. *See, e.g.*, Ex. 22 (Mangum Charter Rpt.) ¶¶ 10, 239.

Dr. Mangum arrives at an alternate royalty for all Defendants of ▮▮▮▮▮ using an "analytical approach," which compares the anticipated profits for a cable company providing VoIP service to the profits from traditional circuit-switched services. Ex. 21 at 74:24–75:16, 76:5–77:10; Ex. 22 (Mangum Charter Rpt.) ¶¶ 186–200. This analysis relies on the assumption that Defendants could implement circuit-switch instead of VoIP telephony, but that the latter would be less expensive. *See* Ex. 21 at 102:2–25. Dr. Mangum also opines that Sprint is entitled to lost profits based on its wholesale VoIP service. As part of this analysis, Dr. Mangum assumes that no company could provide retail VoIP telephone service without Sprint (Ex. 21 at 124:9–15) and, further, that Sprint would have the capacity to provide wholesale VoIP services to meet demand for VoIP during the life of the Asserted Patents. Ex. 22 (Mangum Charter Rpt.) ¶¶ 74–78.

### B.   Argument

#### 1.   Dr. Mangum's Hypothetical Negotiation Construct is Impermissibly Predicated on Verdicts and Other Non-Comparable Litigation Materials.

Generally, "[a] jury verdict does not represent evidence from which a hypothetical negotiation can be reliably determined." *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F.

Supp. 3d 470, 489 (D. Del. 2018).[19] But of Dr. Mangum's four "most relevant" Litigation Materials, the two jury verdicts serve as the ultimate foundation for his ██████████ rate. The *Vonage* verdict involved a 5% royalty, which translates to an effective ██████████ rate, (Ex. 22 (Mangum Charter Rpt.) at Mangum Ex. 5), and that rate served as the basis for the damages award by the *TWC* jury. Ex. 21 at 363:24–364:5, 366:8–17. To conclude that the VoiceGlo and MetroCast settlements support the ██████████ rate, Dr. Mangum relies on the verdicts; when asked to explain how these two settlements translated into a ██████████ rate given that neither provided a mathematical basis to calculate that figure (Ex. 21 at 570:5–14, 571:3–6), Dr. Mangum testified that reliance on the verdicts is a critical part of his overall analysis and discussion of the verdicts is necessary to "fully explain" his approach. Ex. 21 at 348:6–16, 353:18–354:2, 360:21–361:12, 362:13–19, 372:19–24. He also points to language in the MetroCast settlement describing ██████ ████████████████████████████████████—language that finds no support in the considerations underlying that settlement and that, Dr. Mangum agrees, could have been placed in the settlement by Sprint's lawyers to help buttress the ██████████ rate for this co-pending litigation. Ex. 21 at 348:6–16; *see also* Ex. 23 (Mulhern Reb. Rpt.) ¶ 261.

Dr. Mangum's reliance on the *Vonage* and *TWC* verdicts, which rests on an assumption that jurors engage in something akin to a damages expert's analysis, is improper.[20] He claims that

---

[19] Although the Federal Circuit recently affirmed a reasonable royalty partially predicated on a jury verdict in the *Sprint v. TWC* case, the jury verdict preceded the hypothetical negotiation date. 760 F. App'x 977, 981 (Fed. Cir. 2019). That court has not authorized the use of jury verdicts that follow the hypothetical negotiation by years (e.g., 5 and 15 years, for Charter; 3 and 13 years, for RCN; 2 and 12 years, for Grande; 2 and 12 years, for ABB; etc.).

[20] These jury verdicts are inadmissible. *See, e.g., Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975) ("A jury is likely to give a prior verdict against the same defendant more weight than it warrants. The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it.").

"jury verdicts are informative in considering the outcome of a hypothetical negotiation" because "[a] jury is presented with relevant facts and circumstances for the matter, and is asked to reconstruct the but for world that would have existed just prior to first infringement," which (he says) "is a similar exercise that a damages expert goes through." Ex. 24 (Mangum Charter Reply Rpt.) ¶ 160. Indeed, Dr. Mangum "would not agree" with this Court's observation that a verdict is, "at best, an informed lay opinion." *Compare* Ex. 21 at 403:25-404:2, *with Acceleration Bay*, 324 F. Supp. 3d at 489. Although the verdict at issue in *Acceleration Bay* did not involve a patent that was part of the hypothetical negotiation, the same reasoning applies here: lay juries in *Vonage* and *TWC* considered different expert opinions, licensees, accused products and services, claim constructions, types of asserted claims, hypothetical negotiation dates,[21] and license timing and scope, all of which render the verdicts incomparable to the hypothetical negotiation.

Dr. Mangum also ignores that all of the Litigation Materials are "tainted by the coercive environment of patent litigation," and do not reflect the hypothetical negotiation, "the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed." *LaserDynamics, Inc. v. Quanta Comput. USA, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). Instead, Dr. Mangum claims that the Litigation Materials evidence "widespread infringement" of the Asserted Patents, justifying his ▓▓▓▓▓▓▓ royalty (*see, e.g.*, Ex. 22 (Mangum Charter Rpt.) ¶¶ 206–208), even though none of

---

Wrapping the prior jury verdicts into expert testimony is no less offensive; the expert testimony should be inadmissible for the same policy reasons.

