# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY LP., *Plaintiff*, v. CHARTER COMMUNICATIONS, INC., *et al.*, *Defendants*. | C.A. No. 17-1734-RGA **REDACTED PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., *Plaintiff*, v. MEDIACOM COMMUNICATIONS CORP., *Defendants*. | C.A. No. 17-1736-RGA **REDACTED PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., *Plaintiff*, v. WIDEOPENWEST, INC. *et al.*, *Defendants*. | C.A. No. 18-361-RGA **REDACTED PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., *Plaintiff*, v. ATLANTIC BROADBAND FINANCE, LLC *et al.*, *Defendants*. | C.A. No. 18-362-RGA **REDACTED PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., *Plaintiff*, v. GRANDE COMMUNICATIONS NETWORKS, LLC *et al.*, *Defendants*. | C.A. No. 18-363-RGA **REDACTED PUBLIC VERSION** |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY UNDER *DAUBERT*

## TABLE OF CONTENTS

I.     DEFENDANTS DO NOT INFRINGE THE ATM PATENTS.................................... 1

    A.     Sprint Does Not Raise Any Genuine Factual Disputes Precluding Summary Judgment .................................................................................................... 2

    B.     Sprint's DOE Theories Vitiate "ATM" from "ATM Interworking Unit" .............. 4

    C.     Sprint Seeks To "Recapture" Its Disclaimed Claim Scope ................................. 6

II.    THE '340 PATENT FAILS THE WRITTEN DESCRIPTION REQUIREMENT ........................................................................................................ 7

III.   SUMMARY JUDGMENT OF NO LOST PROFITS SHOULD BE GRANTED .................................................................................................................. 7

    A.     Circuit Switching Was an Acceptable Non-infringing Alternative ....................... 7

    B.     Partnering with Vonage Was an Acceptable Non-infringing Alternative ............. 9

    C.     Defendants Could Stop Selling Voice Services Rather Than Take a Loss........... 10

    D.     Sprint's "Weight of the Evidence" Arguments Are Meritless.............................. 11

IV.    SPRINT'S FAILURE TO PROVIDE NOTICE UNDER § 287(A) WARRANTS SUMMARY JUDGMENT OF NO PRE-SUIT DAMAGES ............. 12

V.     DR. MANGUM'S OPINIONS ARE INADMISSIBLE ............................................. 14

    A.     Dr. Mangum's Opinions Based on Jury Verdicts and Other Non-Comparable Litigation Materials Should be Excluded ........................................ 14

        1.     *TWC* Does Not Ratify Dr. Mangum's Use of Jury Verdicts.................... 14

        2.     *TWC* Does Not Ratify Dr. Mangum's Use of Other Litigation Materials ................................................................................................... 15

        3.     Dr. Mangum's Failure to Analyze the Relevant Economic Differences and Demonstrate Economic Comparability Warrants Exclusion.................................................................................................... 17

    B.     Dr. Mangum Uses Unreliable Methodology........................................................ 17

        1.     Dr. Mangum's Lost Profits Opinions Fail Due to Dr. Wicker's Unreliable "Blocking Patent" Opinion ..................................................... 17

        2.     Dr. Mangum's Analysis Does Not Satisfy *Panduit* Factor 3 ................... 18

3.      Dr. Mangum's Allocation of All VoIP Cost Savings to Sprint as a
        Royalty Is Arbitrary and Unsupported by Law .......................................... 18

4.      Dr. Mangum's Enhanced Services Opinion Is Unconnected to the
        Value of the Enhanced Services Patent ...................................................... 19

5.      Dr. Mangum Failed to Properly Apportion His Damages Theories ......... 20

        a.      Lost Profits ...................................................................................... 20

        b.      Analytical Approach ........................................................................ 21

        c.      Hypothetical Negotiation ................................................................ 22

VI.     DR.   WICKER'S   "BLOCKING   PATENT"   AND   HIS   LEGAL   AND
        ECONOMIC OPINIONS SHOULD BE EXCLUDED ................................................ 23

        A.      Sprint Does Not Defend Dr. Wicker's "Blocking Patent" Opinion ..................... 23

        B.      Dr. Wicker's Direction and Control Opinions Are Inadmissible ........................ 24

        C.      Dr. Wicker's Unsupported "Economic Feasibility" Opinions ............................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Dey, L.P.*,
    287 F.3d 1097 (Fed. Cir. 2002)....................................................................................5

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    324 F. Supp. 3d 470 (D. Del. 2018)............................................................................15

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
    24 F.3d 178 (Fed. Cir. 1994).......................................................................................13

*Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*,
    377 U.S. 476 (1964).....................................................................................................22

*AstraZeneca AB v. Apotex. Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015)...................................................................................22

*AVM Techs., LLC v. Intel Corp.*,
    Civ. No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)..............................16

*Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*,
    541 F.3d 1115 (Fed. Cir. 2008).....................................................................................4

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    906 F. Supp. 2d 399 (W.D. Pa. 2012).........................................................................12

*Coleman Motor Co. v. Chrysler Corp.*,
    525 F.2d 1338 (3d Cir. 1975).......................................................................................14

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012).....................................................................................5

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    469 F.3d 1005 (Fed. Cir. 2006).....................................................................................5

*Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.*, LLC,
    927 F.3d 1292 (Fed. Cir. 2019)...................................................................................15

*Embrex, Inc. v. Breuil*, SA,
    No. 5:03-CV-914 H3, 2006 WL 8438570 (E.D.N.C. Mar. 30, 2006) .......................13

*Epos Techs., Ltd. v. Pegasus Techs. Ltd.*,
    766 F.3d 1338 (Fed. Cir. 2014).....................................................................................5

*Ericsson, Inc. v. Harris Corp.*,
   352 F.3d 1369 (Fed. Cir. 2003)......................................................................................5

*Fiskars, Inc. v. Hunt Mfg. Co.*,
   279 F.3d 1378 (Fed. Cir. 2002)....................................................................................10

*Forest Labs., Inc. v. Abbott Labs.*,
   239 F.3d 1305 (Fed. Cir. 2001)......................................................................................4

*Grain Processing Corp. v. Am. Maize-Prod. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999)....................................................................................10

*Honeywell Int'l v. Hamilton Sundstrand Corp.*,
   378 F. Supp. 2d 459 (D. Del. 2005)..............................................................................16

*Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*,
   No. 2:16-CV-00055-JRG-RSP, 2017 WL 5165606 (E.D. Tex. Oct. 15, 2017) ......................12

*Inline Connection Corp. v. AOL Time Warner Inc.*,
   465 F. Supp. 2d 312 (D. Del. 2007)..............................................................................13

*In re Kollar*,
   286 F.3d 1326 (Fed. Cir. 2002)....................................................................................13

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)........................................................................................15

*Looksmart Grp., Inc. v. Microsoft Corp.*,
   No. 17–CV–04709–JST, 2019 WL 4009263 (N.D. Cal. Aug. 5, 2019)...........................18, 19

*Lucent Techs. Inc. v. Gateway, Inc*,
   580 F.3d 1301 (Fed. Cir. 2009)........................................................................18, 19, 21

*M2M Sols. LLC v. Enfora, Inc.*,
   167 F. Supp. 3d 665 (D. Del. 2016)..............................................................................17

*Mentor Graphics Corp. v. EVE–USA, Inc.*,
   851 F.3d 1275 (Fed. Cir. 2017)....................................................................................20

*Mentor Graphics Corp. v. EVE–USA, Inc.*,
   870 F.3d 1298 (Fed. Cir. 2017)................................................................................20, 21

*Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*,
   No. CV 17-269-RGA, 2019 WL 4198194 (D. Del. Sept. 4, 2019) ........................................10

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   830 F. Supp. 2d 815 (N.D. Cal. 2011) ..........................................................................12

*Optical Disc Corp. v. Del Mar Avionics*,
208 F.3d 1324 (Fed. Cir. 2000)..............................................................................5

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
875 F.3d 1369 (Fed. Cir. 2017)..............................................................................8

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017)..............................................................................7

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)..........................................................................6, 7

*Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*,
Civ. No. 16-284-LPS-CJB, 2018 WL 7893901 (D. Del. Dec. 17, 2018) ...............12

