IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P.,<br><br>        Plaintiff;<br><br>    v.<br><br>CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS HOLDINGS, LLC, SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, CHARTER COMMUNICATIONS OPERATING, LLC, BRIGHT HOUSE NETWORKS, LLC,<br><br>        Defendants. | Civil Action No. 17-1734-RGA |

<u>MEMORANDUM OPINION</u>

Christina B. Vavala and Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Aaron E. Hankel, B. Trent Webb, John D. Garretson, Jonathan M. Hernandez, Jordan T. Bergsten, Lauren E. Douville, Lydia C. Raw, Mark D. Schafer, Ryan D. Dykal, and Ryan J. Schletzbaum, SHOOK, HARDY & BACON LLP, Kansas City, MO; Michael W. Gray and Robert H. Reckers, SHOOK, HARDY & BACON LLP, Houston, TX, attorneys for Plaintiff Sprint Communications Company LP.

Kelly E. Farnan, RICHARDS, LAYTON & FINGER PA, Wilmington, DE; Alex Henriques, Robert A. Appleby, Ryan Kane, James E. Marina, Gregory Arovas, and Jeanne M. Heffernan, KIRKLAND & ELLIS LLP, New York, NY; Bao T. Nguyen, KIRKLAND & ELLIS LLP, San Francisco, CA; Gregory Polins, KIRKLAND & ELLIS LLP, Chicago, IL; Luke Dauchot, KIRKLAND & ELLIS, LLP, Los Angeles, CA; Daniel L. Reisner, David S. Benyacar, and Michael Block, ARNOLD & PORTER KAYE SCHOLER LLP, New York, NY; Robert J. Katerberg, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, DC; Thomas T. Carmack, ARNOLD & PORTER KAYE SCHOLER LLP, Palo Alto, CA, attorneys for Defendants Charter Communications, Inc. et al.

March 16, 2021

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court is Plaintiff's *Daubert* motion to exclude certain parts of Defendants' expert witness testimony. (D.I. 457). Defendants oppose. I have reviewed the parties' briefing. (D.I. 458, 502, 525). I heard oral argument on November 30, 2020. (D.I. 554).

I. BACKGROUND

Plaintiff Sprint Communications currently asserts claims from nine[1] patents against Defendants Charter Communications, Charter Communications Holdings, Spectrum Management Holding Company, Charter Communications Operating, and Bright House Networks, which I will refer to as Defendants or Charter. Plaintiff asserts that Defendants' Voice-over-IP ("VoIP") systems infringe these patents, which can be grouped into the Call Control Patents, the Broadband Patents, and the Enhanced Services Patent. The Call Control Patents are Nos. 6,452,932 ("the '932 Patent"), 6,463,052 ("the '052 Patent"), 6,633,561 ("the '3,561 Patent"), 7,286,561 ("the '6,561 Patent"), and 7,505,454 (the '454 Patent"). The Broadband Patents are Nos. 6,343,084 ("the '084 Patent"), 6,473,429 ("the '429 Patent"), and 6,298,064 ("the '064 Patent"). Patent No. 6,697,340 ("the '340 Patent") is the Enhanced Services Patent.

II. LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other

---

[1] Plaintiff asserted claims from eleven patents at the time of the briefing, but has since dismissed all claims of two of them. (*See* D.I. 432 at 2; D.I. 493). The reduction to nine patents has no impact on the analysis unless noted.

> specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993).

The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[2] At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v.*

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

3

*Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III.   ANALYSIS

#### A.  Ms. Mulhern's the IP Share Approach

To determine the value of the patents-in-suit, Defendants' expert, Ms. Carla Mulhern, evaluates "the contribution of the patented technology to the value of the Accused Products." (D.I. 505-2, Exh. 71 at 59 of 394). Ms. Mulhern does this in three ways: (1) considering the amount of use of the patents-in-suit as part of Defendants' overall VoIP services; (2) analyzing the contribution of the patents in suit to Plaintiff's entire VoIP portfolio; and (3) evaluating the contribution of the patents-in-suit to VoIP technology overall. (*Id.*). Only the third method is at issue in the *Daubert* motion.

