IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY LP,<br>　　Plaintiff,<br>　　　　　v.<br><br>CHARTER COMMUNICATIONS, INC., et al.,<br>　　Defendants. | C.A. No. 17-1734-RGA |
| SPRINT COMMUNICATIONS COMPANY LP,<br>　　Plaintiff,<br>　　　　　v.<br><br>MEDIACOM COMMUNICATIONS CORP.,<br>　　Defendant. | C.A. No. 17-1736-RGA |
| SPRINT COMMUNICATIONS COMPANY LP,<br>　　Plaintiff,<br>　　　　　v.<br><br>WIDEOPENWEST, INC., et al.,<br>　　Defendants. | C.A. No. 18-361-RGA |
| SPRINT COMMUNICATIONS COMPANY LP,<br>　　Plaintiff,<br>　　　　　v.<br><br>ATLANTIC BROADBAND FINANCE, LLC, et al.,<br>　　Defendants. | C.A. No. 18-362-RGA |
| SPRINT COMMUNICATIONS COMPANY LP,<br>　　Plaintiff,<br>　　　　　v.<br><br>GRANDE COMMUNICATIONS NETWORKS, LLC,<br>et al.,<br>　　Defendants. | C.A. No. 18-363-RGA |

MEMORANDUM OPINION

Christina B. Vavala and Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Aaron E. Hankel, B. Trent Webb, John D. Garretson, Jonathan M. Hernandez, Jordan T. Bergsten, Lauren E. Douville, Lydia C. Raw, Mark D. Schafer, Ryan D. Dykal, Ryan J. Schletzbaum, and Thomas M. Patton, SHOOK, HARDY & BACON LLP, Kansas City, MO; Michael W. Gray and Robert H. Reckers, SHOOK, HARDY & BACON LLP, Houston, TX, attorneys for Plaintiff Sprint Communications Company LP.

Kelly E. Farnan, RICHARDS, LAYTON & FINGER PA, Wilmington, DE; Alex Henriques, Robert A. Appleby, Ryan Kane, James E. Marina, Gregory Arovas, and Jeanne M. Heffernan, KIRKLAND & ELLIS LLP, New York, NY; Bao T. Nguyen, KIRKLAND & ELLIS LLP, San Francisco, CA; Gregory Polins, KIRKLAND & ELLIS LLP, Chicago, IL; Luke Dauchot, KIRKLAND & ELLIS, LLP, Los Angeles, CA; Daniel L. Reisner, David S. Benyacar, and Michael Block, ARNOLD & PORTER KAYE SCHOLER LLP, New York, NY; Robert J. Katerberg, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, DC; Thomas T. Carmack, ARNOLD & PORTER KAYE SCHOLER LLP, Palo Alto, CA, attorneys for Defendants Charter Communications, Inc. et al.

Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Robinson Vu, Lindsay Volpenhein Cutié, Natalie Alfaro Gonzales, and Amy E. Bergeron, BAKER BOTTS LLP., Houston, TX; Timothy S. Durst, BAKER BOTTS LLP, Dallas, TX, attorneys for Defendants Mediacom Communications Corp., WideOpenWest Networks, Inc., Atlantic Broadband Finance, LLC, and Grande Communications Networks, LLC, et al.

March 16, 2021

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court are Defendants' Motion for Summary Judgment and Motion to Exclude Expert Testimony Under *Daubert*. (D.I. 466, 467). I have reviewed the parties' briefing. (D.I. 468, 497, 522).[1] I heard oral argument on some issues on November 30, 2020. (D.I. 554).

## I.   BACKGROUND

Plaintiff Sprint Communications alleged patent infringement against Defendants Charter Communications, Mediacom Communications,[2] WideOpenWest,[3] Atlantic Broadband Finance,[4] and Grande Communications Networks.[5] Plaintiff currently asserts that Defendants' Voice-over-IP ("VoIP") systems infringe nine[6] patents, which can be grouped into the Call Control Patents, the Broadband Patents, and the Enhanced Services Patent. The Call Control Patents are Nos. 6,452,932 ("the '932 Patent"), 6,463,052 ("the '052 Patent"), 6,633,561 ("the 3,561 Patent"), 7,286,561 ("the '6,561 Patent"), and 7,505,454 (the '454 Patent"). The Broadband Patents are Nos. 6,343,084 ("the '084 Patent"), 6,473,429 ("the '429 Patent"), and 6,298,064 ("the '064 Patent"). Patent No 6,697,340 ("the '340 Patent") is the Enhanced Services Patent. The Broadband Patents and the Call Control Patents are also called the "Christie Patents." (D.I. 468

---

[1] I cite only to the 17-1734 docket, unless otherwise specified.  The rulings here apply to the same briefing as filed in the four related cases.

[2] C.A. No. 17-1736.

[3] C.A. No. 18-361.

[4] C.A. No. 18-362.

[5] C.A. No. 18-363.

[6] Plaintiff asserted claims from eleven patents at the time of the briefing, but has since dismissed all claims of two of them.  (*See* D.I. 432 at 2; D.I. 493).  The reduction to nine patents has no impact on the analysis unless noted.

at 2). The Broadband Patents are also called the Asynchronous Transfer Mode ("ATM") Patents. (*Id.*).[7]

## II.    LEGAL STANDARDS

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case.  *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).  A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

---

[7] At the time of briefing, Plaintiff asserted claims from U.S. Patent No. 6,330,224 ("the '224 Patent"), which was also part of the ATM Patents group. Plaintiff has since dismissed all claims from the '224 Patent. (D.I. 493).

other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. *Daubert* Motion

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993).

The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have

interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert."  Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief.  In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity."  Finally, Rule 702 requires that the expert testimony must fit the issues in the case.  In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.  The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[8] At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III.    SUMMARY JUDGMENT

### A.  Motion for Summary Judgment of Noninfringement of the ATM Patents

---

[8] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

Defendants argue that they are entitled to summary judgment of noninfringement of the ATM patents (the '084 Patent, the '429 Patent, and the '064 Patent). (D.I. 468 at 3). As an example, Claim 1 of the '084 Patent recites:

1. A method of operating an interworking unit to handle a plurality of calls, the method comprising:

   receiving messages into the interworking unit on a call-by-call basis where each one of the messages indicates one of a plurality of synchronous connections and a corresponding one of a plurality of identifiers;

   receiving user communications for the calls from the synchronous connections indicated in the messages into the interworking unit;

   in response to the messages, converting the user communications from the synchronous connections into asynchronous communications including the corresponding identifiers; and

   transferring the asynchronous communications from the interworking unit for subsequent routing based on the identifiers.

'084 Patent at col. 23:20-36.

Defendants contend that summary judgment in their favor is warranted as they do not use ATM interworking multiplexers and do not use ATM technology. (D.I. 468 at 3). Defendants assert that Plaintiff's doctrine of equivalents argument "unwinds the claim-construction process as if it never happened," as Plaintiff argues that an ATM interworking multiplexer "covers any packet based interworking unit." (*Id.*). Essentially, Defendants contend that Plaintiff vitiates the "ATM limitation" from the claim. (*Id.* at 9). Defendants also argue that Plaintiff has described the invention as limited to ATM and has distinguished its invention from other types of packet networking. (*Id.* at 3).