[21] The hypothetical negotiation in *TWC* took place in 2010, years after the hypothetical negotiation dates of Charter (2002-2003), RCN (2004) and Grande (2005), ABB (2005/2006), WOW (2008) and Wave's (2008). Ex. 23 (Mulhern Reb. Rpt.) ¶ 275; Ex. 26 (Mangum Mediacom Rpt.) ¶ 187; Ex. 27 (Mangum ABB Rpt.) ¶ 181; Ex. 28 (Mangum Grande Rpt.) ¶ 181; Ex. 29 (Mangum WOW Rpt.) ¶ 177.

the settlements ███████████████████████████████. *See* Ex. 23 (Mulhern Reb.

Rpt.) at ¶ 120, & n.288, ¶ 335. The fact that many (or all, for Charter, RCN, and Grande) of the

Litigation Materials post-date the hypothetical negotiations only exacerbates the comparability

chasm.[22] *ePlus, Inc. v. Lawson Software*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011) (excluding

Mangum's opinions where "[t]he minimal probative value that can be attributable to settlement

agreements that ensue [from] litigation is even less where, as here, the settlement agreements

occurred years after the hypothetical negotiation."), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012).

Sprint itself advanced this same position before this Court, and won. *See Sprint Commc'ns

Co. L.P. v. Comcast IP Holdings, LLC,* No. C.A. No. 12-1013-RGA, D.I. 245 at 261–63, 267–68

(D. Del. Jan. 30, 2015) (arguing that settlement licenses "are not sufficiently comparable to the

license that would have been reached at the hypothetical negotiation" due to underlying litigation

context and time gap); *Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, No. 12–1013–

RGA, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (excluding these licenses due to lack of

comparability). Sprint also previously argued that the VoiceGlo settlement was not a "comparable

license" due to the litigation context. *Sprint Commc'ns Co. L.P., v. Vonage Holdings Corp.*, No.

05-2433-JWL, D.I. 287 at 11 (D. Kan. Aug. 17, 2007). Sprint was right: "Because Sprint's

settlement with VoiceGlo was made during pending litigation, it is not evidence of a reasonable

royalty and must be excluded." *Id*. at 12; *see also Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F.

Supp. 3d 466, 496 (D. Del. 2019). Dr. Mangum fails to address additional economic factors that

independently render the Litigation Materials incomparable to the hypothetical negotiation.

---

[22] The Litigation Materials post-date Charter's hypothetical negotiation dates by between 3 and 18
years. Ex. 23 (Mulhern Reb. Rpt.) ¶ 281, Mulhern Ex. 35. The Litigation Materials also post-
date the hypothetical negotiation for RCN (2004) and Grande (2005), and most post-date the
hypothetical negotiation for ABB (2005/2006). Many of them also post-date the hypothetical
negotiations for Wave and WOW (2008) and Mediacom (2010).

*First*, rather than address the economic and technical changes in the years post-dating the hypothetical negotiation, Dr. Mangum relies on the so-called "Book of Wisdom" as a time machine to transport the unadjusted Litigation Materials into a hypothetical negotiation occurring years earlier. *See, e.g.*, Ex. 22 (Mangum Charter Rpt.) at n.407. But, as Sprint has successfully argued in a prior litigation, the Book of Wisdom "has not been applied to bring in litigation settlement agreements that occurred significantly after the hypothetical negotiation." *Sprint v. Comcast,* C.A. No. 12-1013-RGA, D.I. 245 at 263, n.7; *see also Comcast IP Holdings*, 2015 WL 456154, at *1 (excluding reliance of license agreements that "occurred a number of years after the hypothetical negotiation date"). The Federal Circuit has held license agreements—including settlement agreements—to be irrelevant to the hypothetical negotiation analysis where such agreements post-dated the hypothetical negotiation date by only a few years. *See LaserDynamics*, 694 F.3d at 78; *see also Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1277 (Fed. Cir. 1999) (noting that "the age of the license agreements … made those agreements irrelevant for the hypothetical negotiation analysis" when they post-dated the hypothetical negotiation by 4-5 years).

*Second*, Dr. Mangum does not address economic differences between the past defendants and the present Defendants—such as line of business, product offerings, customers, size, and amount paid to Sprint—that must be accounted for. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010). For example, Vonage and VoiceGlo were both pure telephony companies focused on VoIP services (Ex. 23 (Mulhern Reb. Rpt.) ¶ 268), whereas Defendants are cable companies that sell internet and TV in addition to phone. *Id.* ¶¶ 24, 365; Ex. 26 (Mangum Mediacom Rpt.) ¶ 15; Ex. 27 (Mangum ABB Rpt.) ¶ 15; Ex. 28 (Mangum Grande Rpt.) ¶ 15; Ex. 29 (Mangum WOW Rpt.) ¶ 15. Dr. Mangum also ignores what the settling parties actually paid. VoiceGlo exited the VoIP market less than a year after settling, paying a total of

██████████████████████. Ex. 23 (Mulhern Reb. Rpt.) ¶¶ 248–49. By contrast, Dr. Mangum opines

that Charter should pay ██████████ based on the same settlement—a factor of █████ times more.

Ex. 22 (Mangum Charter Rpt.) at Fig. 2. MetroCast paid Sprint only ████████████ times less

than what Dr. Mangum opines Charter should pay. Ex. 23 (Mulhern Reb. Rpt.) ¶ 260. Dr.

Mangum's total disregard for variations in economic circumstances is also reflected in his opinion

that every Defendant, whether large or small, nationwide or regional, in a hypothetical negotiation

in 2002 or in 2010, pays the exact same royalty: ██████████. Ex. 21 at 449:8–16.