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
289 U.S. 689 (1933)..............................................................................................16

*Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*,
225 F. Supp. 3d 1233 (D. Kan. 2016) ..............................................................15, 19

*Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.*,
760 F. App'x 977 (Fed. Cir. 2019) ..........................................................14, 15, 22

*Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.*,
2018 WL 1215305 (Fed. Cir. Feb. 23, 2018)........................................14, 15, 22, 23

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
127 F.3d 1462 (Fed. Cir. 1997)............................................................................13

*State Indus., Inc. v. Mor–Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989)............................................................................18

*Stryker Corp. v. Intermedics Orthopedics, Inc.*,
96 F.3d 1409 (Fed. Cir. 1996)..............................................................................11

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
C.A. No. 17-1390-LPS-CJB, D.I. 445 (D. Del. Jan. 13, 2020) ...............................20

*TC Tech. LLC v. Sprint Corp.*,
No. 16-CV-153-RGA, 2019 WL 2515779 (D. Del. June 18, 2019)........................15

*Tek Global, S.R.L. v. Sealant Sys. Int'l, Inc.*,
920 F.3d 777 (Fed. Cir. 2019)..............................................................................18

*Tektronix, Inc. v. United States*,
552 F.2d 343 (Ct. Cl. 1977) ............................................................................19, 21

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998)..................................................................................4

*TWM Mfg. Co., Inc. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986).............................................................................19, 21

*Unwired Planet, LLC v. Apple Inc.*,
    No. 13-cv-04134-VC, 2017 WL 1175379 (N.D. Cal. Feb. 14, 2017) ....................12

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
    913 F.3d 1067 (Fed. Cir. 2019)................................................................................20

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
    631 F. Supp. 2d 1010 (N.D. Ill. 2009) ......................................................................6

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
    122 F.3d 1440 (Fed. Cir. 1997)..................................................................................5

*Yarway Corp. v. Eur-Control USA, Inc.*,
    775 F.2d 268 (Fed. Cir. 1985)..................................................................................10

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    365 F. Supp. 3d 466 (D. Del. 2019)..........................................................................17

**Statutes**

35 U.S.C. § 102(b) ................................................................................................................13

35 U.S.C. § 287(a) .................................................................................................11, 12, 13

## I.      DEFENDANTS DO NOT INFRINGE THE ATM PATENTS

Sprint does not dispute that (1) "interworking unit" has an ordinary meaning, (2) this ordinary meaning is a "device that translates between asynchronous [packet] and synchronous formats" and (3) Sprint's ATM Patents disclaimed this ordinary meaning, resulting in the Court's limiting the term to "ATM interworking multiplexer." D.I. 162 at 20; D.I. 296 at 3, 8; Ex. 15[1] at 249:2–6 (Dr. Wicker agreeing that "in the context of the broadband patents, interworking implies interworking between a narrowband PSTN network and a packet based network."). Thus "interworking unit," as that term has been construed, no longer covers a device that translates between *any* type of packet and synchronous formats but must instead translate between *ATM* packet and synchronous formats. In arguing that IP interworking is equivalent to ATM interworking because they both translate between packet to non-packet formats, Sprint advances an equivalents theory that attempts to equate ATM interworking with *all* interworking, thereby assigning no meaning at all to ATM—eviscerating the ATM limitation.

Sprint argues that Dr. Wicker offered evidence that was specific to ATM and IP. His reports and deposition testimony, however, make abundantly clear that his explanation for why ATM and IP are equivalent is entirely predicated on the fact that they are both packet technologies. His theory therefore applies equally to translating between synchronous and any packet format. D.I. 468 at 16. Sprint builds its damages theory on its broad-gauged equivalents theory, arguing that its Broadband Patents are, like the Call Control Patents, "blocking patents" and have "the same scope" because "they both cover *every way* to do a packet based telephony service to connect to the

---

[1]      All "Ex." citations refer to Exhibits to the opening brief, D.I. 471, or to this brief.  For convenience, Defendants cite the docket in *Sprint v. Charter*, No. 17-cv-1734-RGA and the expert reports in that case.  However, unless otherwise noted, similar entries or paragraphs exist in all Defendants' dockets or reports.

PSTN." Ex. 15 (Wicker 6/5/2020 Tr.) at 1272:2–7; 1271: 20–24.[2] Dr. Wicker doubled-down on

his assertion that his equivalents theory encompassed packet-based interworking:

- He could not identify "any packet based interworking multiplexor that would not be equivalent to the ATM multiplexor of the broadband patents." *Id.* at 1273:8–14.

- Under his view "there's no way defendants could have provided a packet based telephony service to connect to the PSTN without practicing the broadband patents." *Id.* at 1271:8–13.

- He admitted that "at minimum," his equivalents theories would encompass "packet based interworking multiplexor[s]." *Id.* at 248:2–11.

Because Sprint's equivalents theory impermissibly equates an ATM interworking multiplexer with

any packet-based interworking multiplexer despite the Court's construction to the contrary,

summary judgment of noninfringement should be granted.

### A.    Sprint Does Not Raise Any Genuine Factual Disputes Precluding Summary Judgment

Sprint argues that "[m]uch of Dr. Wicker's equivalents analysis was specific to the IP and

ATM protocols," and that this demonstrates he does not offer an equivalents theory applying

equally to all interworking. D.I. 497 at 9. Dr. Wicker, however, fails to identify any commonality

between ATM and IP that was not predicated entirely on the fact that they are both packet

technologies. *See generally*, D.I. 468, 5-6; Ex. 15, 164:20–170:13, 175:15–182:11.

There is no genuine dispute about the sweep of Dr. Wicker's opinions. His

interchangeability analysis rests on the fact that "any asynchronous packet network, in order to

interface with the PSTN, would require an interworking function." Ex. 15, 166:2–13. Dr. Wicker

explains that "asynchronous packet networks" including ATM, IP and others, use datagrams that

have "a header component and a payload," which he concedes "is a fundamental aspect of all

packet networks." *Id.* at 166:17–167:21. The payload "include[s] the…voice" and the header with

---

[2]    All emphasis added unless otherwise noted.

an identifier "that is used to route [the] payload." *Id.* at 167:22–168:17. As Dr. Wicker admitted, these are not "unique to ATM and IP"—they are "fundamental…in any packet network." *Id.* at 168:9–23. Any interface between asynchronous and synchronous networks requires "a device at the edge of the packet network capable of converting the bearer traffic between a packet-based and nonpacket-based…format[]." *Id.* at 169:10–17. "[G]enerally speaking, some DSP would not only be useful, but perhaps needed" to accomplish this interworking regardless of the packet format. *Id.* at 169:24–170:13. Thus, when asked if "ATM would also be interchangeable with any other asynchronous packet network," he answered "maybe not any other[,] [b]ut to the extent that each one of these qualities [payloads and headers] applied to the packet network, yes" and admitted that these qualities "are very typical, fundamental aspects of many packet networks." *Id.* at 170:24–171:13. In fact, Sprint cannot identify a single packet technology that is not blocked by its equivalents theory.

Similarly, there is no genuine dispute that Dr. Wicker bases his function-way-result analysis on characteristics of all packet networks. He defined the function as "receiv[ing] and interwork[ing] voice bearer traffic between synchronous and/or asynchronous formats." Ex. 59, ¶ 184. He admitted that his equivalence argument "would not just be limited to IP, but potentially other packet network technologies." Ex. 15 at 178:3–17. He also admitted his explanation of the way prong is not "unique to ATM and IP" but is "shared by other packet networks." *Id.* at 181:5–11. Finally, he defined the result in terms of "convert[ing] and transfer[ing] user communications in a format and with routing information that can be carried over either a synchronous or asynchronous communication network." Ex. 59, ¶ 187. Thus, he admitted, the "result would also be the same if I used another packet technology other than ATM or IP" because "there's nothing unique to ATM and IP…that would not be shared by other packet networks." Ex. 15 at 182:3–11.