To evaluate the contribution of the patents-in-suit to VoIP technology overall, Ms. Mulhern uses two methods, the IP Share Approach and the Equipment Share Approach. (*Id.* at 70-71 of 394). Plaintiff only moves to exclude the IP Share Approach. (D.I. 458 at 1). The purpose of this approach is "to analyze the contribution of the Patents-in-Suit to the overall set of IP related to VoIP networks and services." (D.I. 505-2, Exh. 71 at 70-71 of 394).

In her IP Share Approach, Ms. Mulhern uses different methods to calculate the contribution of the patents-in-suit to VoIP technology overall. She uses (1) numeric proportionality and (2) skewed distribution of value. (*Id.* at 72-73 of 394).[3] Her analysis also

---

[3] At the time of Ms. Mulhern's analysis, there were eleven patents-in-suit. The number of patents in dispute has since been reduced to nine. (*See* D.I. 432 at 2; D.I. 493). While this will

relies, in part, on the work of Defendants' technical expert, Dr. Kevin Almeroth. (*Id.* at 71-72 of 394).

Plaintiff argues for the exclusion of Ms. Mulhern's IP Share Approach because it is "unreliable and divorced from the facts of the case." (D.I. 458 at 1). Plaintiff contends that this approach should be excluded as: (1) it is a "top-down" approach that assumes that the value of Plaintiff's VoIP patents is decreased by the number of patents Ms. Mulhern determined are "relevant to VoIP;" (2) Ms. Mulhern uses a numeric proportionality analysis that assumes that every patent "relevant to VoIP" is automatically comparable and has equal value; and (3) Ms. Mulhern's skewed distribution of value analysis relies on a 1998 article which she uses to set a cap on the value of any patent "relevant to VoIP" and assumes Plaintiff's patents cannot exceed that cap. (*Id.* at 1-2).

### i. Ms. Mulhern's IP Share Approach is Not an Impermissible "Top-Down" Approach

Plaintiff argues that Ms. Mulhern applies an impermissible "top-down" approach "to a nebulous grouping of patents she has determined to be 'relevant to VoIP.'" (*Id.* at 7). Plaintiff contends that district courts have limited use of a top-down approach to standards essential patents, which the patents in this case are not. (*Id.* at 6-7).

Defendants counter that Ms. Mulhern's analysis is not a "top-down" approach, but an apportionment analysis, as is required for calculating damages. (D.I. 502 at 36-37). Defendants argue that Ms. Mulhern's analysis begins with measured values of the asserted patents including Plaintiff's wholesale VoIP profits earned from Defendants, the cost savings of VoIP, and licenses to Plaintiff's VoIP portfolio. (*Id.* at 37). Defendants assert that Ms. Mulhern's analysis is

---

presumably cause Ms. Mulhern's results to be different numerically, it has no impact on the Court's analysis of the reliability of her methods.

distinguishable from that which was excluded in *TC Tech. LLC v. Sprint Corp.*, 2019 WL 2515779, at *15 (D. Del. June 18, 2019), as she did not use a royalty cap, started with values from Plaintiff's expert, Dr. Mangum, and used her apportionment analysis to isolate the value of the asserted patents. (D.I. 502 at 37-38).

Plaintiff counters that *TC Tech* is indistinguishable from this case, as "it is improper to set any number as an absolute ceiling that must be split among all patents within the industry." (D.I. 525 at 13). Plaintiff maintains that Ms. Mulhern's analysis is an unreliable top down approach notwithstanding that it begins with Dr. Mangum's calculated values. (*Id.* at 13-14).