Plaintiff argues that its expert, Dr. Stephen Wicker, identified the accused media gateways in Defendants' Internet Protocol ("IP") networks that are equivalent to an ATM

interworking multiplexer and analyzed the equivalence between these media gateways and an ATM interworking multiplexer. (D.I. 497 at 1). Plaintiff contends that Dr. Wicker's analysis was specific to IP and ATM protocols, and that he provided a "detailed function-way-result and interchangeability analysis between the proposed equivalent IP gateways and the claimed ATM interworking multiplexers." (*Id.* at 4).

"The proper inquiry for the court is to apply the doctrine of equivalents, asking whether an asserted equivalent represents an 'insubstantial difference' from the claimed element, or 'whether the substitute element matches the function, way, and result of the claimed element.'" *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012). "If no reasonable jury could find equivalence, then the court must grant summary judgment of no infringement under the doctrine of equivalents." *Id.* The Federal Circuit has held that a patentee's expert's "detailed application of the function-way-result test to the claim element and the allegedly equivalent feature of the accused product is sufficient to create a genuine issue of material fact for the jury to resolve." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1348 (Fed. Cir. 2013).

"[I]f a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8 (1997). "A holding that the doctrine of equivalents cannot be applied to an accused device because it 'vitiates' a claim limitation is nothing more than a conclusion that the evidence is such that no reasonable jury could conclude that an element of an accused device is equivalent to an element called for in the claim, or that the theory of equivalence to support the conclusion of infringement otherwise lacks legal sufficiency." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1018-19 (Fed. Cir. 2006).

At claim construction, the Court construed "interworking unit" to mean "ATM interworking multiplexer." (D.I. 296 at 3). Based on Plaintiff's evidence, a reasonable jury could find equivalence between Defendants' accused media gateways and an "ATM interworking multiplexer." Dr. Wicker has provided a detailed function-way-result analysis, in addition to a thorough interchangeability analysis. (D.I. 500-1, Exh. 1 at 2-84 of 1423). Much like in *Brilliant Instruments*, the "detailed application of the function-way-result test to the claim element [the ATM interworking multiplexer] and the allegedly equivalent feature of the accused product [the accused media gateways] is sufficient to create a genuine issue of material fact for the jury to resolve." *Brilliant Instruments,* 707 F.3d at 1348.

Plaintiff's doctrine of equivalents theories, supported by Dr. Wicker's report, create a genuine issue of material fact from which a reasonable jury could find equivalence. *See Deere & Co.*, 703 F.3d at 1356. I am informed in reaching this conclusion by a similar case where "interworking unit" was also construed to mean "ATM interworking multiplexer," and the Federal Circuit held that there was sufficient evidence, including Dr. Wicker's testimony on the function-way-result test, to support the jury's verdict of infringement under the doctrine of equivalents. *Sprint Commc'ns Co. v. Time Warner Cable, Inc.* 760 F. App'x 977, 987-88 (Fed. Cir. 2018), *cert. den.*, 140 S. Ct. 467 (2019).

As Plaintiff's theory of infringement under the doctrine of equivalents is legally sufficient and a reasonable jury could find equivalence, Defendants' vitiation argument fails. *See DePuy Spine,* 469 F.3d at 1018-19. There is a genuine issue of material fact as to whether Defendants infringed Plaintiff's patents under the doctrine of equivalents; Defendants' motion for summary judgment on this ground is denied.

**B.  Motion for Summary Judgment that the Service Platform System Claim is Invalid for Lack of Written Description**

Claim 17 of the '340 Patent involves a "service platform system." (D.I. 1-8, Exh. H at cols. 28:47-56, 29:7-8). Defendants argue that this claim is invalid as it does not specifically require ATM conversion and has been construed broadly, exceeding the scope of its disclosure. (D.I. 468 at 11). Defendants contend that there is no material dispute that the specification only describes a service platform that includes an interworking unit. (*Id.* at 12). Defendants also assert that there is no genuine dispute that Plaintiff's claims are broader than the disclosure because the claims do not require that the service platform system have an ATM interworking unit, while the specification does not describe a service platform system without an ATM interworking unit. (*Id.*).

Plaintiff argues that Defendants are trying to limit the term to a preferred embodiment, and that this argument was rejected at the *Markman* stage. (D.I. 497 at 14). Plaintiff contends that a person having ordinary skill in the art ("PHOSITA") would understand that the specification's disclosure of a "service platform system" is not limited to one that includes an ATM interworking unit.  (*Id.* at 15).  Whether a PHOSITA would know this is asserted to be a genuine issue of material fact. (*Id.*).

After the *Markman* hearing, the Court construed "service platform system" to have its plain and ordinary meaning and rejected Defendants' proposed construction of "a system containing a signaling processor, a service platform, and an ATM interworking multiplexer." (D.I. 296 at 10). The Court noted that Defendants' proposed construction appeared in a section of the specification called "preferred embodiment," and did not limit the invention itself. (*Id.*). The Court stated that its construction limiting the interworking unit [in the no-longer asserted '224 patent] to ATM "does not mean every component of the '340 and '224 patents is limited to ATM" and that while the "language of the Enhanced Services specification is ATM-centric, it

9

does not clearly limit the entire 'service platform system' described in the '340 claims to ATM technology." (*Id.*).

The Court gave "service platform system" a broad construction. The specification is ATM-centric. The parties dispute whether a PHOSITA reading the specification would understand whether a service platform system could be non-ATM-centric. Plaintiff's expert, Dr. Wicker, states "that a person of ordinary skill in the art would understand [] the '340 Patent as describing a service platform system that is not limited to an ATM interworking unit." (D.I. 500-1, Exh. 5 at 1057 of 1423). Defendants' expert, Dr. Kevin Almeroth, opines that a PHOSITA "would not understand a [service platform system] to have a specific meaning" and "would have to look to the '340 patent in order to understand the term." (D.I. 503-1, Exh. 15 at 457 of 752). Dr. Almeroth concludes that the "disclosure in the specification of the '340 patent, however, is limited to a[] [service platform system] that includes an ATM interworking multiplexer," and "that the '340 patent is invalid for lack of written description." (*Id.* at 458 of 752).

The parties' experts dispute how a PHOSITA would understand the specification. This genuine issue of material fact precludes summary judgment on Defendants' motion that the '340 Patent is invalid for lack of written description.

### C.  Motion for Summary Judgment of No Lost Profits

To recover lost profits, a patentee must show a "reasonable probability that, 'but for' infringement, it would have made the sales that were made by the infringer." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (quoting *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001)). A patentee can show 'but for' causation using the *Panduit* factors. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). Following *Panduit*, the patentee

must prove four elements: "(1) demand for the patented product; (2) an absence of acceptable, non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made." *Presidio Components,* 875 F.3d at 1380 (citing *Panduit,* 575 F.2d at 1156). Once the patentee "establishes a reasonable probability of 'but for' causation, 'the burden shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales.'" *Grain Processing Corp. v. Am. Maize-Prods Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc)).