*Finally*, Dr. Mangum fails to address the ways in which the settlements themselves differ

from the hypothetical licenses. Nearly all of the settlements (including the VoiceGlo and

MetroCast settlements) ███████████████████████████

█████████████████████████████. Ex. 23 (Mulhern Reb. Rpt.) ¶¶ 139, 270-

71, Mulhern Exs. 27, 35. The hypothetical license, however, would encompass only the Asserted

Patents, a fact which needs to be accounted for. *See Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443,

1446–47 (Fed. Cir. 1990). Dr. Mangum also fails to account for differences in the settlements'

royalty structures. The MetroCast settlement includes ██████████████████████

███████████████████████████████████████████

███████████████████ Ex. 21 at 570:15–24; Ex. 23 (Mulhern Reb. Rpt.) ¶ 260. Likewise,

████████████████████████████████████████████

████████████████████████████████████████████

█████████. Ex. 21 at 520:10–14; Ex. 23 (Mulhern Reb. Rpt.) ¶¶ 247, 272.

**2.      Dr. Mangum's Analyses Are Based on Unreliable Methodology.**

> a.      <u>Dr. Mangum's Lost Profit Opinions Rely On Dr. Wicker's</u>
> <u>Unsupported Opinion That The Asserted Patents Are Blocking.</u>

The bedrock of Dr. Mangum's lost profits opinion is that in the but-for world, Sprint would

be the only provider of wholesale VoIP services. Ex. 22 (Mangum Charter Rpt.) ¶¶ 88–89; Ex. 15

at 1276:2–23. Dr. Mangum relies on Dr. Wicker's opinion that the Asserted Patents are "blocking

patents" to support this assumption. Ex. 22 (Mangum Charter Rpt.) ¶¶ 69, 88–89; Ex. 21 at 609:17-

610:9. As explained in Section X below, Dr. Wicker's "blocking patent" opinion should be

excluded under *Daubert*. Since Dr. Mangum's lost profits opinions flow from Dr. Wicker's

unreliable "blocking patent" opinion, Dr. Mangum's opinions are unreliable as well.

> b.      <u>Dr. Mangum's Analysis of Under *Panduit* Factor 3 Is Unsupported.</u>

Under his lost profits theory, Dr. Mangum assumes that all retail VoIP suppliers would be

forced to use Sprint as a wholesale VoIP provider. Ex. 21 at 124:9–15; *see, e.g.*, Ex. 24 (Mangum

Charter Reply Rpt.) ¶¶ 21–22. During the damages period, this would involve between ███████

███████████████████████████████████████████████████████████████████████████

███████ Ex. 23 (Mulhern Reb. Rpt.) at Mulhern Exs. 8–10, 19; *see* Ex. 21 at 124:9–15. But Dr.

Mangum does not do any calculation to show Sprint had the capacity to handle this massive

increase in subscribers (Ex. 21 at 189:20–190:3) or to show the cost (including access to the

necessary capital) or timing of this radical hypothetical expansion. Ex. 21 (Mangum 6/5/20 Dep.)

at 302:7-303:3, 316:10-17; Ex. 23 (Mulhern Reb. Rpt.) ¶ 159. These omissions doom his opinion

by rendering it mere *ipse dixit*. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999); *see*

*also ePlus*, 764 F. Supp. 2d at 813 (excluding Dr. Mangum's *ipse dixit* testimony). Because Dr.

Mangum lacks "sound economic and factual predicates" to support Sprint's required capacity in

the "but-for" world, his lost profits analysis must be excluded. *Riles v. Shell Expl. & Prod. Co.*,

298 F.3d 1302, 1311 (Fed. Cir. 2002).

              c.     Dr. Mangum's Analytical Approach Arbitrarily Assigns All Alleged VoIP Cost Savings to Sprint as a Royalty.

The Federal Circuit has consistently held that allocating a particular amount of a royalty value to one party, absent analysis as to why that allocation is applicable to the facts of the case, is an unreliable methodology that warrants exclusion under *Daubert*. In *Uniloc USA, Inc. v. Microsoft Corp.*, the Federal Circuit held that the "25 percent rule of thumb," which allocated 25% of the value of the infringing product to the patentee and 75% to the licensee, was a "fundamentally flawed premise" for calculating damages because it was "arbitrary" and "unrelated to the facts of [the] case." 632 F.3d 1292, 1315, 1317–18 (Fed. Cir. 2011). In *Virnetx, Inc. v. Cisco Sys., Inc.*, the Federal Circuit rejected a damages methodology that assumed a 50/50 allocation of incremental profit between the patentee and the licensee because it "asserts nothing about what situations in the real world fit those premises." 767 F.3d 1308, 1332 (Fed. Cir. 2014).

Dr. Mangum effectively applies a "100 percent rule" by arbitrarily allocating to Sprint the entire cost savings he attributes to offering VoIP instead of circuit-switched telephony. Under his "analytical approach," Dr. Mangum calculates the cost savings as ███████████ and assumes— without analysis or explanation—that Defendants would pay the entire cost savings to Sprint as a reasonable royalty. Ex. 21 at 102:2–15, 229:24–230:21, 449:2–7; *see, e.g.*, Ex. 22 (Mangum Charter Rpt.) ¶¶ 199–200. Other courts have held that this is arbitrary and unreliable. In *Looksmart Grp., Inc. v. Microsoft Corp.*, Looksmart's expert calculated a reasonable royalty as the cost savings from using the patented technology and "allocate[d] all of Microsoft's avoided costs to Looksmart." No. 17-CV-04709-JST, 2019 WL 4009263, at *3 (N.D. Cal. Aug. 5, 2019). This assumption was held to be unsupportable "[a]s a matter of both rudimentary economics and common sense" because the non-infringing alternative and the license would be of equal value to