That Sprint's equivalents theory applies equally to all packet networks is also evident in Sprint's damages theory. Dr. Mangum, its damages expert, assumes that the Broadband Patents are "blocking patents" which preclude any non-infringing alternatives. Ex. 22, ¶¶ 28, 16-25, 90. If these patents were limited to only certain types of packet technologies, Defendants could simply use another packet technology to deliver voice-over-packet service and avoid infringement. Dr. Mangum supports his assumption with an opinion from Dr. Wicker "that the Christie patents are blocking patents." Ex. 15 at 1269:13–19. Dr. Wicker concluded "there's no way defendants could have provided a packet based telephony service to connect to the PSTN without practicing the broadband patents." *Id.* at 1271:18–1272:22, 1273:8–14. In fact, he concluded that the "call control and broadband patents have the same scope" because they "both cover *every* way to do a packet based telephony service to connect to the PSTN." *Id.* at 1272:2–7. Thus, his equivalents theory assumes away the Court's construction that limited the Broadband Patents to ATM interworking while permitting the Call Control Patents to cover all packet-to-PSTN interfaces, and Dr. Mangum extended this same faulty reasoning to the '340 patent.

### B.    Sprint's DOE Theories Vitiate "ATM" from "ATM Interworking Unit"

Sprint argues that its "detailed function-way-result and interchangeability analysis" raises genuine factual issues that defeat summary judgment. But none of its "details" change the fact that Sprint's entire theory is predicated on equating ATM interworking with all types of interworking. D.I. 497 at 14. The Federal Circuit has consistently rejected equivalents theories that argue all types of a component are equivalent to the particular type of component specified by the claim. *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) (rejecting equivalents theory that sought to equate "any shape" of a cup with the required cup with a "generally conical outer surface"); *Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*, 541 F.3d 1115, 1129 (Fed. Cir. 2008) (rejecting equivalents theory that sought to equate "any bacterial source" with the required "*E.*

4

*coli*" "bacterial source"); *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1313 (Fed. Cir. 2001) (rejecting equivalents theory that sought to equate "an unknown percentage of water…to the claimed water percentages" because the water is "irrelevant"). These equivalents theories are impermissible because they vitiate a claim limitation. *Id*. For the same reason, Sprint's theory equating ***any*** interworking with ATM interworking fails.[3]

None of the cases Sprint cites permit the evisceration of claim language by equating every type of component to the particular type of component specified by the claim limitation. Unlike here, in those cases, the patentee offered evidence that showed why a particular element of an accused product or method was equivalent to a claim limitation, without the patentee's position being predicated on rendering the limitation irrelevant:

- *Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349, 1356 (Fed. Cir. 2012): theory that "a small spacer connecting the upper and lower deck walls" could be equivalent to the required "contact" did not vitiate that claim limitation;

- *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1020 (Fed. Cir. 2006): theory that "the hollow conically shaped portion of the [accused device]—was insubstantially different from the corresponding 'spherically shaped' limitation . . ." did not vitiate limitation;

- *Ericsson, Inc. v. Harris Corp.,* 352 F.3d 1369, 1375 (Fed. Cir. 2003): theory that supplying power "for just four seconds" (or 0.1% of the time) when on hook is equivalent to "only supply[ing] power" when a phone is off-hook does not vitiate that claim limitation;

- *Abbott Labs. v. Dey, L.P.,* 287 F.3d 1097, 1107 (Fed. Cir. 2002): theory that "99.99%" phospholipid percentage is equivalent to "75.0-95.5%" phospholipid content does not vitiate that limitation because it is still "less than 100%" and it therefore did "not eliminate the upper limit of phospholipid from the claim";

- *Optical Disc Corp. v. Del Mar Avionics,* 208 F.3d 1324, 1337 (Fed. Cir. 2000): theory equating "double step trailing edges" to "ramped trail edges" does not vitiate limitation if it "cause[s]

---

[3] Sprint points out (correctly) that it previously argued "the claimed inventions…are ***not*** limited by the particular type of packet-based protocol." D.I. 497 at 8 (citing D.I. 162 at 7). That is because the ordinary meaning of "interworking unit" is not limited by "the particular type of packet-based protocol." D.I. 162 at 7. The Court, however, ruled that the ATM Patents "disclaim any meaning of 'interworking unit' beyond ATM technology." D.I. 296 at 8. Sprint seeks to recapture this disclaimed claim scope by equating all interworking with ATM interworking.

the temperature of the medium…to fall less abruptly and results in...symmetrical pits".[4]

### C.      Sprint Seeks To "Recapture" Its Disclaimed Claim Scope

Sprint argues that it does not "broaden the claims to packet-based interworking, generally,"

D.I. 497 at 12, but that is precisely what Sprint did. Having disclaimed all types of interworking

in favor of ATM interworking, Sprint cannot use an equivalents theory that is broad enough to

recapture all types of interworking. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,

Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001) ("Having specifically identified, criticized, and

disclaimed the dual lumen configuration, the patentee cannot now invoke the doctrine of

equivalents to 'embrace a structure that was specifically excluded from the claims.'"); *Wm. Wrigley

Jr. Co. v. Cadbury Adams USA LLC*, 631 F. Supp. 2d 1010, 1042 (N.D. Ill. 2009) ("Claiming an

invention narrowly will [also] affect the resulting scope of the invention under the doctrine of

equivalents. . . . [D]isclaimed material is specifically excluded from the patent implicitly through

the patentee's narrow claiming, and the patentee may not use the doctrine of equivalents to broaden

the scope of the claims without impeding the functions of the PTO and upsetting the notice function

of patents."). Sprint's attempt to recapture its disclaimed scope also violates the public notice

function. Sprint "had an opportunity to draft the patent in a way that would make clear that" it

covered all interworking multiplexers. Instead "the patentee did just the opposite, leaving

competitors and the public to draw the reasonable conclusion that the patentee was not seeking

---

[4] Sprint also cited cases where the Federal Circuit vacated grants of summary judgment because a
court failed to consider patentee's arguments. *See Epos Techs., Ltd. v. Pegasus Techs. Ltd.*, 766
F.3d 1338, 1348 (Fed. Cir. 2014) (vacating decision containing "only two sentences" explaining
why there was no equivalents so that the court could consider the expert's opinion as to "why the
[defendant's] Product's signals are equivalent to the claimed intermittent ultrasound signal");
*Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) (vacating
decision as it was based on a "partially erroneous" construction and defendant's "purported
concession is no longer relevant" therefore "the district court must give Wright an opportunity to
prove whether Osteonics infringed under the doctrine of equivalents."). Here, full consideration of
Sprint's arguments based on a proper construction shows it seeks to eviscerate the ATM limitation.

patent protection" for all types of interworking. *SciMed* 242 F.3d at 1347.

## II.    THE '340 PATENT FAILS THE WRITTEN DESCRIPTION REQUIREMENT

Defendants' motion does not attempt "an end run around the Court's plain meaning construction." D.I. 497 at 13. To the contrary, it embraces the broad construction, and focuses on the lack of support in the specification. D.I. 468 at 21. That the Court held the claims do not limit the SPS to a system that has an ATM interworking unit does not mean that the Court found written description support for the claim. If anything, the Court suggested the opposite. *Id*. Sprint fails to dispute that the specification repeatedly describes "the present invention" as one that uses "ATM," that every disclosed embodiment of the SPS uses an "ATM interworking unit," and that nothing in the specification describes an SPS in broader terms. *Id*. at 22, n.4; Ex. 9, 1:30–3:25, 6:32–40.

Sprint argues that its expert's opinion creates fact issues on this question. But Dr. Wicker did no more than point to passages in the specification that referred to "service platform" 112 which is part of SPS 104. He never even attempted to explain why the interworking unit 114 also shown as part of SPS 104 is anything but an ATM interworking unit, and ignored the fact that the specification states the opposite: Interworking unit 114 "may be an ATM interworking multiplexer that interworks between the ATM format and other formats…or it may be an ATM interworking unit that interworks between different types of ATM systems." *Id.* at Fig, 1; 7:63–8:1.

## III.    SUMMARY JUDGMENT OF NO LOST PROFITS SHOULD BE GRANTED

Sprint does not have a principled response to Defendants' motion. To oppose the motion, then, Sprint could only muster arguments that (i) directly contradict the opinions of its expert; (ii) ignore the absences of proof identified by Defendants; and (iii) improperly attempt to shift the burden of proof on non-infringing alternatives to Defendants. The motion should be granted.