A "top-down" approach "determines a reasonable royalty based on an aggregate royalty for the end-products associated with a standard." *TC Tech*, 2019 WL 2515779, at *15. In *TC Tech*, the Court determined that the expert's testimony was insufficiently tied to the facts of the case as the expert did not explain why the "top-down" approach applied to a patent not subject to a FRAND obligation nor did he address why the rate associated with the standard essential patents should apply in that case, when the patent at issue was not accepted into the standard. *Id.* at *16. For those reasons, the Court excluded the opinion under *Daubert*. *Id.*

I agree with Defendants that this case is distinguishable from *TC Tech*. Ms. Mulhern's analysis is not a "top-down" approach and it is tied to the facts of the case. Her opinion does not "determine a reasonable royalty based on an aggregate royalty for the end-products associated with a standard." *Id.* at *15. First, there are no patents associated with a standard in this case. Second, Ms. Mulhern does not base her analysis on an "aggregate royalty for the end-products." Instead, Ms. Mulhern bases the application of the IP Share Approach on Dr. Mangum's calculated damages. (D.I. 505-2, Exh. 71 at 87-92, 104 of 394).

For her IP Share Approach, Ms. Mulhern calculates the contribution of the patents-in-suit to the value of patents relevant to VoIP technology overall. She uses a numeric proportionality approach and a skewed distribution of value approach to approximate this contribution. She then applies the calculated values to Dr. Mangum's damages calculations. (*Id.* at 87-92, 104 of 394).

Ms. Mulhern is not using an "aggregate royalty for the end products." She applies her calculated values to Dr. Mangum's calculated damages, opining that this represents the appropriate apportionment to award damages for the contribution of the patents-in-suit to VoIP technology as a whole. (*Id.* at 69-71, 74, 77-78 of 394). This analysis is sufficiently tied to the facts of the case, as Dr. Mangum's calculated damages were based on the accused products and the patents-in-suit. (*See, e.g.*, D.I. 471, Exh. 22 at 335, 337, 340 of 742). The parties dispute the extent of apportionment that is necessary in the damages calculations, but that is not grounds to exclude Ms. Mulhern's IP Share Approach. Plaintiff will be able to address any weaknesses in Ms. Mulhern's approach to apportionment at trial through cross examination and opposing witness testimony.

As Ms. Mulhern's analysis is an apportionment analysis that is tied to the facts of the case, and not a "top-down" approach, Plaintiff's motion to exclude the IP Share Approach is denied.

### ii. Ms. Mulhern's Numeric Proportionality Analysis

Ms. Mulhern's numeric proportionality approach assigns "a share of value to a subset of patents within a portfolio that corresponds to the number of patents in the subset, assigning each patent its pro rata share." (D.I. 505-2, Exh. 71 at 63 of 394). The approach assumes that all patents in VoIP technology have the same value. (*Id.* 72 of 394). To calculate the contribution of the patents-in-suit to VoIP technology overall, Ms. Mulhern divided the number of patents-in-

7

suit by the total number of patents relevant to VoIP services. (*Id.* at 63 of 394). This resulted in a calculation that each patent-in-suit contributed an estimated 0.5% (11/2200) of value to VoIP technology overall. (*Id*. at 72 of 394).

Plaintiff contends that Ms. Mulhern's "'numeric proportionality' assumption is incompatible with fundamental principles of law" as it makes "unsupported" assumptions that each patent in every set that she chose and analyzed are comparable and have equal value. (D.I. 458 at 7-8). Plaintiff argues that different patents cannot be assumed to have equivalent value to one another, and therefore Ms. Mulhern's assumptions are unreliable. (*Id.* at 8).

Defendants counter that Ms. Mulhern's "numeric proportionality" approach is tied to the facts of the case as she analyzes Plaintiff's portfolio licenses, including the asserted patents, and "accounts for the relative contribution of the Asserted Patents compared to the other 100 plus patents in Sprint's VoP portfolio." (D.I. 502 at 38-39).[4] Defendants contend that Ms. Mulhern's "numeric proportionality" approach is conservative as Ms. Mulhern's unchallenged forward citation analysis revealed that each asserted patent had fewer citations than expected in comparison to patents of similar age in the same field. (*Id.* at 38; *see* D.I. 505-2 at 68 of 394). Thus, according to the forward citation analysis, each of Sprint's asserted patents is less valuable than the average VoIP patent.