The main dispute in this case centers on *Panduit* factor two. Does Plaintiff have sufficient evidence to prove the absence of an acceptable, non-infringing alternative for its VoIP service? (D.I. 468 at 13-14). "To prove the absence of acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time." *Presidio Components*, 875 F.3d at 1380 (citing *Grain Processing Corp.*, 185 F.3d at 1353-55). The proper inquiry under *Panduit* is "whether a non-infringing alternative would be acceptable compared to the patent owner's product, not whether it is a substitute for the infringing product." *Presidio Components*, 875 F.3d at 1381.

Defendants argue that there are three acceptable non-infringing alternatives: (1) using circuit-switched networks instead of VoIP networks; (2) entering into paid referral agreements with existing licensees of Plaintiff's products; and (3) not entering the telephony business at all. (D.I. 468 at 13-14). Defendants assert that Plaintiff's expert, Dr. Russell Mangum, III, concedes that using a circuit-switched network was an available, non-infringing alternative that would have been acceptable. (*Id.*). And, Defendants argue, Dr. Mangum does not analyze the cost of that alternative. (*Id.*). Defendants also contend that Dr. Mangum's responses to the other

11

alternatives are insufficient, as he simply opines that Plaintiff's licensees are prohibited from entering into referral agreements with Defendants and he does not support his conclusion that Defendants would not have stayed out of the telephony business for economic reasons. (*Id.*). Defendants argue that Plaintiff is not entitled to lost profits as it has not carried its burden to show that "but for" Defendants' alleged infringement, Defendants would have purchased Plaintiff's VoIP service. (*Id.* at 13).

Plaintiff argues that none of the Defendants' three alternatives are commercially acceptable. (D.I. 497 at 15). Plaintiff asserts that there is no evidence that a circuit-switched network was available to Defendants and maintains that each company that Defendants reference did not use a traditional circuit-switched network across all its markets. (*Id.* at 17). Plaintiff also argues that Defendants do not put forth any evidence that Defendants would have been able to partner with one of Plaintiff's licensees and that such arrangements would infringe under the license agreements. (*Id.* at 20). Lastly, Plaintiff contends that "doing nothing" is not an acceptable substitute as there is no evidence that Defendants viewed this as a viable option. (*Id.* at 21).

With the *Panduit* test, Plaintiff has shown a reasonable probability that "but for" Defendants' infringement, it would have made Defendants' sales. *See Presidio Components,* 875 F.3d at 1380. While Dr. Mangum concedes, "Traditional circuit-switched telephony is a non-infringing alternative for the provision of wireline telephone service," he states that the "provision of such service is significantly more expensive than VoIP." (D.I. 471, Exh. 22 at 279 of 742). Dr. Mangum opines, "The fact that circuit-switched telephony was an existing technology yet was not adopted broadly by cable companies until after the Telecommunications Act of 1996 – which allowed for competition in wireline telephone service – and prior to the

widespread use of VoIP is evidence that it was not an acceptable alternative from the perspective of cable companies." (*Id.*). Dr. Mangum states that this alternative was not "economically feasible for cable companies to implement" and that this is shown by "the fact that cable companies did not generally implement this solution prior to the advent of VoIP technology despite recognizing the advantages to offering wireline telephony as part of a bundle." (*Id.* at 285 of 742). Dr. Mangum also points to Charter's objections and responses to Sprint's second set of individual interrogatories and states that Defendant Charter owned some circuit-switched infrastructure, but did not expand those offerings and instead focused on VoIP, whereas Defendant Bright House (now a subsidiary of Charter) did not consider offering circuit-switched and/or Time Division Multiplexing ("TDM") telephony services instead of VoIP services. (*Id.* at 279 of 742).

Dr. Mangum opines that "using a wholesale provider other than Sprint was not an available, acceptable non-infringing alternative for Defendant" and that it is his "understanding that using an unlicensed provider like Level 3 would still infringe Sprint's patents under Dr. Wicker's analysis, and that Sprint's licenses excluded such services from the scope of its license." (*Id.* at 279-80 of 742).

Through Dr. Mangum's report, Plaintiff has offered evidence to show the absence of acceptable, non-infringing alternatives and therefore, for summary judgment purposes, has established a reasonable probability that, but for infringement, it would have provided the VoIP services and made the profit. As Plaintiff has made this showing, the burden shifts to Defendants to establish that Plaintiff's "but for" causation claim is unreasonable for all or some of the lost sales. *See Grain Processing Corp.*, 185 F.3d at 1349. Defendants have not made that showing, as they have not established that Plaintiff's analysis of the lack of available, acceptable non-

infringing alternatives is unreasonable. Plaintiff has shown a reasonable probability of "but for" causation through the *Panduit* test, which is sufficient to create a genuine issue of material fact for the jury. Summary judgment of no lost profits is denied.

### D.  Motion for Summary Judgment of No Pre-Suit Damages

Defendants maintain that they are entitled to summary judgment of no pre-suit damages, as there was no pre-suit marking or notice for seven of the nine asserted patents, to wit, the '340, '429, '084, '064, '932, '6,561, and '454 Patents. (D.I. 468 at 21 & n.14). Defendants argue that Plaintiff initially asserted both apparatus and method claims against Defendants and that Plaintiff claimed to practice these patents without marking or providing pre-suit notice. (*Id.*). Defendants contend that Plaintiff asserted an apparatus claim in each of the patents, as Plaintiff alleged that Defendants infringed via "making" products. (*Id.* at 23). Defendants further assert that Plaintiff accused products that were "capable of receiving" or "capable of placing" certain types of calls and that such allegations apply to apparatus claims. (*Id.*). Defendants then argue that they were not on notice regarding the alleged infringement. (*Id.* at 23-24).

Plaintiff argues that it only asserted method claims and did not assert apparatus claims, so the marking statute does not apply. (D.I. 497 at 23). Plaintiff contends that Defendants cannot point to any apparatus claims in the complaints, identifications of asserted claims, or infringement contentions, as there are none. (*Id.* at 24). Plaintiff also states that it has never accused any Defendant of "making" an apparatus. (*Id.*). Plaintiff further argues that even if the marking statute applied, there were no tangible items to mark and that Defendants had actual notice of their potential infringement prior to the suit being filed. (*Id.* at 25-26).

35 U.S.C. § 287 sets forth limitations on damages in patent cases. *See* 35 U.S.C. § 287. Under this provision, patentees may give notice to the public by marking their patented article,

but where the patentee fails to mark, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter." *Id.* at § 287(a).  In other words, "A party that does not mark a patented article is not entitled to damages for infringement prior to actual notice." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009). "[T]he purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc*., 127 F.3d 1462, 1470 (Fed. Cir. 1997).

However, "the notice provisions of section 287 do not apply where the patent is directed to a process or method." *Am. Med. Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993). When the patent contains both method and apparatus claims, but only the method claims are asserted, the section 287 marking requirement does not apply. *Crown Packaging Tech.,* 559 F.3d at 1317.

In this case, Plaintiff has asserted only method claims. (*See* D.I. 500, Gray Decl. at 2). The patents themselves confirm that each of the asserted claims in the seven patents at issue are method claims. (The '340 Patent, Claim 11; the '429 Patent, Claim 1; '084 Patent, Claim 1; the '064 Patent, Claim 1; the '932 Patent, Claim 1; the '6,561 Patent, Claim 11; the '454 Patent, Claim 1). Defendants point to nothing other than vague and general language in the complaints to argue that Plaintiff ever asserted apparatus claims from any of the seven patents.  That is not enough.  As only method claims are asserted, and have ever been asserted, there is no requirement of marking under section 287. *See Crown Packaging Tech.,* 559 F.3d at 1317. For that reason, Defendants' motion for summary judgment of no pre-suit damages due to Plaintiff's failure to mark is denied.