33

Microsoft, so there would be no economically rational reason for Microsoft to participate in the hypothetical negotiation. *Id.* The same is true here. Under Dr. Mangum's analytical approach, implementing the non-infringing circuit-switched solution (an alleged incremental cost of ████ ████) would cost the same as a license from Sprint (at a ████████ royalty rate). Dr. Mangum does not (and cannot) explain why, in such a situation, Defendants would accept a license at that rate. Dr. Mangum's analytical approach should be excluded under *Daubert*.

        d.    <u>Dr. Mangum's Royalty Rate for the Enhanced Services Is Unconnected to the Alleged Value of those Patents.</u>

Dr. Mangum arrives at the ████████ rate for the Enhanced Services Patents by taking the ratio of a non-party TWC's phone pricing versus its voicemail pricing and then applying that resulting percentage ████ to the ████ effective PSPM rate he calculates as the royalty for the Christie Patents, which is derived from the *Vonage* verdict (a verdict that did not include the Enhanced Services Patents). Ex. 22 (Mangum Charter Rpt.) ¶¶ 174–79, 239; Ex. 25. But Dr. Mangum does nothing to tie the price of TWC's voicemail service to the value of the Enhanced Services Patents, rendering his methodology unreliable. Indeed, the district court in the *TWC* litigation excluded a strikingly similar theory advanced by Sprint's damages expert, who sought to assign a royalty rate to the same patents by comparing Sprint's revenues for wholesale VoIP with its revenue for voicemail services. *See Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*, 225 F. Supp. 3d 1233, 1252 (D. Kan. 2016) ("The fact that two different sets of patents both represent 'core' technologies used in products or services does not necessarily or reasonably mean that the patented technologies make up the same percentage of the overall products or services."). Because Dr. Mangum's royalty methodology for the Enhanced Services Patents is unconnected to the alleged value of those patents, his opinions must be excluded.

e.    Dr. Mangum Fails to Apportion to Reflect the Alleged Contribution
of the Asserted Patents.

Apportionment "is necessary in both reasonable royalty and lost profits analysis." *Mentor*

*Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017). For all three of his

damages approaches, however, Dr. Mangum performs no apportionment analysis. Instead, he

effectively equates the value of the patented technology to the ***entire*** value of VoIP telephony

without any evidence to support this assumption. "'[T]he patentee … must in every case give

evidence tending to separate or apportion the defendant's profits and the patentee's damages

between the patented feature and the unpatented features … or show that 'the entire value of the

whole machine, as a marketable article, is properly and legally attributable to the patented

feature.'" *Uniloc*, 632 F.3d at 1318 (internal citation omitted). Dr. Mangum's failure to either

apportion the value of the patented technology or explain why the entire market value rule

("EMVR") exception applies renders his methodology unreliable, warranting exclusion.

i.    Lost Profits

Apportionment is necessary for a lost profits analysis "[i]f the application of the *Panduit*

factors does not result in the separation of profits attributable to the patented device and the profits

attributable to providing other aspects." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d

1067, 1073 (Fed. Cir. 2019); *see also Mentor Graphics*, 851 F.3d at 1288 (holding that

"satisfaction of the *Panduit* factors satisifie[d] principles of apportionment" where it was clear the

plaintiff's damages were "tied to the worth of its patented features"). Dr. Mangum calculates

Sprint's lost profits to be all profits that Sprint allegedly would have earned as Defendants'

wholesale VoIP provider. *Id,*, ¶¶ 88–92. However, as Dr. Mangum acknowledges, Sprint's

patented technology is limited to certain methods of interconnecting a VoIP network and the

PSTN. Ex. 22 (Mangum Charter Rpt.) ¶ 33. Sprint provided services beyond just interconnections

to the PSTN as part of its wholesale VoIP service, such as ███████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ .

*See* Ex. 30 (Pedigo Rpt.) ¶¶ 29–33; *see also* Ex. 21 at 644:22–645:25. Since wholesale VoIP

encompasses a "basket of services" beyond the patented technology, Dr. Mangum needed to

apportion the value of that technology out from the total profits Sprint would have earned. *See*

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17-1390-

LPS-CJB, D.I. 445, at 13-14 (D. Del. Jan. 13, 2020) (excluding lost profits opinions where expert

"never engage[d] in an apportionment analysis in which he assesses the ***value of the patents in***

***relation to the other many aspects of the butane supply agreements*** on which his damages

calculation rates are based" (emphasis in original)).

 Additionally, because all of Sprint's currently asserted claims are method claims, damages

should be correlated to infringing calls, *i.e.*, calls that traverse the PSTN. *Lucent Techs., Inc. v.*

*Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009). The record shows that, for Charter, at least

██████████████████████████, and therefore do not use Sprint's patented method. *See* Ex.