### A.    Circuit Switching Was an Acceptable Non-infringing Alternative

Dr. Mangum admits that "[t]raditional circuit-switched telephony is a non-infringing

alternative [ ] from a technical perspective." Ex. 22, ¶ 70. More than that, he affirmatively relies on this non-infringing alternative in his reasonable royalty calculation based on cost savings (his "analytical approach"). *Id.*; *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (reasonable royalty calculation based on cost savings requires comparison of the cost of infringing to the cost of "non-infringing alternatives"). Sprint's opposition ignores these admissions. Indeed, Sprint now contradicts its expert by contending that circuit switching was not an available non-infringing alternative.

Sprint concedes that "[i]n the 1990s certain cable companies began building traditional circuit-switched networks in some markets, and Sprint does not contend that those networks infringed." D.I. 497 at 15-17. Yet, because these cable companies did not employ circuit switching in *all* of their markets, Sprint contends that it was not an available alternative. *Id.* at 15–16. But the fact that cable companies used circuit switching in some markets and VoIP in others demonstrates that they *are* available alternatives. And while Sprint contends that RCN, Grande and Wave "modified" their circuit switched networks in such a way that they did infringe, (*id.* at 17–18), Sprint does not claim that Charter or other cable companies did so. There is no evidence that such modifications were required to offer telephone service. Sprint's reliance on conjecture and innuendo to contradict its own expert cannot possibly satisfy its burden of proving that cable companies were unable to employ (unmodified) circuit switching in all markets if faced with the alternative of paying Sprint the exorbitant ▆ per subscriber, per month ("PSPM") it now seeks.

Sprint also contends that circuit switching was unacceptable because Dr. Mangum opined that it "is significantly more expensive than VoIP." *Id.* at 18. But, as Sprint admits, Dr. Mangum did not compare the expense of offering VoIP using *Sprint's* service with the expense of circuit switching. *See id.* at 18-19. This is the comparison he was legally required to make. D.I. 468 at

18–19 (citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380-81 (Fed. Cir. 2017)). Although Dr. Mangum admitted that he did not even attempt to do this comparison because he did not think it was required, (Ex. 60 at 100:23–101:5; 163:25–164:14), Sprint argues in retrospect that he could not have done this comparison, citing testimony that ███████████████████████████████████████████████████████. D.I. 497 at n.10. But Dr. Mangum was free to use any number of known accounting methods to do this allocation himself, just as he did when he allocated capital costs for other purposes in his report. *See* Ex. 61 at ¶ 84. Sprint cannot now complain that Dr. Mangum did not have the information he needed to perform an analysis he never contemplated performing, especially when he never identified this as information he needed.

### B.    Partnering with Vonage Was an Acceptable Non-infringing Alternative

Sprint contends that Charter never disclosed the non-infringing alternative of referring customers to Vonage in return for a fee. D.I. 497 at 19–20. Instead, Sprint says, Charter disclosed

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████ D.I. 497 at 19–20. Sprint is wrong. As Charter's expert Carla Mulhern explains in her report, ███████████████████████████████████████████████

█████████ Ex. 62 ¶ 139. In fact, ████████████████████████████████████

███████████████████████████████████████████████████████

███████████" *Id.* (internal quotation marks omitted). Ms. Mulhern █████████████████

█████████████████████████████████████

Although Sprint admits that the Vonage Agreement permits █████████████████████

████████████████ Sprint asserts that customers referred ████████████████████████

███████████████████████████████████████████████████████

9



████████████████████ D.I. 497 at 20. Sprint cites to nothing in the Vonage Agreement to support these contentions, of course, because ████████████████████████████████ ████████████████████████████████████████████████████████. In any event, questions of contract interpretation are appropriate for resolution by the Court on summary judgment. D.I. 468 at 20, n.12.

Next, Sprint contends Defendants ████████████████████████████████ ██████████████████████ D.I. 497 at 20. However, it is Sprint's burden to demonstrate absence of non-infringing alternatives. Vonage was and is a well-known telephony provider, and Sprint did not demonstrate that Vonage was incapable of taking on new customers.[5]

Finally, Sprint argues that the Vonage alternative would not be acceptable to Defendants' customers because one defendant, Mediacom, advertised its service as superior to Vonage. D.I. 497 at 20-21. If anything, spending money on this type of advertising demonstrates that Mediacom viewed Vonage as a dangerous competitive threat.[6]

## C.   Defendants Could Stop Selling Voice Services Rather Than Take a Loss

Sprint argues that Defendants would not have exited the voice market because they benefited in unquantified ways from offering triple play services. D.I. 497 at 21. Yet Sprint has no explanation for Dr. Mangum's failure to assess whether Defendants would make or lose money by selling triple play services if they were required to pay an extra ████ PSPM to Sprint to do so.[7]

---

[5] Sprint's reliance on *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed. Cir. 2002) is misplaced. There, the proposed non-infringing alternative was an internal development project that was not on the market. *Id.* Here, the Vonage service was indisputably public and available.

[6] ███████████████████████████████████████████ *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999).

[7] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

Absent this showing, Sprint's claim for lost profits fails as a matter of law. *See Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No. CV 17-269-RGA, 2019 WL 4198194, at *5 (D. Del. Sept. 4, 2019) (Andrews, J.) (where defendants would lose money on each sale, expert did "not rely on sufficient facts or reliable principles for her lost profits opinion").[8]

### D.    Sprint's "Weight of the Evidence" Arguments Are Meritless

Sprint argues the Federal Circuit already rejected Defendants' non-infringing alternatives because, in an entirely different case based on an entirely different record, the Federal Circuit found that sufficient evidence had been presented for the jury to decide that non-infringing alternatives were unavailable. D.I. 497 at 22. There are many differences between that case and this one, including: (1) Sprint did not admit in that case, as it has here, that circuit switching was an acceptable non-infringing alternative; (2) Sprint did not rely in that case, as it does here, on the existence of the circuit switching non-infringing alternative as support for its reasonable royalty calculation; (3) Sprint did not seek lost profits damages in that case and thus did not have the burden of proof on non-infringing alternatives as it does here (Ex. 61, ¶ 92); (4) the Vonage partnership non-infringing alternative was not raised in that case; (5) Sprint sought only a reasonable royalty of $1.37 PSPM in that case, not the ███ PSPM it seeks here as lost profits; and (6) TWC did not raise the non-infringing alternative of not offering telephony in that case. The Federal Circuit's fact-intensive decision on that entirely different record has no bearing here.

Finally, Sprint suggests that the mere fact that it has pled willful infringement is a sufficient showing of absence of non-infringing alternatives to defeat summary judgment. D.I. 497 at 22–23. Obviously, this cannot be so. Sprint relies on a footnote in *Stryker Corp. v. Intermedics*

---

[8] Sprint relies on *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 276–77 (Fed. Cir. 1985) for the proposition that a defendant would not "cut off its nose to spite its face." There, however, it was established that the defendant supplier was selling the product profitably. *See id.* Here, Sprint has failed to demonstrate that purchasing its services would be profitable for Defendants.

*Orthopedics, Inc.*, 96 F.3d 1409, 1418 n.3 (Fed. Cir. 1996) which says, in dicta, that the court's affirmative finding of willful infringement undermines the contention that non-infringing alternatives existed. There, however, the defendants' own documents showed that competing devices lacked an essential feature. *Id.* at 1418. In any event, nothing in *Stryker* suggests that merely pleading willfulness is sufficient to defeat summary judgment of no lost profits.