I agree with Defendants that Ms. Mulhern's numeric proportionality analysis is sufficiently tied to the facts of the case. Her analysis is centered around information from this case: the patents involved in this suit and their estimated contribution to the overall value of patents relevant to VoIP. She does not "assume" that all VoIP patents are equal.  Rather, she

---

[4] At times, the parties' arguments mix-and-match in describing numeric proportionality relative to the Sprint portfolio as opposed to VoIP patents as a whole.

shows that Sprint's patents are less equal, but then gives Sprint the benefit of the doubt in making a calculation based on an assumption of equality.

Further, Ms. Mulhern's other approach to calculating the value of the patents-in-suit recognizes that patents can have different values than other patents in the same set. (*See* D.I. 505-2 at 64 of 394 (describing her use of the "skewed distribution" approach to "account for the fact that the value of individual patents within a portfolio may differ")). Her approaches to calculating the value of the asserted patents are done in a reliable way and the question of which approach is most credible, if any, is for the jury to answer. Plaintiff can address the credibility of Ms. Mulhern's opinions through cross-examination and opposing expert testimony.

### iii. Ms. Mulhern's Skewed Distribution of Value Approach

Ms. Mulhern's skewed distribution of value approach applies conclusions from Dr. Schankerman's article *How Valuable is Patent Protection? Estimates by Technology Field*. (D.I. 459-1, Exh. 1 at 5 of 193). Dr. Schankerman found that for electronics patents the top 1% of patents account for 24% of the total value of the patents in the group, the top 5% of electronics patents account for 55% of the overall value, and the top 10% of electronics patents account for 84% of the value. (*Id.*, Exh. 4 at 171 of 193). Ms. Mulhern then uses these numbers to calculate the value of Plaintiff's patents. (D.I. 505-2, Exh. 71 at 72, 98, 102 of 394). She assumes that all the patents-in-suit are in the top 1% of patents relating to VoIP technology and calculates, based on the overall number of patents estimated to be relevant to VoIP, the value of the patents-in-suit based off of Dr. Schankerman's findings. (*Id.* at 73 of 394). The result is that the patents-in-suit contribute 12% to the overall value of VoIP technology patents. (*Id.*).

Plaintiff argues that Ms. Mulhern's "skewed distribution" approach is unreliable and should be excluded as it misapplies Dr. Schankerman's analysis and is not tied to the facts of the

9

case. (D.I. 458 at 8-9). Plaintiff asserts that Ms. Mulhern applied Dr. Schankerman's findings to Plaintiff's VoIP portfolio and a grouping of selected patents and assumed that Dr. Schankerman's results applied to any "electronics" field in any country at any time, despite Dr. Shankerman's article not suggesting that the same distribution that he found would apply to other sets of patents. (*Id.* at 9-10). Plaintiff contends that "Ms. Mulhern just copied the results Dr. Schankerman got using a completely different set of data." (*Id.* at 10).

Plaintiff asserts that even if Dr. Schankerman's article could be applied to VoIP patents in the United States in 2014, "Ms. Mulhern still stretches the conclusions of the study too far" by assuming that the value of the top 1% of patents is 24% of the value of the group and that the 24% is spread equally among all patents in the top 1%. (*Id.* at 11). Plaintiff contends that the study did not specify the distribution of value within the top 1% of patents and similarly Ms. Mulhern does not "attempt[] to evaluate" whether certain patents in the top 1% are more valuable than others. (*Id.* at 11-12).

Defendants counter that the skewed distribution approach has been confirmed and favorably cited in economics literature and has been the basis for other damages opinions. (D.I. 502 at 39-40). Defendants refute Plaintiff's contention that Ms. Mulhern misapplies Dr. Schankerman's methodology by arguing that the skewed distribution of value is a confirmed methodology that is of the type that experts would use in forming an opinion. (*Id.* at 39). Defendants also contend that Plaintiff's objections to Ms. Mulhern's analysis go to its weight, not its admissibility under *Daubert*. (*Id.*).