IV.     *DAUBERT* MOTIONS

A.  Dr. Mangum's Damages Opinion

Defendants move to exclude the opinions of Dr. Mangum on several grounds. (D.I. 468 at

25). Defendants argue for the exclusion of Dr. Mangum's *Georgia-Pacific* royalty opinion for its

reliance on incomparable verdicts and settlement agreements. (*Id.* at 26-31). Defendants contend

that Dr. Mangum's lost profits opinion, analytical analysis, royalty approach, and Enhanced

Services Patent damages analysis should be excluded for use of unreliable methodology. (*Id.* at

32-34). Lastly, Defendants move to exclude all of Dr. Mangum's damages opinions for failure to

apportion the damages to reflect the alleged contribution of the asserted patents. (*Id.* at 35-40).

i.  *Georgia-Pacific* Royalty Opinion

In his analysis of the *Georgia-Pacific* factors, Dr. Mangum relies on information from

prior jury verdicts and settlements to calculate a reasonable royalty. (D.I. 471, Exh. 22 at 326-27,

332-33, 338-40 of 742). Dr. Mangum opines that the hypothetical negotiation would "heavily

consider" the Vonage jury verdict, the Time Warner Cable jury verdict, the Voiceglo settlement,

and the Metrocast settlement. (*Id.* at 326 of 742). He concludes that this hypothetical negotiation

would result in a royalty of at least $1.37 per subscriber per month. (*Id.* at 332 of 742). The

parties' dispute centers on whether these jury verdicts and settlements can be permissibly used to

calculate the result of a hypothetical negotiation between Plaintiff and Defendants.

Defendants argue that the jury verdicts and settlement agreements ("Litigation

Materials") on which Dr. Mangum relies are incomparable to a hypothetical negotiation in this

case.  (D.I. 468 at 25). Defendants assert that Dr. Mangum's reliance on the jury verdicts rests on

an improper assumption "that jurors engage in something akin to a damages expert's analysis."

(*Id.* at 27). Defendants also contend that that the jury verdicts are incomparable as the other

juries considered different accused products and services, expert opinions, licenses, claim constructions, and types of asserted claims. (*Id.* at 28). Defendants further argue that Dr. Mangum did not address economic factors that render the Litigation Materials incomparable, as he did not address (1) the economic and technical changes in the years after the hypothetical negotiation; (2) economic differences between past defendants and present Defendants; and (3) how the settlements differ from hypothetical licenses. (*Id.* at 30-31).

Plaintiff argues that Dr. Mangum's reliance on these materials was proper. (D.I. 497 at 27). Plaintiff relies on the Federal Circuit's affirmance of the jury verdict in *Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977 (Fed. Cir. 2019), and rejection of the argument that the 2007 Vonage verdict should have been excluded from consideration in calculating a reasonable royalty. (*Id.* at 27). Plaintiff asserts that Dr. Mangum's use of past jury verdicts and settlements is reliable as Defendants do not point to anything in prior decisions that suggests timing is important, the Voiceglo settlements and Vonage verdict happened prior to the hypothetical negotiation for several defendants, and Defendants have not shown any change in the marketplace to suggest passage of time would make a difference in the hypothetical negotiation. (*Id.* at 29). Lastly, Plaintiff argues that Dr. Mangum did consider economic differences between the different defendants. (*Id.* at 32).

The Federal Circuit has permitted evidence of prior verdicts to be used to inform a reasonable royalty determination. *See Sprint Commc'ns*, 760 F. App'x at 981; *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1366 (Fed. Cir. 2006). For evidence of prior litigation to be admissible, it "must pass muster, like any other evidence, as relevant and probative of an issue in the second case." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1573

(Fed. Cir. 1993). The Federal Circuit has indicated that the timing of prior verdicts can impact their relevancy.

In *Applied Medical Resources,* the Federal Circuit affirmed admission of evidence of a prior verdict as the prior litigation was "relevant to the reasonable royalty analysis because the hypothetical negotiation…took place on the heels of the *Applied I* jury verdict." *Applied Med. Res. Corp.,* 435 F.3d at 1366. Similarly, in *Sprint Communications*, the Federal Circuit affirmed admission of the Vonage verdict, as the lower court determined that the "verdict would be a factor of which the parties would have been aware at the time of their hypothetical negotiation" and that a reasonable jury could conclude that the "verdict and the amount of damages awarded in a similar prior litigation would have influenced the outcome of a hypothetical negotiation in the case at bar." *Sprint Commc'ns*, 760 F. App'x at 981. In both cases, the prior verdict was admissible as it occurred before the date of the hypothetical negotiation.

Here, Plaintiff and many of the Defendants would not have been aware of the verdicts or settlements at the time of their respective hypothetical negotiations. The Vonage jury verdict was in 2007, the Time Warner Cable jury verdict was in 2017, the Metrocast settlement agreement was in 2019, and the VoiceGlo settlement was in 2006. (D.I. 499-1, Exh. 1 at 32-33, 40-41, 49 of 1128). Both parties agree that Plaintiff's hypothetical negotiation with Defendant Charter would have happened in 2002 and the hypothetical negotiation with Defendant Bright House (a co-defendant in the Charter case, No. 17-1734) would have happened in 2003.  (D.I. 554 at 74:1-4; 76:20-22). The hypothetical negation with Defendant RCN (a co-defendant in the Grande case, No. 18-363) was in 2004, with Defendant Grande in 2005, and with Defendant Atlantic Broadband in 2005/2006. (D.I. 471, Exh. 28 at 445 of 742). The hypothetical negotiation date was in 2008 for Defendants WideOpenWest and Wave (a co-defendant in the Grande case, No.

18-363) and in 2010 for Defendant Mediacom. (*Id.* at Exh. 26 at 422 of 742; Exh. 29 at 457 of 742).

Thus, for Defendants Charter, Bright House, RCN, Grande, and Atlantic Broadband, none of the settlement agreements or verdicts would have been "a factor of which the parties would have been aware at the time of their hypothetical negotiation." *Sprint Commc'ns*, 760 F. App'x at 981. Defendants WideOpenWest, Wave, and Mediacom would not have been aware of the Time Warner Cable jury verdict or the Metrocast settlement agreement. The prior settlement agreements and jury verdicts are not relevant when they occurred after the date of the hypothetical negotiation, as the hypothetical negotiation occurred not "on the heels" of the settlement agreements and jury verdicts, but before them. *See Applied Medical Resources Corp.*, 435 F.3d at 1366. As such materials are irrelevant to the hypothetical negotiation at hand, they should not have been considered in Dr. Mangum's reasonable royalty calculation. The jury verdicts and settlements are excluded as irrelevant from Dr. Mangum's opinions for all Defendants whose dates of a hypothetical negotiation preceded the respective dates of the prior jury verdicts and settlement agreements.