31 (Gerstner 1/22/20 Dep.) at 175:3-13; Ex. 23 (Mulhern Reb. Rpt.) ¶ 200.[23] Dr. Mangum did not

attempt to apportion out these non-infringing calls in his lost profits model. Ex. 22 (Mangum

Charter Rpt.) at Mangum Ex. 4. Further, Sprint did not invent all of the technology that is necessary

for provisioning wholesale VoIP services, as the Asserted Patents' inventors admitted.[24] Sprint

---

[23] *See also* Ex. 32 (Bakewell Mediacom Rpt.) ¶¶ 161–63 (explaining that data from
Net2Phone/IDT shows ████████████████████████████████████████████████
████████████); Ex. 33 (Bakewell ABB Rpt.) ¶¶ 163–65 (same); Ex. 34
(Bakewell Grande Rpt.) ¶¶ 160–62 (same); Ex. 35 (Bakewell WOW Rpt.) ¶¶ 162–64 (same).
[24] *See, e.g.*, Ex. 10 (Gardner 1/7/20 Dep.) at 103:5–12 (admitting Sprint did not invent the IP media
gateway), 103:1–18 (admitting Sprint did not invent the IP soft switch); Ex. 12 (DuRee 1/17/20
Dep.) at 225:13–15 (admitting Sprint did not invent voice-over-IP technology), 225:9–12

cannot receive damages attributable to technology it did not invent, and Dr. Mangum failed to apportion to reflect that.

Dr. Mangum apparently believes that no apportionment is required because PSTN connectivity is (allegedly) necessary for providing VoIP services. Ex. 24 (Mangum Charter Reply Rpt.) ¶ 91. But "[i]t is not enough to merely show that the [patented] method is viewed as valuable, important, or even essential" to the overall product or service of which it is a part. *LaserDynamics*, 694 F.3d at 68. Rather, the EMVR is a "narrow exception" to the rule of apportionment that only applies where "the presence of [the patented] functionality is what motivates consumers to buy [the overall product or service] in the first place." *Id.* at 67–68. Here, as noted above, wholesale VoIP companies (including Sprint) provide many different technologies and services, and Dr. Mangum has provided no explanation or analysis to show that Sprint's patented technology motivated customers to purchase wholesale VoIP service. Therefore, Dr. Mangum was required to apportion his lost profits calculations to reflect only the value of the patented technology.

ii.   Analytical Approach

In his "analytical approach," Dr. Mangum also did nothing to apportion out cost savings attributable to technology that Sprint did not invent, and provided no explanation as to why all of the cost savings associated with VoIP are solely attributable to Sprint's Asserted Patents. And while "[a] price for a hypothetical license may appropriately be based on consideration of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings'" without further apportionment, a patentee must still "carefully tie proof of damages to the claimed invention's footprint in the market place." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d

_____

(admitting Sprint did not invent voice-over-packet technology), 226:10–12 (admitting Sprint did not invent call routing technology).

1360, 1376-77 (Fed. Cir. 2017). Unlike in *Prism*, where the uncontroverted evidence established that the cost savings defendant received from using the patented technology fully encompassed the value of the patented technology, Dr. Mangum cites no evidence to show the entire cost savings between offering VoIP and circuit-switched telephony can be attributed to the patented technology, which is limited to methods of interconnecting a VoIP network and the PSTN.

In fact, the record shows (and Dr. Mangum admits) that VoIP features outside the scope of the Asserted Patents contribute to the cost savings of using VoIP over circuit-switched systems. A 2003 Cox Communications whitepaper—cited by Dr. Mangum—explains that there is only an █

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██ ; *see* Ex. 21 at 624:2–15. Sprint's patents have nothing to do with the power source used in a VoIP system (Ex. 17, Almeroth Reb. Rpt., ¶¶ 864-65), such that Dr. Mangum was required to apportion cost savings attributable to power source differences out of his analytical approach royalty, as well as all other VoIP features that contribute to cost savings but are not covered by Sprint's patents. Unlike in *TC Tech. LLC v. Sprint Corp.*, where this Court held that the patentee's cost savings analysis inherently excluded unpatented features that were common to both the infringing and non-infringing systems (and where the expert actually further apportioned cost savings to the patented technology), Dr. Mangum's analysis fails to account for unpatented features unique to VoIP. No. 16-cv-153-RGA, 2019 WL 2515779, at *4-5 (D. Del. June 18, 2019). Dr. Mangum admitted there were a number of unpatented features contributing to the lower capital expenditures associated with offering VoIP, such as the network power source (Ex. 21 at 624:2–15, 627:3–12), less expensive hardware (*id*. at 626:4–9), internet protocol (*id*. at 626:10–13), and

38

packet delivery (*id*. at 626:14–17).[25] Dr. Mangum's lack of apportionment renders his analysis unreliable and it should be excluded.

### iii. Hypothetical Negotiation

According to Dr. Mangum's hypothetical negotiation analysis, Defendants would pay Sprint a royalty of ▉▉▉▉▉ for all subscribers. Ex. 21 at 449:8–16; Ex. 22 (Mangum Charter Rpt.) ¶ 237, Mangum Ex. 11. In contrast to *Sprint v. Time Warner Cable*, where "Sprint's damages expert addressed apportionment at some length during his testimony, explaining that his damages calculations were designed to determine 'the incremental profits that are attributable to the patents in suit,'" (760 F. App'x at 984), Dr. Mangum has offered no opinions to explain why his ▉▉ ▉▉ damages figure either satisfies the EMVR or why the settlements and verdicts he relies on are otherwise incrementally attributable to the Asserted Patents. The VoiceGlo settlement and the *Vonage* verdict were based on a percentage of revenue ▉▉▉, which Mangum claims supports the PSPM number applied to all Defendants. *See* Ex. 24 (Mangum Charter Reply Rpt.) ¶ 146. Critically, however, there is no evidence of the overall PSPM royalty base that the VoiceGlo ▉▉ settlement rate would be applied against, such that it cannot be discerned whether the ▉▉▉ rate used by Dr. Mangum even appropriately reflects one of the key inputs in his analysis.[26] Ex. 21 at 571:3–6; *see Comcast*, 225 F. Supp. 3d at 1251 (holding that "attributing any per-subscriber figure to the Voiceglo" settlement "would be impermissibly speculative").