## IV.   SPRINT'S FAILURE TO PROVIDE NOTICE UNDER § 287(A) WARRANTS SUMMARY JUDGMENT OF NO PRE-SUIT DAMAGES

First, Sprint cites no cases saying that a patent claim is asserted only if the patentee explicitly lists that claim in the complaint. Indeed, Sprint's own actions show that cannot be true— it pursued apparatus claims from the now-dropped U.S. Pat. No. 7,693,131 against the Atlantic Broadband defendants ("ABB"), based on identically-worded allegations from the complaint, thus showing that the language from Sprint's complaints encompasses apparatus claims. Ex. 63 (identifying apparatus claims 1, 7, 9, and 10); *Sprint v. Atlantic Broadband*, No. 18-362-RGA, D.I. 25, ¶ 119 (D. Del. July 6, 2018) (alleging ABB infringed "at least" claim 11 of the '131 patent by "making" "products"). And Sprint cannot avoid § 287(a) by arguing it later chose to narrow the asserted claims to just method claims.[9]

Second, Sprint is incorrect that there are no tangible items to mark. Retail VoIP providers like Sprint's licensees provided customer premise equipment (e.g., eMTAs or phones) as part of

---

[9] Sprint cites two out-of-district cases for the proposition that patentees can drop initially asserted apparatus claims to avoid the marking requirement. D.I. 497 at 23, n.17. The greater weight of authority (including this District) holds that the assertion of apparatus claims triggers the marking requirement, and a patentee cannot avoid marking by later proceeding on method claims only. *E.g.*, *Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, Civ. No. 16-284-LPS-CJB, 2018 WL 7893901, at *4 (D. Del. Dec. 17, 2018); *Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, No. 2:16-CV-00055-JRG-RSP, 2017 WL 5165606, at *2–3 (E.D. Tex. Oct. 15, 2017); *Unwired Planet, LLC v. Apple Inc.*, No. 13-cv-04134-VC, 2017 WL 1175379, at *4 (N.D. Cal. Feb. 14, 2017); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 906 F. Supp. 2d 399, 406-07 (W.D. Pa. 2012); *Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 837-38 (N.D. Cal. 2011).

their retail VoIP services. Ex. 64 (Wicker Vonage Infring. Rpt.) at 582–89 ███████████

███████████████████████████████ Ex. 65 (Wicker Big River Infring. Rpt.) at

165–78 (███████████████████████████████████████████

████████████████"). As in *Vonage* and *Big River*, Dr. Wicker considers ███████

███████████████████████████████████████████

███████. *See, e.g.*, Ex. 59 (Wicker Infring. Rpt), ¶ 191 (███████████████

███████████████████████████████████████"); Ex. 47

at 1–2 (███████████████████████████████████

███████ ███████████████████████████████. ███

███████████████████████████████████████████

███████████████████████████████████████████

███████ These licensees "make" the (allegedly) patented systems when they assemble the systems

in their networks. Sprint's licensees "sell" the eMTA or phone when they lease that equipment to

customers. *See, e.g.*, *In re Kollar*, 286 F.3d 1326, 1331, n.3 (Fed. Cir. 2002) (stating a lease "may

be tantamount to a sale" under 35 U.S.C. § 102(b)); *Embrex, Inc. v. Breuil*, SA, No. 5:03-CV-914

H3, 2006 WL 8438570, at *1 (E.D.N.C. Mar. 30, 2006). Either "making" or "selling" triggers the

marking requirement. 35 U.S.C. § 287(a). And the sale of a service (instead of a physical product)

still triggers that requirement where components of the service could be marked. *Inline Connection

Corp. v. AOL Time Warner Inc.*, 465 F. Supp. 2d 312, 320–21 (D. Del. 2007) (rejecting argument

that "sale of a service, the highspeed internet, is not a 'product' for purposes of § 287(a)").

Finally, there is no dispute that Sprint failed to provide notice under § 287(a). Defendants'

awareness of prior litigations is wholly irrelevant, as actual notice requires more than "mere[]

notice of the patent's existence or ownership." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,

24 F.3d 178, 187 (Fed. Cir. 1994). Rather, actual notice "is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997). Nothing Sprint cites suggests, let alone demonstrates, that Sprint's alleged "notice" to Defendants satisfies this standard.[10] D.I. 497 at 26 (citing nothing that shows a specific charge of infringement for specific products). Summary judgment of no pre-suit damages for the Marking Patents is appropriate.

## V.    DR. MANGUM'S OPINIONS ARE INADMISSIBLE

### A.    Dr. Mangum's Opinions Based on Jury Verdicts and Other Non-Comparable Litigation Materials Should be Excluded

Sprint's principal argument in favor of injecting two prior jury verdicts and multiple litigation-related settlements ("the Litigation Materials") into this case through the opinions of Dr. Mangum is that the Federal Circuit validated their use in *Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.,* 760 F. App'x 977 (Fed. Cir. 2019). D.I. 497 at 27–28. But that was a different case involving different facts and parties. Those differences eviscerate Sprint's arguments.

### 1.    *TWC* Does Not Ratify Dr. Mangum's Use of Jury Verdicts

The Federal Circuit did not, as Sprint states, "already consider[] and reject[] Defendants' arguments" regarding jury verdicts. D.I. 497 at 30. In declining to reverse the district court's admission of the *Vonage* verdict, the Federal Circuit expressly relied on the relative timing of that verdict, explaining the "[2007] verdict would be a factor of which the parties would have been aware at the time of their hypothetical negotiation in 2010." *TWC*, 760 F. App'x at 981. Here, the 2007 *Vonage* and 2017 *TWC* verdicts could not have been a factor in the hypothetical negotiation: the Charter hypothetical negotiation date is 2002, and the Bright House date is 2003.[11] Moreover,

---

[10] The record shows Sprint did ***not*** provide Defendants with any "affirmative communication of a specific charge of infringement by a specific accused product or device," as is its burden. D.I. 468 at 23–24; *Amsted*, 24 F.3d at 187.

[11] Similarly, the hypothetical negotiation dates for RCN (2004), Grande (2005) and ABB

one of the prior verdicts (*TWC*) involves a party now owned by Charter, another distinguishing fact that the Federal Circuit considers particularly prejudicial. *Id.* at 980–81, n.2 ("[A] jury 'is likely to give a prior verdict against the same defendant more weight than it warrants.'" (citing *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975)).

Nor, as Sprint here maintains, (D.I. 497 at 30), does the *TWC* decision negate this Court's observation in *Acceleration Bay LLC v. Activision Blizzard, Inc.* that a jury verdict is "at best, an informed lay opinion." 324 F. Supp. 3d 470, 489 (D. Del. 2018). That observation stands unchallenged by the Federal Circuit. Indeed, this is precisely one of the reasons why the Federal Circuit cautioned that "such evidence can be prejudicial and must be treated with great care." *TWC*, 760 F. App'x at 980. After *TWC*, Sprint itself relied on *Acceleration Bay* before this Court to argue that a damages expert could not rely on the *TWC* jury verdict. *TC Tech. LLC v. Sprint Corp.*, No. 16-CV-153-RGA, 2019 WL 2515779, at *6–7 (D. Del. June 18, 2019). This Court rejected Sprint's argument not because *Acceleration Bay* was wrong in light of *TWC* but because "*Acceleration Bay* is distinguishable" since the opposing expert was not relying on the *TWC* verdict, but rather on the existence of a royalty demand from Sprint at the time of the hypothetical negotiation. *Id.* at *7–8. The Court, nonetheless, excluded the verdict due to lack of comparability. *Id.* at *8.

### 2.    *TWC* Does Not Ratify Dr. Mangum's Use of Other Litigation Materials

As with the jury verdicts, the enormous time gap between the hypothetical negotiations and the Litigation Materials renders the latter unreliable. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 78 (Fed. Cir. 2012).[12] Sprint's only response is that other districts

---

(2005/2006) all predate the *Vonage* verdict. The hypothetical negotiation dates for the remaining defendants all predate the 2017 *TWC* verdict.

[12] Sprint cites *Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.*, LLC, 927 F.3d 1292, 1300 (Fed. Cir. 2019) to argue that later settlement agreements can be considered. D.I. 497 at 31. But *Elbit* only mentions timing in passing, and there is no indication there was a motion to exclude the settlements on this basis. Moreover, there is a difference between post-dating a negotiation by a

have admitted Litigation Materials that post-date the relevant hypothetical negotiations. D.I. 497 at 31. But those courts did not address the issue of timing in their decisions, and the cases settled before trial, thus the evidence was never actually admitted or tested on appeal. *See Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*, 225 F. Supp. 3d 1233, 1248–50 (D. Kan. 2016); D.I. 501-30 at 1.