I agree with Defendants. Dr. Schankerman's findings are a reliable source for Ms. Mulhern's skewed distribution of value analysis. His article is a source of the type upon which a damages expert would be expected to rely. His findings are similar to other studies that have

10

measured patent value. (*See, e.g.*, D.I. 505-2, Exh. 75 at 124, 126 of 394 (finding that the top 10% of patents accounted for 81.3% of the value); Exh. 77 at 138-39 of 394 (stating that the top 10% of electronics patents contributes 85% of the value in Germany, with other countries showing similar results). *But see id.*, Exh. 76 at 130, 132-33 of 394 (characterized by Defendants (D.I. 502 at 33 n.21) as "finding that the top 10% of patents account for approximately 47 to 69% of total value")). In addition, his findings have been admitted as a basis for damages calculations in two cases. *See Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *12 & n.15 (S.D. Cal. Sept. 14, 2016) (concluding that an expert's finding of the top 10% of patents represent 84% of the value based on Dr. Schankerman's article was neither "arbitrary" nor a "general rule of thumb") ; *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013).

Ms. Mulhern applies an accepted rule, the skewed distribution of patent value, to the patents-in-suit based on the overall number of U.S. patents relevant to VoIP. It is reasonable for a damages expert to rely on such a rule to calculate value of the patents-in-suit. Plaintiff's concerns regarding the correctness of and weight given to Ms. Mulhern's analysis can be addressed through cross-examination and other trial testimony. Plaintiff's motion to exclude Ms. Mulhern's skewed distribution of value approach is denied.

### B. Ms. Mulhern's and Dr. Almeroth's References to Other VoIP Patents and Proprietary Technology

Plaintiff argues that both Ms. Mulhern's selection of Cooperative Patent Classification ("CPC") groups on the United States Patent & Trademark Office ("USPTO") website and Dr. Kevin Almeroth's opinions regarding the CPC subclasses should be excluded. (D.I. 458 at 12-14).

Plaintiff asserts that Ms. Mulhern's selection of the CPC subclasses is unreliable as she did not conduct any technical analysis of the patents in the CPC classifications nor would she be qualified to do so as she is not a technical expert. (*Id.* at 12-13). Defendants argue that Ms. Mulhern did not need to be a technical expert to use the USPTO website and search functions to identify the CPC classes and subclasses that referenced "VoIP" or "voice over Internet Protocol." (D.I. 502 at 41). Further, Defendants contend that Dr. Almeroth did all the technical analysis on what Ms. Mulhern found and that it is "proper for a damages expert to rely on the opinions and analyses of technical experts." (*Id.* at 42).

The first point of contention is whether Ms. Mulhern's selection of the CPC classification codes relating to VoIP was reliable. (D.I. 458 at 12; D.I. 502 at 41). Ms. Mulhern "identified all USPTO CPC subclasses and sub-subclasses that mention[ed] 'VoIP' or 'voice over Internet Protocol' in their titles or descriptions." (D.I. 505-2, Exh. 71 at 71 n.567 of 394). Ms. Mulhern's process is detailed in Exhibit 29 of her Rebuttal Report, and describes how "CPC classifications to search were found based on a search of CPC definitions for subclasses H04J, H04L, H04M, and H04Q as they are the subclasses that relate to VoIP." (*Id.* at 100 of 394). Ms. Mulhern lists all the searches that she did for subclasses and sub-subclasses. (*Id.*).