The jury verdicts and settlements will also be excluded for all Defendants as they are not evidence from which a hypothetical negotiation can be reliably determined. As this Court has held, "A jury verdict does not represent evidence from which a hypothetical negotiation can be reliably determined. A jury verdict represents the considered judgment of twelve (or maybe fewer) random non-experts as to what a hypothetical negotiation would have resulted in for the patent(s) at issue. It is, at best, an informed lay opinion." *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018). An informed lay opinion is not a reliable

basis for determining the reasonable royalty rate that a hypothetical negotiation would reach.[9]

Therefore, Dr. Mangum's report and testimony will be excluded to the extent that it relies on

prior jury verdicts.

Similarly, evidence of Plaintiff's prior settlement agreements will also be excluded.

While "there is no per se rule barring reference to settlements simply because they arise from

litigation," *AstraZeneca AB v. Apotex*, 782 F.3d 1324, 1336 (Fed. Cir. 2016), the Federal Circuit

has noted the "longstanding disapproval of relying on settlement agreements to establish

reasonable royalty damages." *LaserDynamics, Inc.*, 694 F.3d at 77.  Similarly, this Court has

observed that "Federal Circuit precedent is hostile toward using litigation settlement agreements

in proving a reasonable royalty, except in limited circumstances." *M2M Sols. LLC v. Enfora,

Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. 2016). There is minimal probative value in using

litigation settlement agreements to calculate a reasonable royalty, as the settlement agreement is

not comparable to a negotiation between two willing parties. *See Sprint Commc'ns Co. v.*

---

[9] I am not ignoring or contradicting what the Court held in the non-precedential decision in the
*Sprint Communications* appeal.  The District Court there had admitted the Vonage verdict for
three purposes – willfulness, TWC's equitable defenses, and "'to the extent that it informs
Sprint's executives concerning what [they] might expect as a reasonable royalty.'"  *Sprint
Commc'ns*, 760 F. App'x at 981 (quoting the District Court).  Leaving aside the attenuated nature
of the argument that a trial verdict is an event that would reliably indicate something about what
a negotiation would produce, the argument would then also support the proposition that any
litigation-inspired settlement agreement should also be admissible.  But that is not the law. *See
LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). The third
purpose is the only one at all related to a reasonable royalty negotiation, but that is not the
purpose for which Dr. Mangum uses it. In his expert report, Dr. Mangum states that the jury in
the Time Warner Cable case awarded Sprint the "full amount it requested at the $1.37 per
subscriber per month rate, which was calculated off of the *Vonage* verdict." (D.I. 478-1, Exh. 9
at 99 of 143). Dr. Mangum uses the Vonage jury verdict as the starting point for what a
reasonable royalty would be. (D.I. 471, Exh. 22 at 332, 338 of 742; Exh. 21 at 237-38 of 742).
That is, Plaintiff wants to get the jury verdict before the jury for a clearly improper purpose
(which is why, I am fairly certain, I would exclude it under Rule 403 if I were not excluding it
for the reasons stated in the text).

*Comcast IP Holdings, LLC*, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (excluding license agreements resulting from litigation for lack of comparability). And, as is the case for certain Defendants, the minimal probative value "is even less, where, as here, the settlement agreements occurred years after the hypothetical negotiation." *ePlus, Inc. v. Lawson Software*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011), *aff'd,* 700 F.3d 509 (Fed. Cir. 2012). As there is little probative value in the settlement agreements in informing a hypothetical negotiation, Dr. Mangum's report and testimony will be excluded to the extent that it relies on such evidence.

Defendants' motion to exclude Dr. Mangum's *Georgia-Pacific* reasonable royalty calculation is granted to the extent that it relies on prior settlement agreements and jury verdicts. The Parties should meet and confer about which portions of and the extent to which Dr. Mangum's report is excluded and whether any supplementation to the report is necessary.

### ii.  Dr. Mangum's Lost Profits Opinions Rely on Dr. Wicker's "Blocking Patents" Opinion

Defendants argue that Dr. Mangum's lost profits opinion relies on Dr. Wicker's improper "blocking patent" opinion. (D.I. 468 at 32). Plaintiff argues that Dr. Mangum properly relies on Dr. Wicker's "blocking patent" opinion. (D.I. 497 at 32). As Dr. Wicker's "blocking patent" opinion is reliable, *see* Section IV.B.i *infra*, Dr. Mangum's lost profits opinion will not be excluded based on its reliance on Dr. Wicker's "blocking patent opinion."

### iii.  Dr. Mangum's Analysis Under Panduit Factor 3

Defendants argue that Dr. Mangum's analysis of manufacturing capacity under *Panduit* Factor 3 is unsupported as he does not do any calculation to show that Plaintiff had the capacity to handle a massive increase in subscribers if all VoIP subscribers were required to use

Plaintiff's services. (D.I. 468 at 32). Plaintiff argues that such calculations are unnecessary, as Dr. Mangum has sufficiently shown that Plaintiff had the requisite capacity. (D.I. 497 at 33).

In *TEK Global, S.R.L.*, the Federal Circuit affirmed the district court's conclusion that the "jury could reasonably infer manufacturing capacity from [the plaintiff's] prior activities." *TEK Global, S.R.L. v. Sealant Systems Internat'l, Inc.*, 920 F.3d 777, 790 (Fed. Cir. 2019). For his conclusion that Plaintiff had the capacity to supply the accused services, Dr. Mangum relies on deposition testimony and interviews with Plaintiff's executives, as well as Plaintiff's internal financial documents. (D.I. 499-1, Exh. 1 at 3, 25-26, App'x 2). The sources on which Dr. Mangum relies are similar in nature to the supporting evidence used in *TEK Global* that the Federal Circuit concluded a reasonable jury could rely on to infer manufacturing capacity. *See TEK Global*, 920 F.3d at 790-91 (referring to inventor testimony and damages expert testimony based on deposition transcripts, reports, financial documents, and conversations with plaintiff's executives). As Dr. Mangum appropriately relied on evidence other than calculations to conclude that Plaintiff had the manufacturing capacity under *Panduit* Factor 3, his damages opinion is not excluded on this ground.

### iv.  Dr. Mangum's Analytical Approach

As a part of Dr. Mangum's analytical approach analysis, he calculates the cost savings to Defendants from their use of VoIP technology.  In deciding on a reasonable royalty, he says the parties would agree that Plaintiff gets 100% of the cost savings.   Defendants contend that Dr. Mangum's allocation of all the alleged VoIP cost savings to Plaintiff is arbitrary. (D.I. 468 at 33). Defendants argue that the Federal Circuit has consistently held that allocation of a royalty value to one party requires analysis that is specific to the facts of the case. (*Id.*). Defendants compare Dr. Mangum's assignment of all the alleged cost savings to the "25 percent rule of

thumb" which the Federal Circuit determined to be a flawed premise for calculating damages. (*Id.*). Plaintiff counters that Dr. Mangum's analytical approach is an alternative to the hypothetical negotiation and follows the approach described and approved by the Federal Circuit. (D.I. 497 at 37).