Further, despite the use of a PSPM number, Dr. Mangum's royalty rate is still derived from

---

[25] The inventors of the Asserted Patents similarly testified that Sprint did not invent a number of features and technologies involved in offering VoIP services. *See supra*, n. 24.

[26] Even if the use of a percentage of revenue were proper, the VoiceGlo's settlement rate ▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉ ▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Ex. 21 at 520:10–14.

a percentage of total VoIP revenue, which is a violation of the EMVR. As noted, Dr. Mangum has not established that Sprint's patented technology is the reason consumers purchase Defendants' VoIP services. *See LaserDynamics*, 694 F.3d at 67; *see also Lucent*, 580 F.3d at 1336–39 (finding that a royalty based on percentage of revenue was not supported by substantial evidence where the EMVR did not apply). The *TWC* verdict and MetroCast settlement suffer from the same fatal flaw— ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████. Ex. 22 (Mangum Charter Rpt.) ¶ 208; Ex. 24 (Mangum Charter Reply Rpt.) ¶ 146.

Dr. Mangum's analysis also improperly fails to apportion the royalty base, as "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement." *AstraZeneca AB v. ApotEx. Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015). For Charter, the evidence shows that between ████████ of its subscribers do not use their VoIP service. Ex. 23 (Mulhern Rpt.) ¶¶ 198–99.[27] Dr. Mangum, however, testified that it did not "matter to [his] damages analysis whether a subscriber actually received or placed phone calls in any given month" and that he did no "adjustments based on how telephone calls were actually completed." Ex. 21 at 520:10–14, 559:20–25. Because the asserted claims are method claims, damages should be correlated to the alleged infringing use. *See Lucent Techs.*, 580 F.3d at 1334. Subscribers who do not use their phone service do not perform the allegedly infringing method; consequently, these subscribers should have been apportioned out of the royalty base. *Id.* Further, as explained above, a large percentage of calls actually made on Defendants' VoIP networks cannot be infringing because they do not traverse the PSTN. Ex. 23 (Mulhern Rpt.) ¶ 200; Ex. 31 (Gerstner 1/22/20

---

[27] The other Defendants' subscribers exhibit similar patterns of non-use of VoIP service. For example, Mediacom estimates that in the past five years, ████████████████ of customers have, but do not make significant use of, VoIP service. *See* Ex. 32 (Bakewell Rpt.) ¶ 92.

Dep.) at 175:3-13.[28] Dr. Mangum should have apportioned these calls out of the royalty base. His

failure to do so renders his hypothetical negotiation analysis unreliable.

## X.    DR. WICKER'S IMPROPER AND UNSUPPORTED OPINIONS FAIL *DAUBERT*

Defendants move to exclude Dr. Wicker from providing expert opinion on whether Sprint's

patents are "blocking patents" because he "engage[d] in no actual analysis of the product's features

as compared to the claim limitations." *Mfg. Res., Int'l, Inc. v. Civiq Smartscapes, LLC*, Civ. No.

17-269-RGA, 2019 WL 4198194, at *7 (D. Del. Sept. 4, 2019) (excluding opinion on non-

infringing alternatives under FRE 702). Dr. Wicker also exceeds the bounds of his technical

expertise by offering legal and economic opinions about whether actions by Defendants constitute

direction or control of a third party, and about whether non-infringing alternatives were

economically feasible to pursue. Dr. Wicker, an electrical engineer, is not qualified to provide such

opinions and the opinions are inadmissible *ipse dixit*.

### A.    Argument

#### 1.    Dr. Wicker's "Blocking Patent" Opinion Has No Methodological Basis.

Dr. Wicker opines that the Christie Patents are "blocking patents"—in other words, that it

is not possible to provide a packet-PSTN telephony service without practicing the Christie Patents.

Ex. 16 (Wicker Charter Reply Rpt.) at ¶ 432; Ex. 15 (Wicker 6/5/2020 Dep.) at 1263:23–1265:19,

1269:5–19. Dr. Wicker, however, did not provide any analysis of known alternatives to prove that

other packet-PSTN telephony services actually practice the Christie Patents. *Id.* As this Court

previously held, a technical expert who opines that other products are not available as non-

---

[28] *See also* Ex. 32 (Bakewell Mediacom Rpt.) ¶¶ 161–63, 230; Ex. 33 (Bakewell ABB Rpt.) ¶¶ 163–65, 232; Ex. 34 (Bakewell Grande Rpt.) ¶¶ 160–62, 229; Ex. 35 (Bakewell WOW Rpt.) ¶¶ 162–64, 231.

infringing alternatives is unreliable when that expert "engages in no actual analysis of the product's features as compared to the claim limitations." *Mfg. Res.*, 2019 WL 4198194, at *7.