As a back-up, and flip-flopping on its prior position before this Court (*see* D.I. 468 at 29–30), Sprint argues that the Book of Wisdom permits consideration of later settlement agreements. D.I. 497 at 29. But the Book of Wisdom does not offer a patentee *carte blanche* to sweep into the hypothetical negotiation selective later events that a patentee deems favorable. The Book of Wisdom allows consideration of after-the-fact data that informs data actually discussed at the hypothetical negotiation. *Honeywell Int'l v. Hamilton Sundstrand Corp*., the case to which Sprint cites for the "Book of Wisdom" proposition, (D.I. 497 at 29), makes this point. There, the patentee was permitted "to calculate damages using the [defendant's] 2004–05 sales projections as a royalty base" in a March 2000 hypothetical negotiation. 378 F. Supp. 2d 459, 466 (D. Del. 2005). Evidence regarding scope of infringement is what gave rise to the Book of Wisdom concept. *Id*. (noting data approximates "the use made of the invention by" defendant); *see also Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697 (1933). Permitting unknown later settlements fueled by unknown litigation considerations into the hypothetical negotiation does not belong in the "Book of Wisdom" as courts have used that concept.[13]

---

few months (as in *Elbit*) rather than many years (as with Charter and several other defendants).
[13] Sprint incorrectly suggests that Defendants' experts conducted a similar analysis. D.I. 497 at 29. None of Defendants' experts opine that the Litigation Materials are comparable and admissible to determine a reasonable royalty. Their analyses also differ from Dr. Mangum's. *See, e.g.*, Ex. 62 (Mulhern Reb. Rpt.), ¶¶ 191, 329 (discussing non-litigation licenses from the damages period and adjusting for differences); Ex. 68 (Bakewell ABB Reb. Rpt.), ¶¶ 243, 489, n.520 & n.848 (noting he takes no position on admissibility and that "opinions do not depend on this type of evidence").

### 3. Dr. Mangum's Failure to Analyze the Relevant Economic Differences and Demonstrate Economic Comparability Warrants Exclusion

Sprint cites no cases to support its claim that "comparability" is a factual issue that must be left to a jury. Indeed, the law is expressly to the contrary. "Federal Circuit precedent is clear that [patentee] must show that the prior licenses are truly comparable to the license that the parties would have negotiated for the asserted patent before introducing this evidence to the jury." *AVM Techs., LLC v. Intel Corp.*, Civ. No. 10-610-RGA, 2013 WL 126233, at *3 (D. Del. Jan. 4, 2013). This Court has excluded opinions relying on licenses where the expert failed to demonstrate comparability. *See, e.g.*, *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 496 (D. Del. 2019) (excluding reliance on settlement where expert did not "address the effect of" key economic considerations and thus "fail[ed] to demonstrate how…economically similar or dissimilar [it] is"); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. 2016) (similar).

In arguing that Dr. Mangum "properly considered" the economic considerations underlying the Litigation Materials, Sprint points to 20 pages of Dr. Mangum's report. D.I. 497 at 32, n.34 & n.35 (citing D.I. 499-1, ¶¶ 94–147). But those pages simply provide factual background for the Litigation Materials. *Id.* Nowhere does Dr. Mangum analyze whether or how the disparate facts surrounding the Litigation Materials make them applicable to the hypothetical negotiation here. D.I. 468 at 30–31. Because Dr. Mangum's "analysis fails to demonstrate how…economically similar or dissimilar the" Litigation Materials are to the hypothetical license, his reliance on the same should be excluded. *Zimmer Surgical*, 365 F. Supp. 3d at 496.

### B. Dr. Mangum Uses Unreliable Methodology

### 1. Dr. Mangum's Lost Profits Opinions Fail Due to Dr. Wicker's Unreliable "Blocking Patent" Opinion

As explained in Section VI.A, Sprint concedes that Dr. Wicker provides no analysis to show that alternative wholesale VoIP providers, such as AT&T and Verizon, infringe the Asserted

Patents. Rather, Sprint argues that, per Dr. Wicker, these services are not alternatives because they are "either unavailable or unacceptable." D.I. 497 at 40–41. But Dr. Mangum has repeatedly admitted that his "analysis is premised on the basis that any company providing VoIP service are infringing." Ex. 69, ¶ 38; *see also id.* ¶¶ 27, 133; Ex. 22, ¶¶ 69, 72, 88, 170, 171; Ex. 60 at 229:1–23, 268:17–269:9, 275:14–22, 609:17–610:9, 611:23–612:10, 730:16–731:6, 732:2–18. Because Dr. Mangum relied on an unsupported and unreliable basis for his lost profits opinions, these opinions should be excluded.

### 2. Dr. Mangum's Analysis Does Not Satisfy *Panduit* Factor 3

Sprint's argument that Dr. Mangum could rely on evidence of prior activities in lieu of performing a capacity "calculation," (D.I. 497 at 33), is unavailing. While evidence of prior business activities can be sufficient to prove capacity under *Panduit* Factor 3,[14] Dr. Mangum has done no analysis to close the enormous gap between Sprint's past activities and the capacity required by Dr. Mangum's but-for world. ███████████████████████████████

███████████████████████████, and Dr. Mangum provides no evidence or analysis showing that Sprint, who would be the sole provider of wholesale VoIP in his but-for world, had the capacity ████████████████████s. Ex. 60 at 189:20–190:3. Nor does Dr. Mangum provide any evidence or analysis showing Sprint had the capital resources ███████████

███████████████. *Id.* at 302:7–303:3, 316:10–17; Ex. 62 (Mulhern Reb. Rpt.) ¶¶ 157–59; Ex. 70 at 607:4–10, 608:21–609:4. These opinions should be excluded.

### 3. Dr. Mangum's Allocation of All VoIP Cost Savings to Sprint as a Royalty Is Arbitrary and Unsupported by Law

---

[14] In *Tek Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, capacity was inferred from prior activities because the patentee served 100% of the relevant customer's sales before the entrance of the infringer. 920 F.3d 777, 790-91 (Fed. Cir. 2019). In *State Indus., Inc. v. Mor–Flo Indus., Inc.*, the court found capacity satisfied where the patentee had a 40% market share and could therefore capture at least 40% of the infringer's sales. 883 F.2d 1573, 1579 (Fed. Cir. 1989). Neither supports an assumption that a patentee can increase capacity by ██████ based on much smaller activities.

Dr. Mangum and Sprint ignore that cost savings must be allocated between the patentee and the alleged infringer to qualify as a reasonable royalty. This is true when cost savings are awarded as reasonable royalty damages under either a hypothetical negotiation approach, *see Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17–CV–04709–JST, 2019 WL 4009263, at *3 (N.D. Cal. Aug. 5, 2019), or the "analytical approach." Indeed, in *Lucent Techs. Inc. v. Gateway, Inc.*, (cited by Sprint, *see* D.I. 497 at 37), the Federal Circuit explained that the analytical approach is conducted by "calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer." 580 F.3d 1301, 1324 (Fed. Cir. 2009).[15] Sprint does not dispute that Dr. Mangum allocated 100% of the ███ cost savings as a royalty to Sprint.[16] As it was in *Looksmart*, this 100% allocation is arbitrary, unreasonable, and should be excluded.

### 4. Dr. Mangum's Enhanced Services Opinion Is Unconnected to the Value of the Enhanced Services Patent

Here, Sprint ignores Defendants' argument: Dr. Mangum failed to explain how the price of non-party TWC's voicemail service relates to the value of the Enhanced Services Patent. D.I. 468 at 34. As the case with Sprint's prior damages expert, Dr. Mangum arrives at his royalty rate for the Enhanced Services Patent "by assuming that the ratio of" voicemail versus VoIP pricing overall somehow indicates the relative value of Sprint's Asserted Patents. *Compare Comcast*, 225

---

[15] The "analytical approach" cases Sprint cites are hypothetical negotiation cases. D.I. 497 at 37 & n.44; *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir. 1986) (analytical approach decided in context of a "hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee"); *Tektronix, Inc. v. United States*, 552 F.2d 343, 349 (Ct. Cl. 1977) (applying *Georgia-Pacific* hypothetical negotiation framework).