Ms. Mulhern used the USPTO website in a way that any person with some knowledge of computers could, performing searches for CPC subclasses and sub-subclasses that contain "VoIP" or "voice over Internet Protocol" in their titles or descriptions. (*See id.* at 71, 100 of 394). She does not need to be a technical expert to be qualified to use the USPTO website in that way. Further, once Ms. Mulhern had the information, Dr. Almeroth performed the subsequent technical analysis of the CPC codes and their underlying patents to determine their relevance to VoIP. (*Id.* at 72 of 394; *id.*, Exh. 78 at 239-43 of 394). Ms. Mulhern, therefore, did not act as a

technical expert in any way. Plaintiff's motion to exclude on this ground is denied. (There is no reason to believe that it will even be necessary for Ms. Mulhern to testify about this part of the process. What is important is what Dr. Almeroth has to say about it, including what he did with the data.).

The parties next dispute whether Dr. Almeroth's analysis of the CPC subclasses and sub-subclasses was reliable. (D.I. 458 at 13-14; D.I. 502 at 42-43). Plaintiff argues that because Dr. Almeroth's opinions are downstream from Ms. Mulhern's unreliable analysis, his opinions should be excluded as well. (D.I. 458 at 13). Plaintiff also contends that even if Ms. Mulhern's selection of the CPC subclasses is reliable, Dr. Almeroth's opinions regarding the CPC subclasses should still be excluded as "not tied to the technology at issue in the case." (*Id.*). Plaintiff argues that Dr. Almeroth does not review the patents in the subclasses to show their relevance to the technology at issue in this case. (*Id.*). Plaintiff asserts that Dr. Almeroth's analysis is unreliable because he did not complete a full analysis of the randomly selected patents before ranking them nor did he give any explanation of his methodology for determining a relevant VoIP patent versus an irrelevant one. (*Id.* at 14).

Defendants argue that Plaintiff has not identified a methodological flaw in Dr. Almeroth's analysis of the CPC codes. (D.I. 502 at 42). Defendants assert that Plaintiff can address its complaint that Dr. Almeroth should have done more in determining the relevance of the patents through cross examination. (*Id.* at 43).

Dr. Almeroth analyzed the patents in the four largest CPC groups relating to VoIP by using a random, statistically valid sample from each group. (D.I. 505-2, Exh. 78 at 239-41 of 394). He then evaluated each of the randomly selected patents to determine whether the patent was relevant to VoIP. (*Id.* at 242 of 394). To do this, Dr. Almeroth looked at each patent's title,

abstract, filing date, and first independent claim, and ranked each patent on a scale of 1 to 4, with 1 and 2 being relevant and 3 and 4 being not relevant. (*Id.,* Exh. 82 at 335-37 of 394; *id.*, Exh. 78 at 242 of 394). Dr. Almeroth next calculated the percentage of patents relevant to VoIP service in each of the CPC groups. (*Id.*, Exh. 82 at 335-57 of 394). Dr. Almeroth then found the weighted average of percent relevant patents to be 52.2%, and based on that, he determined that of the 4,227 patents in the four CPC groups, 2,205 of them related to VoIP technology. (*Id.*, Exh. 71 at 101 of 394). Ms. Mulhern then used 2,200 to represent the overall number of U.S. patents related to VoIP in her calculations of the contribution of the patents-in-suit to the overall value of VoIP technology. (*Id.* at 71-73, 101 of 394).

Dr. Almeroth is a technical expert who analyzed a statistically significant grouping of patents, ranking their relevance based on his reading of the patent's title, abstract, filing date, and first independent claim. (*See id.*, Exh. 78 at 239-41 of 394). Plaintiff's concerns regarding the extent to which Dr. Almeroth analyzed the patents and his metrics for determining relevance go to the weight of his opinions, not to their admissibility. Plaintiff will be able to address any shortcomings in Dr. Almeroth's analysis through cross-examination and opposing expert testimony. Plaintiff's motion to exclude Dr. Almeroth and Ms. Mulhern's opinions regarding the selection and analysis of the CPC groups is denied.