I agree with Plaintiff. The Federal Circuit has affirmed use of the analytical approach where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Dr. Mangum did exactly that, as he subtracted the "normal" industry profits from the expected VoIP profits, resulting in a VoIP profit premium. (D.I. 499-1, Exh. 1 at 75-83 of 1128). This analysis follows the approach affirmed by the Federal Circuit in *TWM*. *See TWM Mfg. Co.*, 789 F.2d at 899 (awarding a 30% royalty not an abuse of discretion when the difference between anticipated net profit and "industry standard net profit" was about 30%). Whether it makes sense to award 100% to Plaintiff in these particular cases may be challenged by cross-examination and an opposing expert's opinion. *See Lucent*, 580 F.3d at 1324 (quoting John Skenyon, Patent Damages Law & Practice § 3.4, at 3-9 to 3-10 (2008) (the analytical method involves "'calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer.'")) (dicta). Thus, Defendants' motion to exclude on this ground is denied.

### v.  Dr. Mangum's Royalty Rate for the Enhanced Service Patent

Defendants assert that Dr. Mangum's royalty rate for the Enhanced Services Patent is unreliable as it is not connected to the alleged value of the patent. (D.I. 468 at 34). Defendants argue that Dr. Mangum relies on non-party Time Warner Cable's pricing and the per subscriber

per month rate he calculated using the Vonage verdict (which does not include the Enhanced Services Patent) to calculate the $0.12 per subscriber per month rate for the Enhanced Services Patent. (*Id.*). Defendants cite to prior litigation between Plaintiff and Comcast where the district court excluded a similar theory that attempted to assign a royalty to the same patents by comparing Plaintiff's revenues for wholesale VoIP with its revenue for voicemail services. (*Id.*). Plaintiff argues that Dr. Mangum's analysis is properly tied to the facts of the case as his opinion does not have the same fatal flaws as the expert opinion in the Time Warner Cable litigation. (D.I. 497 at 34).

I agree with Plaintiff that the exclusion of the expert opinion in Plaintiff's prior litigation with Comcast is not persuasive here. The two cases are different. In the Comcast case, the court excluded the expert's damages opinion as the expert used unreliable methods in comparing general VoIP revenues to revenues for other associated patents, inexplicably rounded up the calculated royalty rate, and based his calculations on data for voicemail services which were not at issue in the case. *Sprint Commc'ns Co. v. Comcast Cable Commc'ns LLC*, 225 F. Supp. 3d 1233, 1252-53 (D. Kan. 2016). This case differs as Dr. Mangum explained the financial materials on which he relied to calculate the Enhanced Services Patent royalty rate, he did not round up his calculations, and voicemail services are at issue here. (*See* D.I. 471, Exh. 22 at 333 of 742; D.I. 499-1, Exh. 1 at 75-76 of 1128).

Dr. Mangum opined that if the Enhanced Services Patent (but none of the Christie Patents) is found to infringe, a reasonable royalty of $0.12 per subscriber per month would be appropriate to account for the benefits provided by voicemail under the Enhanced Services Patent. (D.I. 471, Exh. 22 at 333 of 742). This royalty is 9% of the $1.37 royalty rate calculated for all asserted patents. (*Id.*). Dr. Mangum used 9% based on pricing from Time Warner Cable,

which Dr. Mangum states was publicly available information that service providers relied on in analyzing financial performance. (*Id.*).

Dr. Mangum states that it was not uncommon for service companies to prepare financial reports and predictions based on figures from competing companies. (*Id.*; D.I. 499-1, Exh. 1 at 75-76 of 1128). Therefore, relying on Time Warner Cable's pricing to assess the value of the services covered by the Enhanced Services Patent is reliable. Defendants can challenge the persuasiveness of Dr. Mangum's use of Time Warner Cable's pricing on cross-examination and by opposing expert testimony. However, Dr. Mangum's Enhanced Services Patent reasonable royalty is excluded to the extent that it relies on prior settlement agreements and jury verdicts. *See* Section IV.A.i *supra*. The Parties should meet and confer to determine the extent to which Dr. Mangum's Enhanced Services Patent royalty opinion is excluded due to its reliance on prior settlement agreements and jury verdicts.

### vi.  Dr. Mangum's Approach to Apportionment

Defendants move to exclude all of Dr. Mangum's damages opinions for failure to apportion the damages. (D.I. 468 at 35-40).

Defendants argue that Dr. Mangum failed to apportion his lost profits analysis. (*Id.* at 35). Defendants contend that since wholesale VoIP includes services beyond the patented technology, Dr. Mangum needed to apportion the value of the other technology out of his total lost profits calculation. (*Id.* at 36). Defendants also argue that Dr. Mangum failed to apportion out non-infringing calls from his lost profits model. (*Id.*)

Plaintiff counters that Dr. Mangum properly apportioned his lost profits analysis. (D.I. 497 at 34-36). Plaintiff contends that Dr. Mangum properly analyzed the first two *Panduit* factors, which satisfies lost profit apportionment analysis under Federal Circuit precedent. (*Id.* at

34). Plaintiff further argues that if there is an additional apportionment step after meeting the

*Panduit* factors, the record establishes that Plaintiff's wholesale VoIP service is "synonymous"

with the patented methods and that there is no evidence that other features have a separate value

that can or should be apportioned from Dr. Mangum's lost profits analysis. (*Id.* at 35). Lastly,

Plaintiff argues that Dr. Mangum "adequately apportion[ed] out valuable unpatented aspects of

VoIP technology." (*Id.* at 36). Plaintiff notes that apportionment was not needed for VoIP

services that do not allow calls with the PSTN, as they are a free service. Plaintiff argues that

other methods of apportioning out VoIP technology "improperly apportion out IP-related

technology for which the cable company Defendants never paid Plaintiff." (*Id.*).[10]

In *Mentor Graphics*, the Federal Circuit stated that requiring patentees to prove the first

two *Panduit* factors "ties lost profit damages to specific claim limitations and ensures that

damages are commensurate with the value of the patented features." *Mentor Graphics Corp. v.

EVE-USA, Inc*., 851 F.3d 1275, 1285 (Fed. Cir. 2017), *reh'g en banc denied*, 870 F.3d 1298

(Fed. Cir.), *cert. den*., 139 S. Ct. 44 (2018). The Court stated that the two factors together

"consider[] demand for the patented product as a whole" and "consider[] demand for particular

limitations or features of the claimed invention." *Id.* In denying rehearing *en banc*, the

concurrence did not "read the panel's decision to apply broadly to all lost profits analysis," and,

---

[10] The sentence as written by Plaintiff is difficult to understand. It cites to four paragraphs of Dr. Mangum's report, one of which does not exist. (D.I. 497 at 36, citing Ex. 2, ¶¶ 180-183; *see* D.I. 499-1, Ex. 2, ¶¶ 180-182). After reviewing the three existing paragraphs, I note that they appear to be in response to what Dr. Mangum takes as a critique of his analytical approach. Thus, I am not sure what the purported relevance is to apportionment in regard to lost profits, which is what Plaintiff cites it for. There is some similar discussion in connection with lost profits (*see id*., Ex. 1, ¶ 90), which may be what Plaintiff had in mind. If that is so, then I understand the argument to be that the other method of apportioning out technology involves apportioning out technology that not charged for by subscribing to Sprint's VoIP service, which means that it would not need to be apportioned out.

under the "narrow facts" of the case, "the panel determined that because the *Panduit* factors are satisfied, the damages award properly accounted for apportionment." *Mentor Graphics*, 870 F.3d at 1300. Apportionment is necessary where the "application of the *Panduit* factors does not result in the separation of profits attributable to the patented device and the profits attributable" to the other aspects of the product. *WesternGeco LLC v. ION Geophysical Corp.*, 913 F.3d 1067, 1073 (Fed. Cir. 2019).