Just as in *Manufacturing Resources*, Dr. Wicker's opinion that the Christie Patents are "blocking patents" has no reliable methodological basis. Ex. 16 (Wicker Charter Reply Rpt.) at ¶ 432; Ex. 15 (Wicker 6/5/2020 Dep.) at 1263:23–1265:19. For example, Defendants identified available and acceptable non-infringing alternatives, including services provided by AT&T and Verizon. Ex. 17 (Almeroth Reb. Rpt.) at ¶¶ 794-812; Ex. 18 (Gilchrist Reb. Rpt.) at ¶ 962-64; Ex. 30 (Pedigo Rpt.) at ¶¶22-28. But Dr. Wicker admitted that he failed to analyze and does not know how AT&T or Verizon systems operate. *E.g.*, Ex. 15 (Wicker 6/5/2020 Dep.) at 1276:2-23, 1265:20-1273:14. Dr. Wicker's opinion that the Christie Patents are necessarily infringed cannot be reliable when by Dr. Wicker's own admission he did not analyze the services Defendants specifically identified as non-infringing. Nor does Dr. Wicker perform any claim-based analysis to support his blanket "blocking patent" opinions; he merely states in conclusory fashion that the patents are blocking. Ex. 16 (Wicker Reply Rpt.) at ¶ 432. Because Dr. Wicker's "blocking patent" opinions fail to analyze relevant non-infringing alternatives and are otherwise unsupported by any reliable methodology or analysis, they should be excluded. *Mfg. Res.*, 2019 WL 4198194, at *7.

### 2.     Dr. Wicker's "Direction or Control" Opinions Should Be Excluded.

Dr. Wicker's opinions on whether actions by Defendants constitute direction or control of a third party are inadmissible legal opinions. Dr. Wicker opines that Atlantic Broadband ("ABB") "directs and controls" a third party, Net2Phone, to provide interconnection between VoIP and the PSTN, relying on his interpretation of the contract between ABB and Net2Phone. Ex. 19, (Wicker ABB Infring. Rep.) at ¶¶ 2, 30 ("N2P was *contractually bound* to provide PSTN interconnectivity on behalf of ABB."), 33 (similar). Dr. Wicker also cites deposition testimony of Net2Phone and ABB non-lawyer employees for interpretation of the contract. *See, id.*, ¶¶ 30-33; Ex. 45, (Wicker

ABB Reply Rpt.), ¶¶ 207-209. Relatedly, Dr. Wicker opines that one of Defendants' proposed non-infringing alternatives, an IP-to-IP interconnection, would infringe the Asserted Patents because the "bearer communication may be passed in IP form between the two carriers but still be converted to a narrowband form for termination to the PSTN *under the direction and control of the originating party*" or that Defendants "*control and directs* the method and manner of delivery to the PSTN" under an IP-peering agreement. Ex. 14, (Wicker Infring. Rpt.) at ¶ 207.

*First*, as an engineer, Dr. Wicker lacks the credentials to opine on the legal issues of direction or control under Rule 702. Fed. R. Evid. 702. Dr. Wicker has a Bachelor's, Master's, and Ph.D. in Electrical Engineering. Ex. 20, (Wicker CV). He has neither a degree nor experience in law. *Calhoun v. Yamaha Motor Corp*., U.S.A., 350 F.3d 316, 322 (3d Cir. 2003) ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."). Dr. Wicker confirmed he has never been hired to provide a legal opinion or interpret contracts. Ex. 15, at 471:20-472:17; *see also* Ex. 15, (Wicker 6/5/20 Dep.) at 1350:2-7 (deferring to counsel as his basis for concluding there was direction and control).

*Second*, even if he were qualified, Dr. Wicker offers inadmissible *ipse dixit* regarding Defendants' direction or control of third parties in an IP interconnection or IP peering agreement—specifically, whether Defendants would control unnamed third parties after handing off a call in IP format. Ex. 14 (Wicker Infring. Rpt.) ¶ 207. Dr. Wicker admits that multiple parties could be involved in passing off calls before terminating on the PSTN. *See* Ex. 15 at 1278-1279:20. He does not cite to any evidence for his assertion that Defendants would direct or control those potentially innumerable, unknown third parties to hand off the call to the PSTN. *Id.* at 1279:21-1281:7. Dr. Wicker also provides no analysis for his assertion that Defendants handing off a call in IP format to another company would infringe. Instead, Dr. Wicker improperly cites his infringement

report from a previous, unrelated case. Ex. 14, ¶ 207 (citing Cable One infringement report). But those reports cannot demonstrate how Defendants here direct and control any third party.

*Finally*, Even if Dr. Wicker were qualified to provide legal opinions and those opinions were reliable, Dr. Wicker's conclusions regarding direction and control should nevertheless be excluded as not helpful within the meaning of Rule 702. Dr. Wicker inappropriately interprets the contract between Net2Phone and ABB to conclude that ABB directs and controls the actions of Net2Phone. *See, e.g.,* Ex. 19, (Wicker ABB Infring. Rpt.) at ¶¶ 30-31. These opinions as to the scope and meaning the contract between Net2Phone and ABB and each party's contractual obligations must be excluded because it is the Court's job to explain the law to the jury, not Dr. Wicker's. *Dow Chemical Canada Inc. v. HRD Corp.,* 656 F.Supp.2d 427, 435-435 (D. Del. 2009) (striking portion of expert report related to "legal duties, standards, or ramifications arising from" a contract) (internal quotation omitted).

### 3.      Dr. Wicker's Economic Feasibility Opinions Should Be Excluded.

*First*, as with Dr. Wicker's legal opinions, Dr. Wicker lacks the qualifications to provide economic opinions. Nothing in Dr. Wicker's CV indicates any economic expertise. Ex. 20. Dr. Wicker agreed that someone with an accounting or finance background would be better equipped to assess whether Defendants could have economically implemented certain alternatives. Ex. 15 at 1292:12-1293:25, 1295:17-1296:13. Dr. Wicker also does not have the expertise to opine that Defendants did not have the "know how" to build a circuit-switched network. *See* Ex. 15, Wicker Dep., June 3, 2020 at 576:3-14 (explaining his work did not focus on "building out a functioning voice network"). Without the relevant expertise, Dr. Wicker's opinions should be excluded.