[16] Sprint's assertion that the cost savings calculated by Dr. Mangum is actually ███ PSPM (D.I. 497 at 37 n.45) is incorrect, as that number was not the basis for Dr. Mangum's ███ PSPM opinion. Ex. 22, ¶¶ 197, 199–200. Instead, Dr. Mangum opines that the difference between "normal" circuit-switched profits and expected VoIP profits is ███ PSPM, and arbitrarily assigns that entire amount as a royalty to Sprint. *Id.* ¶¶ 199–200; D.I. 468 at 33–34.

F. Supp. 3d at 1252–53 (excluding opinion based on ratio of Sprint's voicemail revenue to VoIP revenue) *with* Ex. 22, ¶¶ 174–79, 239 (using ratio of TWC's voicemail price to VoIP price). Nothing supports equating TWC's relative voicemail pricing (███ of its overall VoIP pricing) to the relative value of the Enhanced Services Patent (i.e., ███ of ████ PSPM, or ████ PSPM).

### 5. Dr. Mangum Failed to Properly Apportion His Damages Theories

#### a. Lost Profits

Under controlling law, apportionment is always necessary, including for lost profits. *Mentor Graphics Corp. v. EVE–USA, Inc.* does not support Sprint's proposition that satisfaction of the first two *Panduit* factors necessarily dispenses with apportionment. *See* D.I. 497 at 34–35. Rather, in that case, the *Panduit* analysis demonstrated that "damages are tied to the worth of [the] patented features" based on "the undisputed facts of [that] record." 851 F.3d 1275, 1288 (Fed. Cir. 2017); *see also Mentor Graphics Corp. v. EVE–USA, Inc.*, 870 F.3d 1298, 1300 (Fed. Cir. 2017) (in denying rehearing, Judge Stoll noted the decision was based on "the narrow facts of this case" and that it did not "apply broadly to all lost profits analyses"). The Federal Circuit reiterated this rule in *WesternGeco L.L.C. v. ION Geophysical Corp.*, explaining that "[i]f the application of the *Panduit* factors does not result in the separation of profits attributable to the patented device and the profits attributable to providing other aspects…it appears that apportionment is necessary." 913 F.3d 1067, 1073 & n.2 (Fed. Cir. 2019). In *Sunoco*, the patentee argued its expert "'apportioned the Patents' in connection with his analyses of the *Panduit* factors." *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC,* C.A. No. 17-1390-LPS-CJB, D.I. 445, at 14 (D. Del. Jan. 13, 2020). Relying on *WesternGeco*, the judge held that apportionment is necessary unless the entire market value rule ("EMVR") is satisfied. *Id.* at 14–15.

Here, Dr. Mangum made no attempt to satisfy the EMVR. Nor does his *Panduit* analysis reflect only the value of the patented technology because there are many aspects of Sprint's

20

wholesale VoIP basket of services unrelated to VoIP-PSTN interconnection. *See, e.g.*, Ex. 22, ¶¶ 85–86, Fig. 2 (



); *see also* Ex. 70 at 590:7–16. Sprint's own contracts show that its wholesale services pricing can be apportioned. For example, in its contract with Wide Open West, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 71 at 533. Dr. Mangum did nothing to account for these other technologies and services. Instead, he improperly assigned the entire wholesale VoIP profit to the Asserted Patents.

Sprint's argument that Dr. Mangum did not need to apportion out non-infringing VoIP-to-VoIP calls because such calls are "offered for free," (D.I. 497 at 36), is wrong. There is no dispute that Sprint provided such non-infringing connections as part of its services. *See, e.g.,* Ex. 70 at 609:23–610:18, Ex. 71 at 485, 527 (explaining services included IP-IP telephony traffic); Ex. 30, ¶¶ 23, 31. Dr. Mangum presented no evidence or analysis supporting that VoIP-to-VoIP calls in Sprint's wholesale VoIP service were "free."

> b.  **Analytical Approach**

Apportionment "is necessary in both reasonable royalty and lost profits analysis." *Mentor Graphics*, 851 F.3d at 1287. As the analytical approach is a reasonable royalty analysis, it must be apportioned. *Lucent*, 580 F.3d at 1324 (analytical approach includes "apportioning the projected profits between the patent owner and the infringer"). The cases Sprint cites, *TWM* and *Tektronix*, are not to the contrary. Rather, apportionment was unnecessary there because the EMVR exception was satisfied. *TWM*, 789 F.2d at 901; *Tektronix*, 552 F.2d at 352. As Dr. Mangum does not invoke the EMVR here, his failure to apportion is fatal to his analytical approach.

Sprint argues that unpatented elements of a VoIP system, including power source, hardware, internet protocol, and packet delivery, do not need to be apportioned out either because more-expensive power sources were never deployed or because the technologies are "in the public domain." D.I. 497 at 38 & n.48. But, as Dr. Mangum admitted, these unpatented technologies contribute to the lower capital expenditures associated with offering VoIP in comparison to circuit–switched telephony. Ex. 60 at 624:2–15, 626:4–9, 626:14–17, 627:3–12. Sprint's unsupported argument to the contrary does not save his analysis.

### c.   Hypothetical Negotiation

Sprint argues that the Federal Circuit decision in *TWC* validates Dr. Mangum's ███ PSPM royalty as already apportioned. D.I. 497 at 38–39. Sprint is wrong: the record here is different from that in *TWC*. In *TWC*, Sprint's expert Dr. Rao performed an apportionment analysis before arriving at the ███ rate. 760 F. App'x at 984. Not so here. Rather than "using the same reasoning and evidence [as Dr. Rao], but aided by additional corroborating data points," (D.I. 497 at 39), Dr. Mangum performs no apportionment or EMVR analysis whatsoever to corroborate that ███ "reflected the incremental value of the inventions and thus satisfied the requirement of apportionment." *TWC*, 760 F. App'x at 983. Indeed, Sprint does not point to any apportionment analysis; rather, Sprint cites to 20 pages of Dr. Mangum's report that list background on Sprint's licenses.[17] D.I. 497 at 39 n.49 (citing Ex. 22, ¶¶ 94–147). Moreover, Dr. Mangum relies on *different* data points than Dr. Rao to arrive at his royalty rate (e.g., the *TWC* verdict and MetroCast settlement), and Dr. Mangum should have analyzed whether those data points are incrementally attributable to the Asserted Patents.

In arguing that Dr. Mangum need not account for subscribers who did not use the infringing

---

[17] Sprint also never addresses the disconnect between the ███ rate and Dr. Mangum's ███ or that the ███ only applied to VoIP-PSTN calls. D.I. 468 at 39 & n.26.

method because Defendants still make money on such subscribers, Sprint turns Dr. Mangum's analysis into profit disgorgement. *See* D.I. 497 at 39–40. But this is not a proper basis for damages. *Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 377 U.S. 476, 505–07 (1964) (noting disgorgement of infringer's profits not available as a remedy); *AstraZeneca AB v. Apotex. Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) ("The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement."). Since certain subscribers did not infringe, Dr. Mangum was required to apportion them out of his royalty base.[18]

## VI. DR. WICKER'S "BLOCKING PATENT" AND HIS LEGAL AND ECONOMIC OPINIONS SHOULD BE EXCLUDED

### A. Sprint Does Not Defend Dr. Wicker's "Blocking Patent" Opinion

In his opening report, Dr. Wicker opined the Christie Patents were "blocking patents" because, in his opinion, *every* packet-PSTN telephony service infringed these patents. (Ex. 59, ¶¶ 203, 207; Ex. 15 at 1269:9–12 (defining a "blocking patent" as a one in which "a given technology" "cannot [be] practice[d] … without licensing or using somehow that patent"). Defendants moved to exclude Dr. Wicker's "blocking patent" opinion under *Daubert* as wholly unsupported. (D.I. 468 at 42). Sprint offers ***no defense*** for that opinion. *See generally* D.I. 497 at 40–41. Nor could it: Dr. Wicker failed to compare alternative packet-PSTN systems, including the acknowledged AT&T and Verizon services, to the claims of the Christie Patents. *E.g.* Ex. 15 at 1276:2–23, 1265:20–1273:14. This Court has held generalized infringement opinions like Dr. Wicker's insufficient under *Daubert*, and it should do so here too. *Mfg. Res.*, 2019 WL 4198194, at *7 (excluding opinion that non-infringing alternative is non-infringing because expert "engage[d] in no actual analysis of the product's features as compared to the claim limitations");

---

[18] *TWC* is inapposite. There, Dr. Rao concluded that TWC made no profits attributable to IP-IP calls. Br. of Appellee, *Sprint Commc'ns Co., L.P. v. TWC, Inc.*, 2018 WL 1215305, at *38 (Fed. Cir. Feb. 23, 2018). Dr. Mangum performed no such analysis of Defendants' profits. Ex. 22, ¶ 173.

*Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, Civ. A. No. 07-127-LPS-MPT, 2014 WL 529983, at *6 (D. Del. Feb. 7, 2014) (excluding generalized infringement opinion as "void of the necessary analysis for comparing each element of the claim").[19]

Instead of defending Dr. Wicker's "blocking patent" opinion, Sprint argues that "it is enough to examine whether a supposed alternative was either unavailable or unacceptable." D.I. 497 at 41. But that answers a different question: whether Dr. Wicker's "unavailability" and "unacceptability" opinions pass muster under *Daubert*. Though Defendants disagree with those opinions, Defendants moved to exclude Dr. Wicker's *blocking patent* opinion. *See generally* D.I. 468 at 41–42 (Section titled "Dr. Wicker's 'Blocking Patent' Opinion Has No Methodological Basis"). As Sprint provides no explanation or methodology to support Dr. Wicker's "blocking patent" opinion, the Court should grant Defendants' motion to exclude it.

### B.     Dr. Wicker's Direction and Control Opinions Are Inadmissible

Sprint's response ignores the challenge to Dr. Wicker's unsupported opinions regarding direction and control of third parties for an IP interconnection non-infringing alternative. *See* D.I. 497 at 42. With respect to the alleged direction and control of Net2Phone by ABB, Sprint argues that Dr. Wicker is not interpreting the contract but providing a "technical opinion." D.I. 497 at 42. This is incorrect. None of the portions of the contract or testimony relied on by Dr. Wicker relate to technical aspects of the VoIP systems or the interconnection between systems. Rather, they relate to whether there is a *contractual* requirement to connect to the PSTN. *See* D.I. 468 at 44. Neither case Sprint cites supports admission of Dr. Wicker's testimony. First, Sprint misstates the court's decision in *Datatreasury Corp. v. Wells Fargo & Co.*, Civ. A. No. 2:06–CV–72 DF, 2010

---

[19] Sprint argues that "none of Defendants' technical experts offered evidence that AT&T and Verizon's systems did *not* infringe." D.I. 497 at 41, n.51. But Sprint bears the burden on this issue. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1544 (Fed. Cir. 1991) ("the burden of proof was properly placed on [patentee] to show the absence of acceptable non-infringing substitutes.").

WL 3768105, at *5 (E.D. Tex. Sept. 13, 2010). D.I. 497 at 42. There, the court found that "expert testimony on whether Defendants' systems are even capable of direction or control" was admissible but noted that "[t]he ultimate legal conclusions regarding direction and control [] are not a proper subject of testimony by a technical expert." *Datatreasury*, 2010 WL 3768105 at *4, 5. Similarly, in *Roche Diagnostics Ops., Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 606 (D. Del. 2010), the expert's opinion was properly admitted where he "did not offer opinions as to the scope and meaning of the Agreement and its terms, and did not opine on the ultimate question." D.I. 497 at 43. Here, Dr. Wicker offers opinions on the scope and meaning of the contract and the ultimate legal conclusion on direction and control—courts agree such testimony is inadmissible.

### C.      Dr. Wicker's Unsupported "Economic Feasibility" Opinions

Sprint fails to explain how Dr. Wicker is qualified to offer "economic feasibility" opinions. Based on Dr. Wicker's undefined "experience," Sprint argues that "it was impractical for Defendants to undertake the massive effort of implementing their own cellular networks." D.I. 497 at 43. In so doing, it ignores that this was not the only way Defendants could provide cell service; Defendants also proposed a MVNO relationship. *See* D.I. 500-1, ¶ 201. Dr. Wicker has no support for his opinion that a MVNO arrangement would not be "economically feasible."

Similarly, Sprint's response does not address Dr. Wicker's unfounded opinions that Defendants did not have the "know-how" to build a circuit-switched network. With respect to Dr. Wicker's opinion on the "prohibitive cost" of the circuit-switched alternative, Sprint, again, points only to third parties' documents and that Defendants did not "seriously consider" such a service.[20] *See* D.I. 497 at 44–45. But that does not mean that circuit-switched telephony was deemed too expensive for these Defendants.

---

[20] This is not even true for WOW, RCN, Wave, and Grande that each provided or continue to provide circuit-switches telephony. *See* D.I. 468 at 45.

|  | */s/ Kelly E. Farnan* |
| --- | --- |
|  | Kelly E. Farnan (#4395) |
|  | Valerie A. Caras (#6608) |
| OF COUNSEL: | Richards, Layton & Finger, P.A. |
|  | One Rodney Square |
| David S. Benyacar | Suite 600 |
| Daniel L. Reisner | 920 N. King Street |
| ARNOLD & PORTER KAYE SCHOLER LLP | Wilmington, DE 19801 |
| 250 West 55th Street | (302) 651-7700 |
| New York, NY 10019 | farnan@rlf.com |
| (212) 836-8000 | caras@rlf.com |
| david.benyacar@arnoldporter.com |  |
| daniel.reisner@arnoldporter.com |  |

OF COUNSEL:

David S. Benyacar
Daniel L. Reisner
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
david.benyacar@arnoldporter.com
daniel.reisner@arnoldporter.com

Gregory Arovas
Ryan Kane
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
garovas@kirkland.com
ryan.kane@kirkland.com

Luke L. Dauchot
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400
ldauchot@kirkland.com

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Valerie A. Caras (#6608)
Richards, Layton & Finger, P.A.
One Rodney Square
Suite 600
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
caras@rlf.com

*Attorneys for Defendants Charter
Communications, Inc., Charter
Communications Holdings, LLC,
Spectrum Management Holding
Company, LLC, Charter Communications
Operating, LLC, and Bright House
Networks, LLC*

OF COUNSEL:

Robinson Vu
Natalie Alfaro Gonzales
Lindsay Volpenhein Cutié
Amy E. Bergeron
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

*/s/ Andrew C. Mayo*
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants Mediacom
Communications Corporation,
WideOpenWest Finance, LLC,*

Timothy S. Durst
BAKER BOTTS L.L.P.
2001 Ross Avenue
Suite 900
Dallas, Texas 75201-2980
(214) 953-6500

*WideOpenWest Networks, Inc.,
WideOpenWest, Inc., WideOpenWest
Georgia, LLC, Knology of Alabama, Inc.,
Knology of Florida, LLC, Knology of
Georgia, Inc., Knology of South Carolina,
Inc., Knology of Tennessee, Inc., Knology
of Kansas, Inc., Anne Arundel Broadband,
LLC, Atlantic Broadband (CT) LLC,
Atlantic Broadband (Delmar) LLC,
Atlantic Broadband (Miami) LLC,
Atlantic Broadband (NH-ME) LLC,
Atlantic Broadband LLC (Penn), Atlantic
Broadband (SC) LLC, Atlantic Broadband
Finance, LLC, Grande Communications
Networks, LLC, RCN Telecom Services,
LLC, Radiate Holdings, LP, and
WaveDivision Holdings, LLC
Telecom Services, LLC, Radiate Holdings,
LP, and WaveDivision Holdings, LLC.*

DATED: July 13, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2020, true and correct copies of the foregoing document were caused to be served on the following counsel of record as indicated:

**BY ELECTRONIC MAIL**
Stephen J. Kraftschik
Christina B. Vavala
Polsinelli PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

**BY ELECTRONIC MAIL**
B. Trent Webb
Aaron E. Hankel
Ryan J Schletzbaum
Ryan D. Dykal
Jordan T. Bergsten
Lauren E. Douville
Mark D. Schafer
Samuel J. LaRoque
Maxwell C. McGraw
Thomas M. Patton
Lydia C. Raw
Shook, Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108

**BY ELECTRONIC MAIL**
Robert H. Reckers
Michael W. Gray
Shook, Hardy & Bacon LLP
JPMorgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)