### C. Dr. Almeroth's Separate Patentability Opinions

Dr. Almeroth opines that the accused media gateways perform interworking in a way that is substantially different from Plaintiff's claimed "ATM interworking multiplexer." (D.I. 505-2, Exh. 78 at 144 of 394). Specifically, Dr. Almeroth states that the accused media gateways "are designed to operate over an IP network" and the way that "they perform interworking, including in connection with SDP/RTP/UDP/IP technology and PacketCable signaling systems – is

substantially different from the ATM interworking multiplexer described and claimed in Sprint's ATM Patents." (*Id.*). Dr. Almeroth opines that the substantial differences are evident in the technology itself and the fact that the alleged equivalents have been found to be separately patentable. (*Id.*). Dr. Almeroth discusses other, third-party patents in support of his opinion that since the alleged equivalents are separately patentable, "they are substantially different from prior art ATM interworking multiplexers." (*Id.*).

Plaintiff argues that Dr. Almeroth's separate patentability opinions should be excluded as unreliable and irrelevant, as Dr. Almeroth fails to show that Defendants' accused networks "actually embody the inventions disclosed in the later-issued third party patents." (D.I. 458 at 15). Plaintiff also contends that Dr. Almeroth's separate patentability opinions warrant exclusion as Dr. Almeroth did not demonstrate that the USPTO considered Plaintiff's asserted patents during prosecution of the third-party patents. (*Id.* at 16).

Defendants counter that Dr. Almeroth's report extensively details how the accused products practice the separate patents. (D.I. 502 at 44). Defendants argue that Plaintiff's doctrine of equivalents theories "encompass these separate patents, because its theories admittedly cover 'every way' to do packet-based interworking." (*Id.*) (emphasis omitted). Defendants also assert that there is no legal requirement that the PTO consider the asserted patents during prosecution of the separate patents and that numerous courts have permitted evidence of separate patentability even when the asserted patents were not specifically cited during prosecution. (*Id.* at 45).

"[F]or purposes of infringement under the doctrine of equivalents, the differences between the claimed device and the accused device must be insubstantial." *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods.*

15

*Co.*, 339 U.S. 605, 10 (1950)). "The fact of separate patentability is relevant, and is entitled to due weight." *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996). The Federal Circuit has "held that when a device that incorporates the purported equivalent is in fact the subject of a separate patent, a finding of equivalency, while perhaps not necessarily legally foreclosed, is at least considerably more difficult to make out." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 493 F.3d 1368, 1379-80 (Fed. Cir. 2007).

    I agree with Defendants. Dr. Almeroth has sufficient analysis to support his opinions that the accused media gateways embody the later-issued, third-party patents. In numerous paragraphs throughout his report, Dr. Almeroth describes the separate patents and connects the claims of those patents to the accused media gateways. Whether his analysis is convincing is not a *Daubert* issue.

    One third-party patent is U.S. Patent No. 5.825,771, also referred to as "Haramaty." (D.I. 505-2, Exh. 78 at 146 of 394). Dr. Almeroth opines, "the accused products utilize RTP [real-time transport protocol], implementations of which are encompassed by the claimed method steps of Haramaty Claim 30." (*Id.* at 154 of 394). He also states, "Documentation for the accused products also shows implementation of packet loss recovery methods like those claimed in Haramaty." (*Id.* at 158 of 394). Another third-party patent, the Cisco '677 Patent, claims an "adaptive jitter management system" (*id.* at 161 of 394), and Dr. Almeroth states "the accused media gateways provide adaptive jitter buffer management techniques." (*Id.* at 162 of 394). Dr. Almeroth further opines, "Dr. Wicker's theories encompass the jitter management techniques for VoIP gateways and networks described and claimed in the Cisco '677 Patent, which were found separately patentable over the prior art." (*Id.*). Dr. Almeroth also connects another third-party patent, the Cisco '906 Patent, to the accused products, stating, "The accused products use DSCP

16

(Differentiated Services Code Point) markings, consistent with Claim 12 of the Cisco '906 Patent." (*Id.* at 167 of 394).