In this case, Dr. Mangum has apportioned his lost profits analysis, as he tied his calculated lost profits damages to the claim limitations and the damages are proportional to the value of the patented features. *See Mentor Graphics Corp.*, 851 F.3d at 1285. Dr. Mangum established the demand for the patented product through the number of Plaintiff's subscribers and Defendants' sales of VoIP telephony services. (D.I. 499-1, Exh. 1 at 25-27 of 1128). Dr. Mangum also opined on the absence of non-infringing alternatives, showing that the demand for the product was tied to the patented features. (*Id.* at 27-29 of 1128). Lastly, Dr. Mangum states that ancillary services, such as directory assistance and voicemail, qualify as part of the lost profits calculation, as they are "convoyed sales" that were "systematically tied to wholesale VoIP service." (*Id.* at 33 of 1128). Dr. Mangum's lost profit analysis is properly apportioned and tied to the value of the patented methods.

Further, Dr. Mangum opines that apportioning further "is not economically logical" as lost profits are meant to "put the plaintiff in the same position it would have been absent the wrongdoing," and "Sprint cannot lose a portion of a sale." (*Id.*, Exh. 2 at 178 of 1128). Dr. Mangum's opinion is that no further apportionment is necessary, as Plaintiff would have profited from the entire sale of its wholesale VoIP services. (*Id.* at 178-79 of 1128). The parties dispute

27

how much the lost profit award should be apportioned, *see id.* at 178-80, and all parties will have the opportunity to address the opposing party's experts through cross examination.

Defendants also argue that Dr. Mangum's analytical approach should be excluded as he failed to apportion cost savings attributable to technology Plaintiff did not invent and did not provide an explanation as to why all of the cost savings associated with VoIP are due to Plaintiff's asserted patents. (D.I. 468 at 47-49).

Plaintiff counters that under Federal Circuit precedent there is no second apportionment step in the analytical approach, as the approach consists of subtracting the infringer's usual net profit from its anticipated net profit from the sales of the infringing product. (D.I. 497 at 37).  I do not think Plaintiff is right here.  "[A]pportionment is required even for non-royalty forms of damages." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Assume a new product comes in a basic form and a deluxe form, they both have the same infringing feature, but the deluxe form has a number of other innovative features, and the profit margin for the deluxe is twice that of the basic, would it make sense to attribute the double profit margin on the deluxe to the one infringing feature?  I don't think so.  Plaintiff further argues that even if there is a need for a second apportionment step, Dr. Mangum explains how his analytical approach apportions out unpatented VoIP technology. (D.I. 497 at 37).

Dr. Mangum appropriately apportioned his analytical approach. Dr. Mangum's opinion includes an explanation of his apportionment, as he describes how the "profit analysis compares margins on circuit-switched and VoIP services with comparable features, where one (i.e., VoIP) is cheaper to deploy." (D.I. 499-1, Exh. 1 at 81-82 of 1128). The major difference between the two systems is that one, VoIP, is cheaper to deploy. (*Id.*). Dr. Mangum also opines that other differences in features, like the power source, are "largely irrelevant…as apparent through

industrywide acceptance." (*Id.*, Exh. 4 at 428-29 of 1128). Therefore, the comparison between the two systems apportions out other differences, as the only meaningful difference between the two compared systems is the profit margin of the VoIP system specifically, which Dr. Mangum is analyzing to determine a reasonable royalty for the asserted patents. (*See id.*, Exh. 1 at 81-83 of 1128).

Dr. Mangum's analytical approach reasonable royalty analysis appropriately apportions the cost savings. Defendants can address the credibility of Dr. Mangum's opinions through cross-examination and opposing expert testimony. Defendants' motion to exclude for failure to apportion the analytical approach is denied.

Lastly, Defendants contend that Dr. Mangum's *Georgia-Pacific* analysis of a reasonable royalty fails for lack of apportionment. (D.I. 468 at 39). Defendants argue that Dr. Mangum does not explain why his calculated royalty of $1.37 per subscriber per month satisfies the entire market value rule or why the settlements and verdicts upon which he relies are attributable to the asserted patents in this case. (*Id.*). Defendants also assert that Dr. Mangum's analysis does not apportion the royalty base, as his damages analysis does not exclude activities that are not infringing. (*Id.* at 40).

Plaintiff argues that Dr. Mangum's opinion is properly apportioned as, like in the Time Warner Cable litigation, his royalty rate reflects the incremental value of the inventions. (D.I. 497 at 39). Further, Plaintiff asserts that Dr. Mangum's opinion is reliable, as he was not required to subtract out non-infringing calls, as Defendants' subscribers could make those calls and Defendants did not refund any money to subscribers if they did not make those calls. (*Id.* at 39-40). Plaintiff contends that it is simply a disagreement between the parties' experts as to whether additional subtractions should be made to the reasonable royalty. (*Id.* at 39).

I agree with Plaintiff. In *Sprint Communications*, the Federal Circuit affirmed the damages verdict based on Dr. Mangum's opinions over an apportionment challenge, stating that "the objective of apportionment can be achieved in different ways, one of which is through the jury's determination of an appropriate royalty by applying the so-called *Georgia-Pacific* factors, under proper instructions embodying apportionment principles." *Sprint Comm'ns*, 760 F. App'x at 983. Dr. Mangum provided a thorough analysis of the *Georgia-Pacific* factors and the specific value of the asserted patents. (D.I. 499-1, Exh.1 at 83-98). While Dr. Mangum's opinions will be excluded to the extent that they rely on prior settlement agreements and jury verdicts, the remainder of Dr. Mangum's analysis of the hypothetical negotiation properly discusses the value of the patents-in-suit to a hypothetical negotiation. (*See id.*). Further, while the parties' experts disagree as to the amount of apportionment that should occur, that disagreement can be addressed by both sides during cross-examination.

All Dr. Mangum's damages opinions have what Dr. Mangum describes as appropriate apportionment. Any disputes as to the persuasiveness of his apportionment opinions can be addressed in cross-examination. Defendants' motion to exclude Dr. Mangum's opinions for failure to apportion is denied.

### B. Dr. Wicker's Opinions

#### i. Blocking Patent Opinion

Defendants argue for exclusion of Dr. Wicker's expert opinion on whether Plaintiff's patents are "blocking patents." (D.I. 468 at 41). Defendants contend that Dr. Wicker does not provide a methodological basis for his opinion that it is impossible to provide a packet-PSTN telephony service without practicing the Christie Patents. (*Id.*). Defendants argue that Dr. Wicker's opinion is unreliable as he does not analyze alternate packet-PSTN systems, including

30

AT&T and Verizon services, which Defendants identified as available, non-infringing alternatives. (D.I. 522 at 23).

Plaintiff argues that Dr. Wicker used reliable methods and addressed every available, non-infringing alternative, as required under Federal Circuit precedent. (D.I. 497 at 40-41). Based on this, Plaintiff contends that Dr. Wicker's "blocking patents" opinion is admissible. (*Id.* at 41-42).