*Second*, these opinions are also inadmissible *ipse dixit*. Dr. Wicker opines that providing a "cellular network" rather than a VoIP phone product would not be "economically feasible" for Defendants and that a circuit-switched network would be "cost prohibitive." *See* Ex. 14, Wicker

Report at ¶¶ 202, 212. Dr. Wicker also opines, without citation to a single document from Defendants, that Defendants did not have the "know how" to build a circuit-switched network. *Id.* at ¶ 212. Dr. Wicker cites no evidence from Defendants for these opinions, relying only on documents for third parties, and ignores that several cables companies provided cellular and circuit-switched telephony products to their customers. *See id.* at ¶ 213; Ex. 15, (Wicker 6/5/20 Dep.) at 1308:25-1309:16; 1310:9-19. Because Dr. Wicker has not based these economic opinions on any facts or evidence, they too should be excluded as unreliable *ipse dixit*.

## XI.    CONCLUSION

For the reasons explained above, Defendants ask the Court to grant their motions for summary judgment and to exclude expert testimony.


<table>
<tr><td></td><td>/s/ Kelly E. Farnan</td></tr>
<tr><td></td><td>Kelly E. Farnan (#4395)</td></tr>
<tr><td>OF COUNSEL:</td><td>Valerie A. Caras (#6608)<br>Richards, Layton & Finger, P.A.</td></tr>
<tr><td>David S. Benyacar</td><td>920 N. King Street</td></tr>
<tr><td>Daniel L. Reisner</td><td>One Rodney Square</td></tr>
<tr><td>ARNOLD & PORTER KAYE SCHOLER LLP</td><td>Wilmington, DE 19801</td></tr>
<tr><td>250 West 55th Street</td><td>(302) 651-7700</td></tr>
<tr><td>New York, NY 10019</td><td>farnan@rlf.com</td></tr>
<tr><td>(212) 836-8000</td><td>caras@rlf.com</td></tr>
<tr><td>david.benyacar@arnoldporter.com</td><td></td></tr>
<tr><td>daniel.reisner@arnoldporter.com</td><td>*Attorneys for Defendants Charter*<br>*Communications, Inc., Charter*</td></tr>
<tr><td>Gregory Arovas</td><td>*Communications Holdings, LLC,*</td></tr>
<tr><td>Jeanne M. Heffernan</td><td>*Spectrum Management Holding*</td></tr>
<tr><td>Ryan Kane</td><td>*Company, LLC, Charter Communication*</td></tr>
<tr><td>KIRKLAND & ELLIS LLP</td><td>*Operating LLC and Bright House*</td></tr>
<tr><td>601 Lexington Avenue</td><td>*Networks, LLC*</td></tr>
<tr><td>New York, NY 10022</td><td></td></tr>
<tr><td>(212) 446-4800</td><td></td></tr>
<tr><td>garovas@kirkland.com</td><td></td></tr>
<tr><td>jheffernan@kirkland.com</td><td></td></tr>
<tr><td>ryan.kane@kirkland.com</td><td></td></tr>
</table>

Luke L. Dauchot
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400
ldauchot@kirkland.com

Bao Nguyen
Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400
bnguyen@kirkland.com

/s/ Andrew C. Mayo
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

OF COUNSEL:

Robinson Vu
Natalie Alfaro Gonzales
Lindsay Volpenhein Cutié
Amy E. Bergeron
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Timothy S. Durst
BAKER BOTTS L.L.P.
2001 Ross Avenue
Suite 900
Dallas, Texas 75201-2980
(214) 953-6500

*Attorneys for Defendants Mediacom
Communications Corporation,
WideOpenWest Finance, LLC,
WideOpenWest Networks, Inc.,
WideOpenWest, Inc., WideOpenWest
Georgia, LLC, Knology of Alabama, Inc.,
Knology of Florida, LLC, Knology of
Georgia, Inc., Knology of South Carolina,
Inc., Knology of Tennessee, Inc., Knology
of Kansas, Inc., Anne Arundel Broadband,
LLC, Atlantic Broadband (CT) LLC,
Atlantic Broadband (Delmar) LLC,
Atlantic Broadband (Miami) LLC,
Atlantic Broadband (NH-ME) LLC,
Atlantic Broadband LLC (Penn), Atlantic
Broadband (SC) LLC, Atlantic Broadband
Finance, LLC, Grande Communications
Networks, LLC, RCN Telecom Services,
LLC, Radiate Holdings, LP, and
WaveDivision Holdings, LLC*

*Telecom Services, LLC, Radiate Holdings, LP, and WaveDivision Holdings, LLC*

DATED: June 12, 2020

47

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2020, true and correct copies of the foregoing document

were caused to be served on the following counsel of record as indicated:

**BY ELECTRONIC MAIL**
Stephen J. Kraftschik
Christina B. Vavala
Polsinelli PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

**BY ELECTRONIC MAIL**
B. Trent Webb
Aaron E. Hankel
Ryan J Schletzbaum
Ryan D. Dykal
Jordan T. Bergsten
Lauren E. Douville
Mark D. Schafer
Samuel J. LaRoque
Maxwell C. McGraw
Thomas M. Patton
Lydia C. Raw
Shook, Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108

**BY ELECTRONIC MAIL**
Robert H. Reckers
Michael W. Gray
Shook, Hardy & Bacon LLP
JPMorgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)