Dr. Almeroth also outlines how the claims of U.S. Patent Nos. 6,658,022 ("the '022 Patent") and 6,570,869 to ("the '869 Patent"), both to Cisco, are met in the accused products. (*Id.* at 173-89, 206-10 of 394). Dr. Almeroth provides ample support for his opinion that the accused products embody the later-issued separate patents.

Further, there is no legal requirement that the USPTO must have considered the asserted patents during prosecution of the later-issued separate patents. Under Federal Circuit law, "The fact of separate patentability is relevant, and is entitled to due weight." *Nat'l Presto Indus.*, 76 F.3d at 1192. It is true that the Federal Circuit, in discussing separate patentability, notes when the patents-in-suit are considered during prosecution of the later-issued third-party patent. *See id.* at 1191-92; *Zygo Corp.*, 79 F.3d at 1570; *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 (Fed. Cir. 1993). However, Plaintiff cites no Federal Circuit opinions supporting its argument that the USPTO's consideration of the patents-in-suit in prosecution of the later-issued patents is a requirement for an expert's separate patentability opinions.

Plaintiff cites only one non-precedential case supporting its contention that a party seeking to introduce separate patentability opinions "must first introduce evidence" that a plaintiff's patents-in-suit were mentioned in prosecution of the subsequent patents. (D.I. 525 at 19 (quoting *Hochstein v. Microsoft Corp.*, 2009 WL 2022815, at *2 (E.D. Mich. July 7, 2009)). This Court has admitted evidence of other patents in support of a separate patentability theory without a showing that the patents-in-suit were cited in the prosecution of the later-issued third-party patents. (D.I. 505-2, Exh. 84 at 349 of 394 (briefing on issue); *St. Jude Med. Cardiology Div., Inc. v. Volcano Corp.*, No. 10-631, D.I. 395 at 2 (D. Del. Oct. 9, 2012) ("tentatively"

17

ruling)). Other district courts have come to the same conclusion. *See, e.g., Cook Inc. v. Endologix, Inc.*, 2012 WL 4515036, at *5 (S.D. Ind. Oct. 1, 2012); *Engineered Prods. Co. v. Donaldson Co.*, 313 F. Supp. 2d 951, 1002 (N.D. Iowa 2004). Evidence that the patents-in-suit were not considered in the prosecution of the later-issued third-party patents goes to the weight of Defendants' separate patentability argument, not to its admissibility.

Even though it is not a legal requirement, Dr. Almeroth has proffered evidence showing that the Broadband Patents' and Call Control Patents' specifications were considered during prosecution of the later-issued '022 and '869 Cisco Patents. During prosecution of the '022 Patent, Dr. Almeroth opines, "U.S. Patent Nos. 5,991,301 (the September 1995 specification for the Broadband Patents); 5,825,780 (a December 1995 continuation of the May 1994 Call Control Patent specification); 6,031,840 (a continuation-in-part of the '780 Patent); and 5,703,876 (a November 1995 Christie patent directed to an ATM interworking multiplexer interfacing between an ATM system and a PSTN switch)" were before the PTO examiner. (*Id.* at 171 of 394). The examiner found the '022 Patent's claims non-obvious and patentable over the prior art, including the four Christie Patents. (*Id.*). Dr. Almeroth opines, "The Cisco '022 Patent shows that the implementation of call control over IP gateways and networks was found separately patentable relative to the prior art, including the expressly considered Broadband Patent specification ('301 Patent)." (*Id.* at 173 of 394). U.S. Patent No. 5,703,876, which was a November 1995 Christie Patent describing an ATM interworking multiplexer that interfaced between an ATM system and a PSTN switch, was before the examiner during prosecution of the '869 Patent. (*Id.* at 205 of 394).

Plaintiff will be able to address the weight of Dr. Almeroth's opinions on separate patentability through cross-examination and opposing witness testimony. Plaintiff's motion to exclude Dr. Almeroth's opinions on separate patentability is denied.

## IV.   CONCLUSION

Plaintiff's *Daubert* motion to exclude certain parts of Defendants' expert witness testimony (D.I. 457) is denied.