Dr. Wicker opined that the Christie patents are "blocking patents," as providing VoIP telephony service necessarily practices the Christie patents and there are no non-infringing alternatives that Defendants could have used in place of Plaintiff's patent practicing VoIP technology to connect to the PSTN. (D.I. 471, Exh. 15 at 1267:19-1270:17). Dr. Wicker addressed all the alternatives that Defendants put forth as available, acceptable non-infringing alternatives and explained why, in his opinion, these alternatives were not available or acceptable. (D.I. 500-1, Exh. 1 at 72-84 of 1423; *Id.*, Exh. 3 at 854- of 1423).

Defendants argue that Dr. Wicker "failed to compare alternative packet-PSTN systems, including the acknowledged AT&T and Verizon services, to the claims of the Christie Patents." (D.I. 522 at 23). Defendant Charter's expert, Dr. Kevin Almeroth, discussed AT&T and Verizon services as a non-infringing alternative using IP-IP peering. (D.I. 471, Exh. 17 at 133-38 of 742). Dr. Wicker, however, discussed why IP-IP peering was not an available alternative. (D.I. 500-1, Exh. 3 at 854-62 of 1423). Dr. Wicker opined that IP-IP Peering was not an available non-infringing alternative due to restrictions on the service because of regulatory requirements. (*Id.* at 855-57 of 1423). Dr. Wicker also opined that the IP interconnections were not available, as they did not support "lifeline" capabilities, such as 911, which is a requirement in some areas. (*Id.* at 859-60 of 1423). While Dr. Wicker did not address AT&T or Verizon by name, his opinions

included conclusions on why such systems were not available, acceptable non-infringing alternatives. Defendants do not have to agree with Dr. Wicker's opinions on the non-infringing alternatives and whether the Christie Patents are "blocking patents," and can address the persuasiveness of Dr. Wicker's opinions through cross-examination and opposing expert testimony.

### ii.   Direction and Control Opinion

Defendants assert that Dr. Wicker's "direction or control" opinions should be excluded as such opinion is outside his expertise, the opinion is not reliable, and it is unhelpful under Rule 702. (D.I. 468 at 43-44). Defendants argue that Dr. Wicker opines, based on his interpretation of a contract, that Defendant Atlantic Broadband ("ABB") "directs and controls" a third party, Net2Phone ("N2P"), to provide interconnection between VoIP and the PSTN. (*Id.* at 42). Plaintiff contends that Dr. Wicker did not offer legal opinions, but instead offered technical opinions using the technical parts of the contract and witness testimony as a basis to analyze actions of the parties involved. (D.I. 497 at 42).

Dr. Wicker opined, "N2P was contractually bound to provide PSTN interconnectivity on behalf of ABB" (D.I. 471, Exh. 19 at 158 of 742), and "N2P chose the equipment necessary to provide the contractually bound obligation of PSTN interconnection." (*Id.* at 160 of 742). Dr. Wicker also stated, "The contract explicitly directed N2P to provide ABB's VoIP subscribers connectivity to the PSTN for both inbound and outbound calls, and maintain all facets of ABB's PSTN connectivity, including certain enhanced services, under the binding contract." (*Id.* at 159 of 742). In support of these statements, Dr. Wicker cited provisions of the contract, as well as deposition testimony of ABB and N2P employees. (*Id.* at 158-62 of 472).

Experts are prohibited from testifying "as to the legal duties, standards or ramifications arising from a contract." *Dow Chem. Canada, Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 435 (D. Del. 2009) (quoting *North Am. Philips Corp. v. Aetna Casualty & Sur.*, 1995 WL 628447, at *3 (Del. Super. Ct. Apr. 22, 1995)). This Court has admitted expert testimony on an agreement where "it did not constitute a legal opinion" and the expert "did not offer opinions as to the scope and meaning of the Agreement and its terms." *Roche Diagnostics Ops., Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 606 (D. Del. 2010). Here, Dr. Wicker opined as to the parties being "contractually bound" and how the "contract explicitly directed" the parties to take an action. (See D.I. 471, Exh. 19 at 158-59 of 742). Dr. Wicker improperly opined on the "legal duties" arising from the contract between ABB and N2P. He offered "opinions as to the scope and meaning of the [contract] and its terms," which are impermissible opinions from an expert witness. *See Roche Diagnostics Ops., Inc.*, 756 F. Supp. 2d at 606. In addition, to the extent the contract is not self-explanatory, Dr. Wicker is a technical expert. He is not a contract expert. Therefore, Dr. Wicker's "direction and control" opinions are excluded.

### iii.  Economic Feasibility Opinion

Lastly, Defendants move for exclusion of Dr. Wicker's economic feasibility opinions as the opinions are outside his expertise and they are inadmissible *ipse dixit*. (D.I. 468 at 44-45). Plaintiff argues that Dr. Wicker's economic feasibility opinions are admissible as the opinions were based on Dr. Wicker's expertise working with cellular networks and did not require any specialized economic knowledge. (D.I. 497 at 43).

Dr. Wicker discussed the economic feasibility of deploying certain cellular networks. (*See, e.g.*, D.I. 471, Exh. 14 at 71, 74-75 of 742). He stated that "the use of a non-descript 'cellular network' does not provide a technically or economically feasible alternative to Sprint's

patented inventions that is non-infringing or acceptable." (*Id.* at 71 of 742). He further opined

that "deploying and operating a circuit-switched telephone network at the time of first

infringement would be unacceptable and not viable given the prohibitive costs associated with

such a network." (*Id.* at 75 of 742).

Dr. Wicker's opinion on economic feasibility were based on his technical knowledge and

expertise, as well as documents in the record. Dr. Wicker has extensive experience working and

consulting in the telecommunication industry. (D.I. 471, Exh. 20 at 167-69 of 742; D.I. 500-1,

Exh. 1 at 9-10 of 1423). In addition, his research currently focuses on wireless and wired

information networks. (D.I. 500-1, Exh. 1 at 10 of 1423). Such experience can properly serve as

a foundation for his opinions on telecommunication network options and their relative costs. Dr.

Wicker does not use exact numbers in his statements on relative cost, instead comparing the

networks' costs relative to other network options. (*See* D.I. 471, Exh. 14 at 71, 75 of 742). Dr.

Wicker's technical knowledge and expertise regarding telecommunication networks extends to

his opinions on the economic feasibility of different network options. The motion to exclude Dr.

Wicker's economic feasibility opinions is denied without prejudice. At trial Defendants may

object to questions that seek answers outside Dr. Wicker's expertise.

## V.   CONCLUSION

Defendants' motion for summary judgment (D.I. 466; No. 17-1736, D.I. 323; No. 18-361,

D.I. 271; No. 18-362, D.I. 293; No. 18-363, D.I. 269) is denied on all grounds. Defendants'

motion to exclude (D.I. 467; No. 17-1736, D.I. 320; No. 18-361, D.I. 268; No. 18-362, D.I. 292;

No. 18-363, D.I. 268) Dr. Mangum's report is granted to the extent that his hypothetical

negotiation royalty analysis relies on prior settlement agreements and jury verdicts. Defendants'

motion to exclude Dr. Wicker's "direction and control" opinions is granted. All Defendants'

other grounds to exclude Plaintiff's expert opinions are denied.